

FILED
1/26/2024
THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT

NF

# BEFORE THE UNITED STATES JUDICIAL PANEL
## ON MULTIDISTRICT LITIGATION

| | |
|---|---|
| IN RE: ORAL PHENYLEPHRINE MARKETING AND SALES PRACTICES LITIGATION | MDL No. 3089 |

## DEFENDANTS THE PROCTER & GAMBLE COMPANY, JOHNSON AND JOHNSON CONSUMER INC., AND HALEON US HOLDINGS LLC'S
## MOTION FOR TRANSFER PURSUANT TO 28 U.S.C. § 1407

Pursuant to 28 U.S.C. § 1407 and Rules 6.1, 6.2, and 7.1(b) of the Rules of Procedure of the Judicial Panel on Multidistrict Litigation (the "Panel"),[1] Defendants The Procter & Gamble Company, Johnson & Johnson Consumer Inc., and Haleon US Holdings LLC ("Defendants") respectfully move this Panel to transfer the actions listed in the attached Schedule and subsequent tag-along actions to the existing MDL No. 3089 in the Eastern District of New York.

As indicated in his proposed Case Management Order, Judge Cogan plans to have an early Case Management Conference this Spring, between March 15 and April 15, 2024. *See In re: Oral Phenylephrine Mktg. & Sales Pracs. Litig.*, Case No. 1:23-md-03089 (E.D.N.Y.), ECF No. 5. All parties would benefit from clarity as to whether the Maximum Strength Actions will be included in the MDL before that first Case Management Conference.

---

[1] Rule 7.1(b) of the Panel's Rules of Procedure notes that when "the Clerk of the Panel determines that a potential tag-along action is not appropriate for inclusion in an MDL proceeding and does not enter a CTO, an involved party may move for its transfer pursuant to Rule 6.1." As the Clerk of the Panel previously made that determination for certain of these actions, *see* ECF No. 338, Defendants move for transfer now.

Dated:   January 18, 2024

Respectfully submitted,

By: */s/ Andrew Soukup*
Andrew Soukup
COVINGTON & BURLING LLP
One CityCenter
850 Tenth Street, NW
Washington, DC 20001
Telephone: (202) 662-5066
asoukup@cov.com

*Counsel for Defendant The Procter &*
*Gamble Company*

*/s/ Jay P. Lefkowitz*
Jay P. Lefkowitz, P.C.
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, NY 10022
Tel: (212) 446-4800
Fax: (212) 446-6460
Email: lefkowitz@kirkland.com

*Counsel for Haleon US Holdings LLC f/k/a*
*GlaxoSmithKline Consumer Healthcare*
*Holdings (US) LLC*

*/s/ Hannah Y. Chanoine*
Hannah Y. Chanoine
O'MELVENY & MYERS LLP
7 Times Square
New York, NY 10036
Telephone: (212) 326-2128
hchanoine@omm.com

*Counsel for Defendant*
*Johnson & Johnson Consumer Inc.*

BEFORE THE UNITED STATES JUDICIAL PANEL
ON MULTIDISTRICT LITIGATION

| | |
|---|---|
| IN RE: ORAL PHENYLEPHRINE MARKETING AND SALES PRACTICES LITIGATION | MDL No. 3089 |

**DEFENDANTS THE PROCTER & GAMBLE COMPANY, JOHNSON AND JOHNSON CONSUMER INC., AND HALEON US HOLDINGS LLC'S MEMORANDUM IN SUPPORT OF MOTION FOR TRANSFER PURSUANT TO 28 U.S.C. § 1407**

When this Panel created an MDL consisting of consumer class actions based on the allegation that products containing phenylephrine do not work as advertised to relieve nasal congestion, it initially declined to include five cases challenging the "Maximum Strength" labeling of these products.[1]  That decision was "based on statements made at oral argument by counsel representing those plaintiffs," who told this Panel that they would "not litigate the efficacy of oral phenylephrine in their actions and, importantly, [] will amend their complaints to delete the allegations that refer to the alleged inefficacy of oral phenylephrine."  *In re Oral Phenylephrine Mktg. & Sales Pracs. Litig.*, 2023 WL 8538831, at *2–3 (J.P.M.L. Dec. 6, 2023); ECF No. 337 ("Transfer Order").

Counsel did not keep their word.  Instead, the Amended Complaints recently filed in *Tlaib*, *Tuominen*, and *Riccio v. Pfizer* ("*Riccio*") repeatedly allege that the "Maximum Strength" representations are misleading because phenylephrine is not as effective "when compared to other

---

[1] The Maximum Strength Actions are *Tuominen v. Johnson & Johnson Consumer, Inc.*, No. 1:23-cv-13796; *Tlaib v. Procter & Gamble Company*, No. 1:23-cv-13840; *Riccio v. Pfizer, Inc.*, 1:23-cv-13843; *Riccio v. Reckitt Benckiser Pharmaceuticals Inc.*, No. 1:23-cv-13879; and *Nitto v. CVS Pharmacy, Inc.*, No. 1:23-cv-13998.  All were filed in the Northern District of Illinois, and all have the same plaintiffs' counsel.  The original pleadings filed in each case were virtually identical (except for the product-specific information), and the Amended Complaints thus far in *Tlaib*, *Tuominen*, and *Riccio v. Pfizer* are also essentially identical.

over-the-counter nasal decongestants" available to consumers, and references to the "effectiveness" of the products are splattered throughout the new pleadings. *See Tlaib*, ECF No. 23 ("*Tlaib* Am. Compl."), ¶¶ 29–30; *Tuominen*, ECF No. 27 ("*Tuominen* Am. Compl."), ¶¶ 34–35; *Riccio*, ECF No. 28 ("*Riccio* Am. Compl."), ¶ 31–32. And while Plaintiffs stripped the Amended Complaints of their prior references to the FDA Advisory Committee Panel's findings about the efficacy of phenylephrine, they simply replaced those allegations with references to *the studies relied on* by the Advisory Committee. *Compare, e.g.*, *Tlaib* Am. Compl. ¶¶ 29–34, *Tuominen* Am. Compl. ¶¶ 34–39, and *Riccio* Am. Compl. ¶¶ 31–36, *with Tlaib*, ECF No. 1 ¶¶ 29–31, *Tuominen*, ECF No. 1 ¶¶ 27–29, and *Riccio*, ECF No. 1 ¶¶ 29–31. Contrary to Plaintiffs' counsel's earlier representation to this Panel, it will be impossible for these Maximum Strength Actions to proceed *without* "litigat[ing] the efficacy of oral phenylephrine." Transfer Order at *2.

Because the Amended Complaints confirm that the overlap of factual and legal issues between the MDL cases and the Maximum Strength Actions will not be "minimal," as this Panel was led to believe, it should transfer *Tlaib*, *Tuominen*, and *Riccio* to the MDL.[2] *Id.* The vast majority of the cases in the MDL involve similar allegations contrasting the efficacy of phenylephrine with that of other non-prescription nasal decongestants, and pseudoephedrine specifically.[3] The MDL also already includes a case involving similar "Maximum Strength"

---

[2] This motion seeks transfer only of the Maximum Strength Actions in which an Amended Complaint has been filed, namely *Tlaib*, *Tuominen*, and *Riccio v. Pfizer*. However, it is reasonable to assume that the forthcoming Amended Complaints in *Nitto* and *Riccio v. Reckitt Benckiser* will be substantially similar to those already filed, any in any event, no amendment can eliminate the numerous overlapping factual and legal questions between the cases in the MDL and the Maximum Strength Actions. Thus, transfer of all the Maximum Strength Actions is also appropriate.

[3] *See, e.g.*, *Adkins, et al. v. Reckitt Benckiser Pharmaceuticals Inc., et al.*, No. 2:23-cv-21051 (D.N.J.), ECF No. 1 ¶¶ 30, 37, excerpts attached as Exhibit A; *Anderson et al. v. The Procter & Gamble Company, et al.*, No. 2:23-cv-3899 (E.D. Pa.), ECF No. 1 ¶ 35 (same), excerpts attached as Exhibit B; *Barton, et al. v. Reckitt Benckiser LLC, et al.*, 2:23-cv-20370 (D.N.J.), ECF No. 1 ¶¶ 2, 28 (same), excerpts attached as Exhibit C; *Cronin v. Johnson & Johnson Consumer Inc., et* (continued…)

allegations.[4]  The Maximum Strength Actions and the other cases in the MDL will necessarily involve duplicative discovery.

There are additional reasons why these cases should be transferred.  Other plaintiffs in the MDL may still assert arguments related to "Maximum Strength" labeling to support claims that Defendants made false or misleading statements regarding the efficacy of oral phenylephrine, leading to overlapping discovery.  In addition, the MDL cases and Maximum Strength Actions all arise out of the same transaction or occurrence—a consumer's purchase of a product containing phenylephrine—and both seek to proceed on the same theory that consumers are entitled to either a full refund or a price premium.  As the Panel recognized, "the measure of any damages" is a "common factual question[]" for purposes of 28 U.S.C. § 1407.[5]  Transfer Order at *2.  Absent centralization, there is a risk of inconsistent or comparatively unfair damages determinations.

Any of these rationales justify including *Tlaib*, *Tuominen*, and *Riccio* in the MDL.  All of them together compel the conclusion that they all should be transferred to the MDL.

## ARGUMENT

### A.    The Maximum Strength Actions Still Hinge on the Efficacy of Oral Phenylephrine, Notwithstanding Plaintiffs' Contrary Representations.

It is undisputed that the Maximum Strength Actions initially included allegations challenging the efficacy of phenylephrine.  *See* November 30, 2023 Hearing Tr., 10:4-5, attached

---

*al.*, No. 2:23-cv-6870 (E.D.N.Y.), ECF No. 1 ¶ 38 (same), excerpts attached as Exhibit D.  *Barton* and *Cronin* were included in the Panel's original transfer order, and *Adkins* and *Anderson* were included in the Panel's December 7, 2023 Conditional Transfer Order.  *See* Transfer Order at *4; ECF No. 339 at 3–4.

[4] *See, e.g.*, *Noviskis v. Johnson & Johnson Consumer Inc., et al.*, No. 1:23-cv-13926 (N.D. Ill.), ECF No. 1 ¶¶ 41–42, attached as Exhibit E.  *Noviskis* was included in the Panel's December 7 Conditional Transfer Order.  *See* ECF No. 339 at 2.

[5] Defendants do not concede that the "common questions of fact" identified by the Panel under 28 U.S.C. § 1407 satisfy the requirements for certification under Federal Rule of Civil Procedure 23.

as Exhibit F (question from Judge Kennelly: "if efficacy isn't an issue, why is it mentioned in your complaint?"). In response to the Panel's questioning about these efficacy allegations, Plaintiffs' counsel in the Maximum Strength Actions told this Panel that any allegations regarding phenylephrine's efficacy "should[ not] be" in the complaints in the Maximum Strength Actions, that they "will not be" going forward, and that "[t]he discovery is going to be completely different." *Id.*, 9:3–18; 10:3–16. This Panel took counsel at their word and based its decision to exclude the Maximum Strength Actions from the MDL on the premise that these cases would not "litigate the efficacy of oral phenylephrine" and the amended complaints would omit "allegations that refer to the alleged inefficacy of oral phenylephrine." Transfer Order at *2. Because of these representations by counsel, the Panel concluded that the overlap between the Maximum Strength Actions and the MDL cases was "likely to be minimal." *Id.*

The Maximum Strength Plaintiffs have now amended their complaints, and despite their representations to the contrary, the alleged ineffectiveness of phenylephrine remains central to their theory of liability. For example, the Amended Complaints in *Tlaib*, *Tuominen*, and *Riccio* each mention phenylephrine more than 15 times and effectiveness or efficacy as to phenylephrine more than 10 times. *See Tlaib* Am. Compl. ¶¶ 2, 6, 9, 21, 27, 29, 30, 31, 32, 33, 34, 39, 46; *Tuominen* Am. Compl. ¶¶ 2, 9, 21, 28, 32, 34, 35, 36, 37, 38, 39, 40, 41, 46, 53; *Riccio* Am. Compl. ¶¶ 2, 6, 7, 8, 10, 21, 29, 31, 32, 33, 34, 35, 36, 41, 50. The Maximum Strength Plaintiffs assert, for example, that "maximum strength" representations are deceptive because "the active nasal decongestant ingredient, PE, was not as strong as other over-the-counter oral nasal decongestants available to consumers." *Tlaib* Am. Compl. ¶ 9; *Tuominen* Am. Compl. ¶ 9; *Riccio* Am. Compl. ¶ 10. "Thus, [the allegation continues] this maximum strength packaging is misleading because nasal decongestants that are actually stronger" than PE "are available over the counter." *E.g.,*

*Tlaib* Am. Compl. ¶ 10. And rather than remove allegations regarding the Advisory Committee's review of the efficacy of phenylephrine, the Amended Complaints simply conceal those allegations. Specifically, instead of directly discussing the Advisory Committee proceedings, as the cases in the MDL do and the Maximum Strength plaintiffs previously did, *see* Transfer Order at *2, the Amended Complaints cite a variety of studies assessing the effectiveness of phenylephrine. *See, e.g.*, *Tlaib* Am. Compl. ¶ 29, *Tuominen* Am. Compl. ¶ 34, *Riccio* Am. Compl. ¶ 31 (citing "[r]eliable scientific studies" that allegedly "undermine PE's effectiveness"); *Tlaib* Am. Compl. ¶ 30, *Tuominen* Am. Compl. ¶ 35, *Riccio* Am. Compl. ¶ 32 (referencing clinical studies "addressing PE's efficacy" and noting that "PE's effectiveness has been questioned"); and *Tlaib* Am. Compl. ¶ 33, *Tuominen* Am. Compl. ¶ 38, *Riccio* Am. Compl. ¶ 35 (noting that the alleged "ineffectiveness" of phenylephrine is because of its "poor bioavailability"). The Advisory Committee cited all of those studies in its briefing materials.[6] And Plaintiff Tuominen now alleges that the existence of these studies actually *proves* that the representations made by Defendants were false. *See Tuominen* Am. Compl. ¶ 40 (noting that Defendant Johnson & Johnson Consumer Inc. "knew or should have known of" the studies discussing PE's alleged ineffectiveness but made "maximum strength" representations "[n]onetheless"). The Amended Complaints also rely on the views of Leslie Hendeles and Randy Hatton, *see Tlaib* Am. Compl. ¶ 33 n.4, *Tuominen* Am. Compl. ¶ 38 n.4, *Riccio* Am. Compl. ¶ 35 n.6, the two pharmacists who petitioned the FDA to find phenylephrine ineffective and who have taken credit for the Advisory Committee's September

---

[6] *Compare Tlaib* Am. Compl. ¶ 34 n.5, *Tuominen* Am. Compl. ¶ 39 n.5, *Riccio* Am. Compl. ¶ 36 n.7 (citing Horak, F, et al., *A placebo-controlled study of the nasal decongestant effect of phenylephrine and pseudoephedrine in the Vienna Challenge Chamber*, Ann Allergy Asthma Immunol., 102(2):116-120 (Feb. 2009), *with* FDA Briefing Document, *Efficacy of Oral Phenylephrine as a Nasal Decongestant*, (Nonprescription Drug Ad. Comm. Meeting Sept. 11-12, 2023) at 28, 38, 39, 73 (discussing same), excerpts attached as Exhibit G.

2023 conclusion that agreed with them.[7]  Unsurprisingly, the Advisory Committee's briefing materials refer extensively to the research of Hendeles and Hatton.[8]

Far from ensuring that the alleged ineffectiveness of phenylephrine will "not be part" of these cases, *see* Ex. F, 9:6–8, the Maximum Strength Actions continue to seek to litigate that issue. While the Maximum Strength Plaintiffs now allege that phenylephrine is *less* effective than other decongestants, *see, e.g.*, *Tlaib* Am. Compl. ¶ 34, *Tuominen* Am. Compl. ¶ 39, *Riccio* Am. Compl. ¶ 36 (alleging that pseudoephedrine is "far more effective" as a decongestant than phenylephrine), and artfully avoid an unequivocal reference to the alleged "ineffectiveness" of phenylephrine, that is a distinction without a difference.  Whether styled as "not effective" or "less effective," one cannot answer the relevant question without assessing and litigating phenylephrine's efficacy.  To prove that phenylephrine is less effective than other decongestants, plaintiffs in the Maximum Strength Actions will need to prove how effective phenylephrine *is*.  And that question about the efficacy of phenylephrine is front and center in the MDL cases.  Thus, the MDL cases and the amended Maximum Strength Actions share an overlapping factual question that involves overlapping discovery, making transfer warranted.[9]

---

[7] *See* Randy Hatton, *How Two Pharmacists Figured Out That Decongestants Don't Work*, THE SCIENTIFIC AMERICAN, December 21, 2023, available online at https://www.scientificamerican.com/article/how-two-pharmacists-figured-out-that-decongestants-dont-work/ (last visited Jan. 16, 2024).

[8] Ex. G at 8, 21, 23–35, 73–76.

[9] That the Maximum Strength Actions also challenge acetaminophen dosages does not alter that conclusion.  *See, e.g.*, *In re Katz Interactive Call Processing Pat. Litig.*, 481 F. Supp. 2d 1353, 1355 (J.P.M.L. 2007) ("Transfer under Section 1407 does not require a complete identity or even a majority of common factual or legal issues as a prerequisite to transfer."); *In re Deep Vein Thrombosis Litig.*, 323 F. Supp. 2d 1378, 1380 (J.P.M.L. 2004) (ordering centralization because of overlap in "core questions" notwithstanding "differences among the . . . legal theories of recovery and/or types of injury alleged").

**B.** **The MDL Already Contains a "Maximum Strength" Case and Cases Comparing the Effectiveness of Phenylephrine With Pseudoephedrine.**

There are other grounds for transferring *Tlaib*, *Tuominen*, and *Riccio* to the MDL.

To start, there are already cases in the MDL that contain "Maximum Strength" allegations. At the hearing, counsel for the original Movants told the Panel that he was unaware of any cases raising efficacy allegations *and* "Maximum Strength" allegations. *See* Ex. F, 6:25–7:22.[10] That was incorrect. The *Noviskis* lawsuit, originally filed in the Northern District of Illinois and since centralized into the MDL, raises both "Maximum Strength" allegations and allegations regarding the efficacy of oral phenylephrine. *See, e.g.*, *Noviskis*, Ex. E ¶¶ 5, 35 (alleging that Defendants' products containing oral phenylephrine are "not effective and lack[] efficacy" and citing FDA panel's view that oral phenylephrine is ineffective); ¶¶ 41–42 (alleging that Defendants' "Maximum Strength" representations are false and misleading in part because of oral phenylephrine's alleged ineffectiveness); ¶¶ 63–64 (alleging that Defendants' representation that their products containing oral phenylephrine are "Maximum Strength" is deceptive). Counsel for the *Noviskis* plaintiff always supported the inclusion of that action in the MDL, arguing that *Noviskis* and the other phenylephrine cases present "nearly identical issues of law and fact." *In re: Oral Phenylephrine Mktg. & Sales Pracs. Litig.*, ECF No. 252 at 1. There is no meaningful distinction between the "Maximum Strength" allegations in the *Noviskis* complaint and the Maximum Strength Actions. Given the inclusion of *Noviskis* in the MDL and the focus in the amended Maximum Strength Actions on the effectiveness of phenylephrine, "the factual overlap

---

[10] The original Movants tagged one of the Maximum Strength Actions, *Tuominen v. Johnson & Johnson Consumer, Inc.*, for inclusion in this MDL in their motion to transfer. *See* ECF No. 2 at 4. Those Movants' position at the hearing that the Maximum Strength Actions should not be included in the MDL was thus a reversal of their original position. *See* Ex. F, 6:25–7:13.

between the Maximum Strength actions and the actions in the MDL" is far more than "minimal." *Cf* Transfer Order at *2.

Moreover, the vast majority of cases in the MDL compare the efficacy of phenylephrine to pseudoephedrine, as in the Maximum Strength Actions. *See, e.g.*, *Noviskis*, Ex. E, ¶ 31 (relying on studies alleging pseudoephedrine is more effective as a decongestant than phenylephrine to argue phenylephrine is ineffective); *Adkins*, Ex. A, ¶¶ 30, 37 (same); *Anderson*, Ex. B, ¶ 35 (same); *Barton*, Ex. C, ¶¶ 2, 28 (same); *Cronin*, Ex. D, ¶ 38 (same). This is yet another overlapping question that militates in favor of transfer.

### C. The MDL Will Likely Present Questions and Involve Discovery Relevant to "Maximum Strength" Issues.

The MDL already is likely to present questions regarding "Maximum Strength" representations and, should the cases proceed to discovery, would involve similar discovery regarding such representations. For example, plaintiffs in many of the MDL cases are challenging products that contain "Maximum Strength" labeling and may point to the "Maximum Strength" representations to argue the labeling was false, deceptive, or misleading because oral phenylephrine is allegedly ineffective or less strong than other options. *See, e.g.*, *Lee, et al. v. The Procter & Gamble Company, et al.*, No. 2:23-cv-21126 (D.N.J.), ECF No. 1, ¶¶ 19, 28, 31 (challenging "Maximum Strength" products and pointing to "MAX STRENGTH" representations as an "implied message" of phenylephrine's effectiveness), excerpts attached as Exhibit H; *Fong v. Johnson & Johnson Consumer Inc., et al.*, No. 2:23-cv-02430 (D. Kan.), ECF No. 1 ¶¶ 31.d, 32.b, 33.c (challenging "Maximum Strength" claims), excerpts attached as Exhibit I; *Wilson v. Johnson & Johnson Consumer, Inc., et al.*, 2:23-cv-21276 (D.N.J.), ECF No. 1 ¶¶ 34, 36-40, 47, 50 (same), excerpts attached as Exhibit J. These cases therefore present further overlapping factual questions and discovery with the Maximum Strength Actions.

**D.  Damages Is a Common Question of Law That Cuts Across the MDL and the Maximum Strength Actions.**

The Maximum Strength Actions and the MDL also present cross-cutting damages issues. The Panel has already identified "the measure of any damages" as a "common factual question[]" supporting creation of the MDL.  Transfer Order at *2.  By definition, every member of the putative classes in the Maximum Strength Actions (including the named plaintiffs) is also a member of the putative classes in the MDL, as the products challenged in the Maximum Strength Actions all contain phenylephrine.  *See, e.g.*, *Tlaib* Am. Compl. ¶ 2 (all of the challenged products contain phenylephrine); *Tuominen* Am. Compl. ¶ 2 (same); *Riccio* Am. Compl. ¶ 2 (same).  Plaintiffs in both sets of cases likely will contend that damages should be measured by (1) the purchase price of the product, as in a full refund model; or (2) a price premium attributable to the claim that the products treat nasal congestion.  *See, e.g.*, *Tlaib* Am. Compl. ¶¶ 25, 39, 69 (alleging that plaintiffs paid a premium based on alleged misrepresentations and "would not have purchased the Products or would have paid less" for them but for the alleged misrepresentations); *Tuominen* Am. Compl. ¶¶ 28, 45, 75 (same); *Riccio* Am. Compl. ¶¶ 27, 40, 73 (same).  The cases thus present overlapping factual damages questions, which could be more efficiently addressed in a single centralized proceeding. *See In re Proven Networks, LLC, Patent Litig.*, 492 F. Supp. 3d 1338, 1340 (J.P.M.L. 2020) (centralizing cases in part based on common damages issues).

Separate litigation also poses a risk of inconsistent rulings or an inappropriate windfall recovery.  For example, in their current procedural posture, courts could reach conflicting conclusions about the appropriate measure of damages, which could result in putative class members impermissibly receiving a windfall (if the damages awards exceed the price paid to purchase the product) or recovering twice for the same injury.  The Panel has centralized cases before to avoid this issue, and it should do so here as well.  *See In re Antibiotic Drugs*, 309 F.

9

Supp. 155, 157 (J.P.M.L. 1970) (transferring action in part to "eliminate possible overlapping recoveries based on the same purchases"); *see also, e.g.*, *General Tel. Co. of the Nw. v. EEOC*, 446 U.S. 318, 333 (1980) ("It also goes without saying that the courts can and should preclude double recovery by an individual.").

* * *

At bottom, the Amended Complaints in *Tlaib*, *Tuominen*, and *Riccio* confirm that, far from "minimal," there is in fact *substantial* factual and legal overlap between the Maximum Strength Actions and the MDL actions. The Panel should accordingly grant this Motion and transfer those cases into the MDL.

Dated:    January 18, 2024                    Respectfully submitted,

By: */s/ Andrew Soukup*
Andrew Soukup
COVINGTON & BURLING LLP
One CityCenter
850 Tenth Street, NW
Washington, DC 20001
Telephone: (202) 662-5066
asoukup@cov.com

*Counsel for Defendant The Procter &*
*Gamble Company*

*/s/ Jay P. Lefkowitz*
Jay P. Lefkowitz, P.C.
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, NY 10022
Tel: (212) 446-4800
Fax: (212) 446-6460
Email: lefkowitz@kirkland.com

*Counsel for Haleon US Holdings LLC f/k/a*
*GlaxoSmithKline Consumer Healthcare*
*Holdings (US) LLC*

10

*/s/ Hannah Y. Chanoine*
Hannah Y. Chanoine
O'MELVENY & MYERS LLP
7 Times Square
New York, NY 10036
Telephone: (212) 326-2128
hchanoine@omm.com

*Counsel for Defendant*
*Johnson & Johnson Consumer Inc.*

## BEFORE THE UNITED STATES JUDICIAL PANEL
## ON MULTIDISTRICT LITIGATION

| IN RE: ORAL PHENYLEPHRINE MARKETING AND SALES PRACTICES LITIGATION | MDL No. 3089 |
|---|---|

## SCHEDULE OF ACTIONS

| Case Title | Case No. | Court | Judge | Plaintiff | Defendant |
|---|---|---|---|---|---|
| *Mohamad Tlaib v. Procter & Gamble Company* | 1:23-cv-13840 | Northern District of Illinois (Eastern Division) | Judge Franklin U. Valderrama | Mohamad Tlaib | The Procter & Gamble Company |
| *Tina Tuominen v. Johnson & Johnson Consumer, Inc.* | 1:23-cv-13796 | Northern District of Illinois (Eastern Division) | Judge Nancy L. Maldonado | Tina Tuominen | Johnson & Johnson Consumer Inc. |
| *Rose Riccio v. Pfizer, Inc.* [1] | 1:23-cv-13843 | Northern District of Illinois (Eastern Division) | Judge Joan B. Gottschall | Rose Riccio, Paul Mateer, and William Mitchell | Haleon US Holdings LLC |

---

[1] The Amended Complaint is styled as *Rose Riccio, Paul Mateer and William Mitchell v. Haleon US Holdings LLC d/b/a Haleon*.

## BEFORE THE UNITED STATES JUDICIAL PANEL
## ON MULTIDISTRICT LITIGATION

| |
|---|
| **IN RE: ORAL PHENYLEPHRINE MARKETING AND SALES PRACTICES LITIGATION** |

**MDL No. 3089**

## CERTIFICATE OF SERVICE

I, Andrew Soukup, counsel for Defendant The Procter & Gamble Company, hereby certify that on January 18, 2024 on behalf of Defendants The Procter & Gamble Company, Johnson & Johnson Consumer Inc., and Haleon US Holdings LLC, I caused the foregoing Motion for Transfer, Brief in Support, Exhibits, Schedule of Actions, and this Certificate of Service to be electronically filed with the Clerk of the Panel using the CM/ECF system, which constitutes service of pleadings on registered CM/ECF participants via this Panel's ECF filing system pursuant to Rule 4.1(a) of the Rules of Procedure of the United States Judicial Panel on Multidistrict Litigation.  I further will cause the foregoing documents to be served on the following:

**Clerk of Court, U.S. District Court for the Northern District of Illinois (Eastern Division)**
(via Certified Mail)
Everett McKinley Dirksen United States Courthouse
219 South Dearborn Street
Chicago, IL 60604

***Mohamad Tlaib v. Procter & Gamble Co.*, Case No. 1:23-cv-13840 (N.D. Ill.)** (via Email)

Nick Suciu III
MILBERG COLEMAN BRYSON PHILLIPS GROSSMAN, PLLC
6905 Telegraph Rd., Suite 115
Bloomfield Hills, MI 48301
Telephone: (313) 303-3472
Email: nsuciu@milberg.com

Gary M. Klinger
MILBERG COLEMAN BRYSON PHILLIPS GROSSMAN, PLLC
227 W. Monroe Street, Suite 2100
Chicago, IL 60606

Telephone: (866) 252-0878
Email: gklinger@milberg.com

Jeff Ostrow
Jonathan M. Streisfeld
Kristen Lake Cardoso
KOPELOWITZ OSTROW P.A.
One West Las Olas Blvd., Suite 500
Fort Lauderdale, Florida 33301
Telephone: (954) 525-4100
Email: ostrow@kolawyers.com
streisfeld@kolawyers.com
cardoso@kolawyers.com

Melissa S. Weiner
Ryan J. Gott
PEARSON WARSHAW, LLP
328 Barry Avenue South, Suite 200
Wayzata, Minnesota 55391
Telephone: (612) 389-0600
Email: mweiner@pwfirm.com
rgott@pwfirm.com

Erin Ruben
MILBERG COLEMAN BRYSON
PHILLIPS GROSSMAN PLLC
900 W. Morgan Street
Raleigh, NC 27603
Telephone: (919) 600-5000
Email: eruben@milberg.com

J. Hunter Bryson
MILBERG COLEMAN BRYSON
PHILLIPS GROSSMAN, PLLC
405 E 50th Street
New York, NY 10022
Telephone: (630) 796-0903
Email: hbryson@milberg.com

**Counsel for Plaintiff: Mohamad Tlaib**

***Tina Tuominen v. Johnson & Johnson Consumer, Inc.*, Case No. 1:23-cv-13796 (N.D. Ill.)**
(via Email)

Nick Suciu III
MILBERG COLEMAN BRYSON PHILLIPS GROSSMAN, PLLC

6905 Telegraph Rd., Suite 115
Bloomfield Hills, MI 48301
Telephone: (313) 303-3472
Email: nsuciu@milberg.com

Gary M. Klinger
MILBERG COLEMAN BRYSON PHILLIPS GROSSMAN, PLLC
227 W. Monroe Street, Suite 2100
Chicago, IL 60606
Telephone: (866) 252-0878
Email: gklinger@milberg.com

Jeff Ostrow
Jonathan M. Streisfeld
Kristen Lake Cardoso
KOPELOWITZ OSTROW P.A.
One West Las Olas Blvd., Suite 500
Fort Lauderdale, Florida 33301
Telephone: (954) 525-4100
Email: ostrow@kolawyers.com
streisfeld@kolawyers.com
cardoso@kolawyers.com

Melissa S. Weiner
Ryan J. Gott
PEARSON WARSHAW, LLP
328 Barry Avenue South, Suite 200
Wayzata, Minnesota 55391
Telephone: (612) 389-0600
Email: mweiner@pwfirm.com
rgott@pwfirm.com

Erin Ruben
MILBERG COLEMAN BRYSON
PHILLIPS GROSSMAN PLLC
900 W. Morgan Street
Raleigh, NC 27603
Telephone: (919) 600-5000
Email: eruben@milberg.com

J. Hunter Bryson
MILBERG COLEMAN BRYSON
PHILLIPS GROSSMAN, PLLC
405 E 50th Street
New York, NY 10022
Telephone: (630) 796-0903

3

Email: hbryson@milberg.com

**Counsel for Plaintiff: Tina Tuominen**

***Rose Riccio v. Pfizer, Inc.*, Case No. 1:23-cv-13843 (N.D. Ill.)** (via Email)

Nick Suciu III
MILBERG COLEMAN BRYSON PHILLIPS GROSSMAN, PLLC
6905 Telegraph Rd., Suite 115
Bloomfield Hills, MI 48301
Telephone: (313) 303-3472
Email: nsuciu@milberg.com

Gary M. Klinger
MILBERG COLEMAN BRYSON PHILLIPS GROSSMAN, PLLC
227 W. Monroe Street, Suite 2100
Chicago, IL 60606
Telephone: (866) 252-0878
Email: gklinger@milberg.com

Jeff Ostrow
Jonathan M. Streisfeld
Kristen Lake Cardoso
Daniel Tropin
KOPELOWITZ OSTROW P.A.
One West Las Olas Blvd., Suite 500
Fort Lauderdale, Florida 33301
Telephone: (954) 525-4100
Email: ostrow@kolawyers.com
streisfeld@kolawyers.com
cardoso@kolawyers.com

Melissa S. Weiner
Ryan J. Gott
PEARSON WARSHAW, LLP
328 Barry Avenue South, Suite 200
Wayzata, Minnesota 55391
Telephone: (612) 389-0600
Email: mweiner@pwfirm.com
rgott@pwfirm.com

Erin Ruben
MILBERG COLEMAN BRYSON
PHILLIPS GROSSMAN PLLC
900 W. Morgan Street
Raleigh, NC 27603

Telephone: (919) 600-5000
Email: eruben@milberg.com

J. Hunter Bryson
MILBERG COLEMAN BRYSON
PHILLIPS GROSSMAN, PLLC
405 E 50th Street
New York, NY 10022
Telephone: (630) 796-0903
Email: hbryson@milberg.com

Karl Amelchenko
MILBERG COLEMAN BRYSON
PHILLIPS GROSSMAN, PLLC
900 W. Morgan Street
Raleigh, NC 27603
Telephone: (919) 600-5000
Email: kamelchenko@milberg.com

Jimmy Mintz
MILBERG COLEMAN BRYSON
PHILLIPS GROSSMAN, PLLC
201 Sevilla Ave., 2nd Floor
Coral Gables, FL 33134
Telephone: (786) 876-8200
Email: jmintz@milberg.com

**Counsel for Plaintiffs: Rose Riccio, Paul Mateer, and William Mitchell**

Dated:    January 18, 2024                    Respectfully submitted,

By: */s/ Andrew Soukup*
Andrew Soukup
COVINGTON & BURLING LLP
850 Tenth Street, NW
Washington, DC 20001
Telephone: (202) 662-5066
asoukup@cov.com

*Counsel for Defendant*
*The Procter & Gamble Company*

# Complaint, Amended Complaint, and Docket Sheet for *Tlaib v. Procter & Gamble Company*

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| MOHAMAD TLAIB, on behalf of himself and all others similarly situated,<br><br>  Plaintiff,<br><br>v.<br><br>PROCTER & GAMBLE COMPANY,<br><br>Defendant. | **CLASS ACTION COMPLAINT**<br>**JURY TRIAL DEMANDED**<br><br>Case No.: |

Plaintiff, Mohamad Tlaib, on behalf of himself and all others similarly situated, brings this class action against Defendant, Procter & Gamble Company ("Defendant" or "P&G"), and alleges on personal knowledge, investigation of counsel, and on information and belief as follows:

## GENERAL ALLEGATIONS

1.  P&G offers a variety of non-prescription drugs, including oral nasal decongestants, competing in a billion-dollar industry. Such products include the over-the-counter oral nasal decongestants "Vicks DayQuil Severe Cold & Flu" and "Vicks NyQuil Severe Cold & Flu" (collectively, "Products" or "Vicks PE Products"). These Products are phenylephrine hydrochloride ("PE") nasal decongestant and acetaminophen pain relief pills marketed as "MAX STRENGTH" relief for "Nasal Congestion," "Sinus Pressure," "Headache," "Fever," and "Minor Aches and Pains."

2.  The active decongestant ingredient in the Products is phenylephrine hydrochloride, which the weight of the reliable scientific evidence, as recently unanimously confirmed by a Food and Drug Administration ("FDA") committee, has determined to be no more effective as a nasal

decongestant than a placebo.

3.      When consumers purchase decongestants and pain relief pills, the strength of the ingredients are important purchasing considerations, especially for consumers seeking a "MAX STRENGTH" product.

4.      P&G takes advantage of this consumer preference for strong relief by prominently representing the alleged strength of the Vicks PE Products in the one place every consumer looks when purchasing a product—the front packaging.

5.      On each product package for "Vicks DayQuil Severe Cold & Flu," P&G touts in capitalized, green font set against a yellow background, at the top of the package, that it includes a decongestant providing "MAX STRENGTH" relief for "Nasal Congestion," and "Sinus Pressure" and also misleadingly touts "MAX STRENGTH" as to their other active ingredient, acetaminophen, as a pain reliever:



P&G's related "Vicks NyQuil Severe Cold & Flu" has a substantially similar package, with the "MAX STRENGTH" claim:



6.     By portraying the Vicks PE Products as "MAX STRENGTH" decongestants, P&G misleads consumers into believing their ingredients are suited to providing the strongest decongestant relief available over the counter.

7.     Despite marketing these Products as "MAX STRENGTH," P&G knew the active nasal decongestant ingredient, phenylephrine hydrochloride, was not as strong as other decongestants available without a prescription. Indeed, studies have shown phenylephrine

hydrochloride is no more effective than a placebo. Additionally, the Vicks PE Products do not even contain the maximum dosage of acetaminophen, and are thus not deserving of the "MAX STRENGTH" label and representation.

8.      Thus, the "MAX STRENGTH" packaging is misleading because nasal decongestants that are actually effective—without the "MAX STRENGTH" claim—are available. For example, both oxymetazoline and pseudoephedrine are both available without a prescription, and the former may be purchased over the counter.

Further, P&G knew that higher doses of acetaminophen exist on the market. The Court need look no further than the common manufacturing and marketing acetaminophen as "Regular Strength" for 325 mg and "Extra Strength" for 500 mg capsules, tablets, and gelcaps, taken, as with the Vicks PE Products, in dosages of two each.

9.      Despite this knowledge, P&G chose to mislead consumers through its promotion of the Products as "MAX STRENGTH" decongestants and pain relievers. However, none of the Products are "MAX STRENGTH." Consumers, including Plaintiff, lack the scientific knowledge necessary to determine whether the Products are "MAX STRENGTH" decongestants and/or pain relievers, or to ascertain the true quality or strength of these Products. For that reason, reasonable consumers must and do rely on manufacturers, including P&G, to be honest and transparent and to properly disclose on the packaging all material information regarding the Products and the dosage.

10.     Rather than being honest and transparent, P&G makes this "MAX STRENGTH" representation in a knowingly false, misleading, and deceptive manner.

11.     For all the reasons set forth herein, including but not limited to P&G's misrepresentations and omissions regarding its "MAX STRENGTH" claims, Plaintiff seeks relief

4

in this action individually, and as a class action on behalf of similarly situated purchasers of P&G's

PE Products, for: (1) violation of state consumer protection laws and (2) unjust enrichment.

## THE PARTIES

12.     Plaintiff is a citizen of Illinois, residing in Cook County. He purchased the "Vicks

"Vicks Nyquil Severe Cold and Flu" within the applicable statute of limitations period, most

recently in November 2022 at a Walgreens near his home in Orland Hills, Illinois.

13.     P&G is a corporation with its headquarters and principal place of business in Ohio.

## JURISDICTION AND VENUE

16.      This Court has personal jurisdiction over P&G in this matter. The acts and

omissions giving rise to this action occurred in the state of Illinois. P&G has been afforded due

process because it has, at all times relevant to this matter, individually or through its agents,

subsidiaries, officers and/or representatives, operated, conducted, engaged in and carried on a

business venture in this state and/or maintained an office or agency in this state, and/or marketed,

advertised, distributed and/or sold the Products in this state, committed a statutory violation within

this state related to the allegations made herein, and caused injuries to Plaintiff and the putative

class members, which arose out of the acts and omissions that occurred in the state of Illinois,

during the relevant time period, at which time P&G was engaged in business activities in the state

of Illinois.

17.     This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C.§

1332 of the Class Action Fairness Act of 2005 because: (i) there are 100 or more putative class

members, (ii) the aggregate amount in controversy exceeds $5,000,000, exclusive of interest and

costs, and (iii) there is minimal diversity because at least one Plaintiff and P&G are citizens of

different states.

18.     Pursuant to 28 U.S.C. § 1391(a), venue is proper because a substantial part of the events giving rise to the claims asserted occurred in this District. Venue is also proper pursuant to 28 U.S.C. § 1391(c) because P&G conducts substantial business in this District, has sufficient minimum contacts with this District, and otherwise purposely avails itself of the markets in this District, through the promotion, sale, and marketing of the Vicks PE Products in this District. Furthermore, Plaintiff resides in this District.

## FACTS COMMON TO ALL CLASS MEMBERS

20.     P&G is one of the largest drug manufacturing companies in the world. As such, P&G sells several OTC drugs, including the "Vicks" branded line of products.

21.     Phenylephrine hydrochloride is the active ingredient in P&G's Vicks PE Products for nasal decongestion. Acetaminophen is the active ingredient in the Vicks PE Products that are the subject of this action as a pain reliever. Both form the basis for P&G's "MAX STRENGTH" misrepresentations on the Products' packaging, and overall advertising and marketing campaign.

22.     At all relevant times, P&G has marketed the Products in a consistent and uniform manner nationwide.

23.     As alleged above, the Vicks PE Products represent that they are "MAX STRENGTH" relief for "Nasal Congestion," "Sinus Pressure," "Headache," "Fever," and "Minor Aches and Pains," with representations that predominately appear on the front label of the Products in capitalized, bold, green lettering on a yellow background that contrasts with the packaging. This instantly catches the eye of all reasonable consumers, including Plaintiff and class members.

24.     P&G repeats and expands on these "MAX STRENGTH" misrepresentations on its website. For "Vicks NyQuil Severe Cold & Flu," P&G asserts:

"**Just one dose** starts working fast to relieve 9 of your worst cold and flu symptoms. Vicks NyQuil SEVERE provides fast, powerful, **maximum strength 9-symptom**

6

**relief** to treat coughing, sneezing, **stuffy nose**, **minor body pain**, **sinus congestion, sinus pressure**, sore throat, **headache**, and **fever**. Use when you need fast, nighttime relief for your ugliest, roughest, toughest cold symptoms so you can rest. **Nothing works faster**."

https://vicks.com/en-us/shop-products/nyquil/nyquil-severe-cold-and-flu-relief-liquid  (emphasis added). As for "Vicks DayQuil Severe Cold & Flu," P&G's website makes near-identical claims about its alleged "maximum strength" relief for decongestion, using "just one dose":

When a cold comes on strong, knock it out with Vicks DayQuil SEVERE Cold & Flu LiquiCaps™. **Just one dose** starts working fast to relieve 9 of your worst cold and flu symptoms. Vicks DayQuil SEVERE provides fast, powerful, **maximum strength 9-symptom relief** to treat coughing, stuffy nose, **minor body pain**, chest congestion**, sinus congestion, sinus pressure**, sore throat, **headache**, and **fever**. Use when you need fast, non-drowsy daytime relief for your roughest, toughest cold symptoms so you can get on with your day.

https://vicks.com/en-us/shop-products/dayquil/dayquil-severe-cough-cold-flu-daytime-relief-liquicaps-16ct (emphasis added).

25.     A reasonable consumer would understand that "MAX STRENGTH" relief for "Nasal Congestion" means the Vicks PE Products contained the strongest  nasal decongestant available on the over-the-counter market, as well as the strongest dose of acetaminophen for "minor body pain," "headache," and "fever."

26.     All reasonable consumers, including Plaintiff, read and relied on P&G's "MAX STRENGTH" representations when purchasing the Products. Indeed, when purchasing pharmaceuticals, especially those promising to be "MAX STRENGTH," consumers often look for a product with the strongest active ingredients and are willing to pay a premium for them.

27.     P&G's "MAX STRENGTH" representation was material to Plaintiff's and class members' decision to purchase the Vicks PE Products. Had consumers, such as Plaintiff, known the Vicks PE Products were not "MAX STRENGTH" relief for "Nasal Congestion," "Sinus Pressure," "Headache," "Fever," and "Minor Aches and Pains," they would not have purchased

them or would have paid less. Indeed, the only reason consumers purchase pharmaceuticals is for their advertised therapeutic effect. They want relief from their cold symptoms, and in this case, the Plaintiff and the Class members purchased "MAX STRENGTH" Products based on P&G's false representations and omissions.

28.     P&G's marketing efforts are made in order to—and do in fact—induce consumers to purchase the Vicks PE Products at a premium because consumers believe they are getting "MAX STRENGTH" decongestants. This deceives consumers because they are not informed that phenylephrine hydrochloride nasal decongestants are inferior to other, available decongestants.

29.     P&G, however, has at all relevant times been well aware that its PE Products are not "MAX STRENGTH" nasal decongestants, and that other, stronger decongestants are available.

30.     Starting in December 2007, the FDA convened a Nonprescription Drugs Advisory Committee ("NDAC") meeting to address questions about phenylephrine's purported effectiveness. On September 11 and 12, 2023, an advisory panel of the FDA met again to present its findings on scientific literature presented as to the effectiveness of phenylephrine hydrochloride (referred to by the FDA as "PE") as an oral nasal decongestant. The panel found: "[W]e have now come to the initial conclusion that orally administered PE is not effective as a nasal decongestant at the monographed dosage (10 mg of PE hydrochloride every 4 hours) as well as at doses up to 40 mg (dosed every 4 hours)."

31.     In 2015, in a well-publicized fashion, further independent research was submitted to the FDA requesting the PE be reclassified as not effective as a nasal decongestant.

32.     As a leading manufacturer of phenylephrine hydrochloride oral nasal decongestants, P&G knew or should have known of the same scientific literature reviewed by the FDA. Nonetheless, it represents that the Vicks PE Products are "MAX STRENGTH." This is

particularly misleading because there exist other non-prescription nasal decongestants, which contain effective active ingredients, such as pseudoephedrine, which are not marketed as "MAX STRENGTH" relief for "Nasal Congestion" and "Sinus Pressure." Accordingly, consumers are induced into purchasing the Vicks PE Products, based on the "MAX STRENGTH" representation, when comparing it to competing nasal decongestants.

Nonetheless, because the PE Products contain phenylephrine as the only active oral nasal decongestant ingredient, for that reason alone they are not "MAX STRENGTH" relief for "Nasal Congestion" and "Sinus Pressure." Phenylephrine is not the "MAX STRENGTH" nasal decongestant allowable over-the-counter. Even Defendant offers decongestants with higher strength active decongestant ingredients.

33.     Further, the "MAX STRENGTH" relief representation is misleading for another reason. As the back label of the "Vicks DayQuil Severe Cold & Flu" package discloses, the only active ingredient for the dosage of the pain reliever/fever reducer agent, acetaminophen, is only 325 mg per LiquiCap, well below the maximum dosage offered by other pain relief drugs available:



34. P&G repeats the same dosage-related misrepresentations on the package for "Vicks DayQuil Severe Cold & Flu." Despite claiming to provide "MAX STRENGTH" relief for "Headache," "Fever," and "Minor Aches and Pains" on the front of the package, , the back of the package shows the only pain relief ingredient is 325 mg of acetaminophen per LiquiCap, which is well below the dosage available from other over-the-counter products:



35. At any rate, because the Vicks PE Products contain phenylephrine as the only active oral nasal decongestant ingredient, they are not "MAX STRENGTH" relief for "Nasal Congestion" and "Sinus Pressure." Phenylephrine is not the "MAX STRENGTH" nasal decongestant available over the counter.

36. P&G intended for Plaintiff and class members to be deceived or mislead by its

10

misrepresentations and omissions. Indeed, label space is limited, so manufacturers only place the most pertinent information on the front label. Defendant specifically labeled and marketed the Vicks PE Products as "MAX STRENGTH" relief for "Nasal Congestion" and "Sinus Pressure" when other oral nasal decongestants were not marketed in a similar fashion.

37.     P&G's deceptive and misleading practices proximately caused harm to Plaintiff and the Classes.

38.     Plaintiff and class members would not have purchased the Vicks PE Products or would have paid less for them, had they known the truth about the mislabeled and falsely advertised products. Indeed, other stronger nasal decongestants and higher acetaminophen doses are available.

## PLAINTIFF'S FACTUAL ALLEGATIONS

39.     Plaintiff relied on the "MAX STRENGTH" label in deciding to purchase what he believed to be the strongest nasal decongestant. Had Plaintiff known that phenylephrine—the only active oral nasal decongestant ingredient in the Vicks PE Products is not the "MAX STRENGTH" nasal decongestant allowable over the counter, he would not have purchased them.  Further, had he known the acetaminophen in Vicks PE Products was not the maximum dosage available, he would not have purchased it.

40.     Plaintiff is a citizen of Illinois, residing in Cook County. Throughout the relevant period, Plaintiff purchased the Product at issue in this lawsuit and was exposed to, and reasonably relied upon, P&G's "MAX STRENGTH" representations. Specifically, Plaintiff purchased  the "Vicks NyQuil Severe Cold and Flu" within the applicable statute of limitations period, most recently in November of 2022 from a Walgreens located at 8400 171st St, Tinley Park, Illinois 60487. At the time of purchase, Plaintiff reviewed the Product packaging, including the front-label

11

representations, and reasonably believed from these representations that the Products were "MAX STRENGTH." In reasonable reliance on these representations, Plaintiff paid an increased cost for the Products, which were worth less than represented because the statements were not true and were highly misleading. The "MAX STRENGTH" representation on the Products' packaging, was part of the basis of the bargain in that Plaintiff attributed value to those representations and Plaintiff would not have purchased the Products, or would not have purchased them on the same terms, if he knew the "MAX STRENGTH" representations were untrue and/or misleading. Plaintiff paid a price premium for empty promises that P&G did not keep. Had Plaintiff been aware that the "MAX STRENGTH" representations made by P&G on the Products was untrue, he would have paid less for the Products, or would not have purchased them at all.

## FED. R. CIV. P. 9(B) ALLEGATIONS

41.     P&G made material misrepresentations and/or omissions of fact in its labeling and marketing of the Vicks PE Products by representing that they are "MAX STRENGTH" decongestant and pain relief products.

42.     P&G's alleged conduct was and continues to be fraudulent because it has the effect of deceiving consumers into believing that the Vicks PE Products are "MAX STRENGTH" oral nasal decongestant products. P&G omitted from Plaintiff and class members that the Vicks PE Products are not "MAX STRENGTH" oral nasal decongestant products because other decongestant products exist in the market that are stronger as decongestants. P&G knew or should have known this information is material to all reasonable consumers and impacts consumers' purchasing decisions. Yet, P&G has and continues to represent that the Vicks PE Products are "MAX STRENGTH" oral nasal decongestant products when they are not, and has omitted from the Vicks PE Products' packaging the fact that there are other non-prescription products that are

stronger decongestants. So too with respect to P&G's misrepresentations that the Vicks PE Products are "MAX STRENGTH" with respect to pain relief, even though their acetaminophen content is only regular strength.

43.     P&G made material misrepresentations and/or omissions detailed herein, including that the Vicks PE Products are "MAX STRENGTH" oral nasal decongestant and pain reliever products, continuously throughout the applicable class period(s).

44.     P&G's material misrepresentations and omissions, that the Vicks PE Products are "MAX STRENGTH" oral nasal decongestant and pain reliever products, were located on the front label of the Vicks PE Products in capitalized bold, green lettering on a yellow background that contrasts with the packaging, which instantly catches the eye of all reasonable consumers, including Plaintiff and Class members, at the point of sale in every transaction. The PE Products are sold in brick-and-mortar stores and online stores in Illinois and nationwide.

45.     P&G made written misrepresentations of fact on the front label of the Vicks PE Products that the Vicks PE Products were "MAX STRENGTH" oral nasal decongestant products, even though other stronger decongestant products are available over the counter. As such, P&G's "MAX STRENGTH" representations are false and misleading. Moreover, P&G omitted from the Vicks PE Products' labeling the fact that there are other non-prescription products available that are stronger decongestants and pain relievers. And as alleged in detail throughout this Complaint, Plaintiff and Class members read and relied on P&G's "MAX STRENGTH" representations and omissions before purchasing the Vicks PE Products.

46.     P&G misrepresented its PE Products as being "MAX STRENGTH" decongestant products and omitted from the Vicks PE Products' labeling the fact that there are other, non-prescription products available that are stronger decongestants, for the purpose of inducing

13

Plaintiff and Class members to purchase the inferior phenylephrine hydrochloride and acetaminophen products at a price premium. As such, P&G profited by selling the misrepresented products to at least thousands of consumers throughout the nation.

## CLASS ACTION ALLEGATIONS

47. Plaintiff brings this action on behalf of himself and the following "Classes" pursuant to Federal Rule of Civil Procedure 23(a), (b)(2) and/or (b)(3). Specifically, the Classes are defined as:

> **Nationwide Class**: All persons in the United States who purchased the Vicks PE Products in the United States for personal use and not for resale during the applicable statute of limitations period.

> **Multi-State Consumer Protection Class:** All persons who purchased the PE Products in the State of Illinois or any state with similar laws[1] for personal use and not for resale during the applicable statute of limitations period.

> **Illinois Subclass**: All persons in the State of Illinois who purchased the Vicks PE Products in the State of Illinois for personal use and not for resale during the applicable statute of limitations period.

48. Excluded from the Classes are (a) any person who purchased the Vicks PE Products for resale and not for personal or household use, (b) any person who signed a release of any P&G in exchange for consideration, (c) any officers, directors or employees, or immediate family members of the officers, directors or employees, of any P&G or any entity in which a P&G has a controlling interest, (d) any legal counsel or employee of legal counsel for P&G, and € the presiding Judge in this lawsuit, as well as the Judge's staff and their immediate family members.

---

[1] While discovery may alter the following, Plaintiff assert that the other states with similar consumer fraud laws under the facts of this case include, but are not limited to: California (Cal. Bus. & Prof. Code § 17200, et seq.); Florida (Fla. Stat. §§ 501.201, et seq.); Illinois (815 ICLS §§ 505/1, et seq.); Massachusetts (Mass. Gen. Laws Ch. 93A, et seq.); Michigan (Mich. Comp. Laws §§ 445.901, et seq.); Minnesota (Minn. Stat. §§ 325F.67, et seq.); New Jersey (N.J. Stat. §§ 56:8-1, et seq.); New York (N.Y. Gen. Bus. Law §§ 349, et seq.); Washington (Wash. Rev. Code §§ 19.86.010, et seq.). *See Mullins v. Direct Digital, LLC,* No. 13-cv-1829, 2014 WL 5461903 (N.D. Ill. Sept. 30, 2014), aff'd, 795 F.3d 654 (7th Cir. 2015).

49.     Plaintiff reserves the right to amend the definition of the Classes if discovery or further investigation reveals that the Classes should be expanded or otherwise modified.

50.     **Numerosity – Federal Rule of Civil Procedure 23(a)(1).** Class members are so numerous and geographically dispersed that joinder of all class members is impracticable. While the exact number of class members remains unknown at this time, upon information and belief, there are thousands, if not hundreds of thousands, of putative class members.

51.     **Predominance of Common Questions of Law and Fact – Federal Rule of Civil Procedure 23(a)(2) and 23(b)(3).** Common questions of law and fact exist as to all class members and predominate over any questions affecting only individual Class members. These common legal and factual questions include, but are limited to, the following:

a.  Whether P&G made the "MAX STRENGTH" representations;

b.  Whether P&G promoted the Vicks PE Products with false and misleading statements of fact and material omissions;

c.  Whether P&G's "MAX STRENGTH" representations are deceptive, unfair, or misleading to the reasonable consumer;

d.  Whether P&G's actions and/or omissions violate applicable laws;

e.  Whether Plaintiff and putative members of the Classes have suffered loss of monies or property or other value as a result of P&G's acts, omissions, or misrepresentations of material facts;

f.  Whether P&G was unjustly enriched at the expense of Plaintiff and members of the putative Classes in connection with the Vicks PE Products;

g.  Whether Plaintiff and members of the putative Classes are entitled to monetary damages or statutory damages, and, if so, the nature of such relief; and

h.  Whether Plaintiff and members of the putative Classes are entitled to equitable, declaratory, or injunctive relief and, if so, the nature of such relief.

52.  **Typicality – Federal Rule of Civil Procedure 23(a)(3).** Plaintiff's claims are typical of those of the absent class members in that Plaintiff and the class members each purchased and used the Vicks PE Products and each sustained damages arising from P&G's wrongful conduct, as alleged more fully herein. Plaintiff shares the aforementioned facts and legal claims or questions with putative members of the Classes, and Plaintiff and all members of the putative Classes have been similarly affected by P&G's common course of conduct alleged herein. Plaintiff and all members of the putative Classes sustained monetary and economic injuries including, but not limited to, ascertainable loss arising out of P&G's false and deceptive "MAX STRENGTH" representations about the Vicks PE Products, as alleged herein.

53.  **Adequacy – Federal Rule of Civil Procedure 23(a)(4).** Plaintiff will fairly and adequately represent and protect the interests of the members of the putative Classes. Plaintiff has retained counsel with substantial experience in handling complex class action litigation, including complex questions that arise in this type of consumer protection litigation. Further, Plaintiff and her counsel are committed to the vigorous prosecution of this action. Plaintiff does not have any conflicts of interest or interests adverse to those of putative Classes.

54.  **Insufficiency of Separate Actions – Federal Rule of Civil Procedure 23(b)(1).** Absent a class action, Plaintiff and members of the Classes will continue to suffer the harm described herein, for which they would have no remedy. Even if separate actions could be brought by individual consumers, the resulting multiplicity of lawsuits would cause undue burden and expense for both the Court and the litigants, as well as create a risk of inconsistent rulings and adjudications that might be dispositive of the interests of similarly situated consumers,

16

substantially impeding their ability to protect their interests, while establishing incompatible standards of conduct for P&G. Accordingly, the proposed Classes satisfy the requirements of Fed. R. Civ. P. 23(b)(1).

55. **Declaratory and Injunctive Relief – Federal Rule of Civil Procedure 23(b)(2).** P&G has acted or refused to act on grounds generally applicable to Plaintiff and all Members of the Classes, thereby making appropriate final injunctive relief and declaratory relief, as described below, with respect to the members of the Classes as a whole.

56. **Superiority – Federal Rule of Civil Procedure 23(b)(3).** A class action is superior to any other available methods for the fair and efficient adjudication of the present controversy for at least the following reasons:

a. The damages suffered by each individual member of the putative Classes do not justify the burden and expense of individual prosecution of the complex and extensive litigation necessitated by P&G's conduct;

b. Even if individual members of the Classes had the resources to pursue individual litigation, it would be unduly burdensome to the courts in which the individual litigation would proceed;

c. The claims presented in this case predominate over any questions of law or fact affecting individual members of the Classes;

d. Individual joinder of all members of the Classes is impracticable;

e. Absent a class, Plaintiff and members of the putative Classes will continue to suffer harm as a result of P&G's unlawful conduct; and

f. This action presents no difficulty that would impede its management by the Court as a class action, which is the best available means by which Plaintiff and members of the

putative Classes can seek redress for the harm caused by P&G.

g.  In the alternative, the Classes may be certified for the following reasons:

(1) The prosecution of separate actions by individual members of the Classes would create a risk of inconsistent or varying adjudication with respect to individual members of the Classes, which would establish incompatible standards of conduct for P&G;

(2) Adjudications of claims of the individual members of the Classes against P&G would, as a practical matter, be dispositive of the interests of other members of the putative Classes who are not parties to the adjudication and may substantially impair or impede the ability of other putative class members to protect their interests; and

(3) P&G has acted or refused to act on grounds generally applicable to the members of the putative Classes, thereby making appropriate final and injunctive relief with respect to the putative Classes as a whole.

## **CLAIMS FOR RELIEF**

### **COUNT I**
**VIOLATION OF THE ILLINOIS CONSUMER FRAUD
AND DECEPTIVE BUSINESS PRACTICES ACT
(By Plaintiff on Behalf of the Illinois Subclass)**

57.  Plaintiff incorporates paragraphs 1-56 as if fully set forth herein.

58.  Plaintiff brings this action on behalf of himself and the Illinois Subclass.

59.  In Illinois, the "Consumer Fraud and Deceptive Business Practices Act" 815 Ill. Comp. Stat. 505/1, et seq., prohibits "unfair methods of competition and unfair or deceptive acts or practices, including but not limited to the use or employment of any deception, fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of any

material fact, with intent that others rely upon the concealment, suppression or omission of such material fact or the use or employment of any practice described in Section 2 of the 'Uniform Deceptive Trade Practices Act' . . . ."

60.     Plaintiff and the Illinois Sub-Class members were injured by P&G's deceptive misrepresentations, concealments and omissions and these misrepresentations, concealments and omissions were material and deceived Plaintiff and the Illinois Subclass. Because Plaintiff and the Illinois Subclass members relied on P&G's misrepresentations, concealments and omissions when purchasing the Products, they were injured at the time of purchase.

61.     P&G does business in Illinois, sells and distributes the Products in Illinois, and engaged in deceptive acts and practices in connection with the sale of the Products in Illinois and elsewhere in the United States.

62.     The Products purchased by Plaintiff and the Illinois Subclass members were "consumer items" as that term is defined under the Illinois Consumer Fraud Act.

63.     P&G engaged in unfair and deceptive acts in violation of 815 Ill. Comp. Stat. 505/2 when it misrepresented and deceptively concealed, suppressed and/or omitted the material information known to P&G as set forth above concerning its Products, which has caused damage and injury to Plaintiff and the Illinois Subclass Members. Plaintiff and the Illinois Subclass members were injured by P&G's unfair and deceptive acts at the time of purchasing the Products.

64.     P&G's marking of Vicks PE products violates this prohibition by deceiving consumers into believing Vicks PE is a "MAX STRENGTH" decongestant or pain reliever/fever reducer.

65.     P&G engaged in fraudulent and/or deceptive conduct, which creates a likelihood of confusion or of misunderstanding in violation of the Act.

66.     P&G engaged in misleading and deceptive advertising that represented that the Vicks PE products were MAX STRENGTH." P&G chose to package and market the products in this way to impact consumer choices and gain market dominance, as it knew or should have known that all consumers who purchased the products would be impacted by its omissions and would reasonably believe P&G's false and misleading "MAX STRENGTH" representations and omissions.

67.     P&G's deceptive acts occurred in a course of conduct involving trade and commerce in Illinois and throughout the United States.

68.     P&G intended Plaintiff and the Illinois Subclass members to rely on its deceptive acts when purchasing the Products.

69.     P&G's deceptive acts proximately caused actual injury and damage to Plaintiff and the Illinois Subclass members at the time of purchase.

70.     Plaintiff and the Illinois Subclass members would not have purchased, or would have paid less for, the Products but for P&G's material misrepresentations as described in this Complaint.

## COUNT II
## VIOLATION OF ILLINOIS UNIFORM DECEPTIVE TRADE PRACTICES ACT
### (By Plaintiff on Behalf of the Illinois Subclass)

71.     Plaintiff incorporates paragraphs 1-56 as if fully set forth herein.

72.     Plaintiff brings this action on behalf of himself and the Illinois Subclass.

73.     The Illinois Deceptive Trade Practices Act ("UDTPA"), 815 Ill. Comp. Stat. 510/2, et seq., prohibits "[u]nfair methods of competition and unfair or deceptive acts or practices, including but not limited to the use or employment of any deception, fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of any material fact, with

intent that others rely upon the concealment, suppression or omission of such material fact."

74.      815 ILCS 510/2 provides in pertinent part that a "person engages in a deceptive trade practice when, in the course of his or her business, vocation, or occupation," the person does any of the following: "(5) represents that goods or services have . . . uses, benefits or quantities that they do not have . . .; (7) represents that goods or services are of a particular standard, quality, or grade or that goods are a particular style or model, if they are of another; . . . [or] (12) engages in any other conduct which similarly creates a likelihood of confusion or misunderstanding."

75.      P&G's marking of Vicks PE products violates this prohibition by deceiving consumers into believing Vicks PE is a "MAX STRENGTH" decongestant or pain reliever/fever reducer.

76.      P&G engaged in fraudulent and/or deceptive conduct, which creates a likelihood of confusion or of misunderstanding in violation of the Act.

77.      P&G engaged in misleading and deceptive advertising that represented that the Vicks PE products were MAX STRENGTH." P&G chose to package and market the products in this way to impact consumer choices and gain market dominance, as it knew or should have known that all consumers who purchased the products would be impacted by its omissions and would reasonably believe P&G's false and misleading "MAX STRENGTH" representations and omissions.

78.      P&G intended that Plaintiff and each of the other Illinois Subclass members would reasonably rely upon the material omissions concerning the true nature of the Vicks PE products.

79.      P&G's concealment, omissions, and other deceptive conduct were likely to deceive and cause misunderstanding and/or in fact caused Plaintiff and each of the other Illinois Subclass members to be deceived about the true nature of the products.

80.     P&G's deceptive acts occurred in a course of conduct involving trade and commerce in Illinois and throughout the United States.

81.     P&G's deceptive acts proximately caused actual injury and damage to Plaintiff and the Illinois Subclass Members at the time of purchase.

82.     Plaintiff and the Illinois Subclass Members would not have purchased, or would have paid less for, the Products but for P&G's material misrepresentations as described in this Complaint.

83.     P&G intended Plaintiff and the Illinois Subclass members to rely on its deceptive acts when purchasing the Products.

## COUNT III
## VIOLATION OF STATE CONSUMER PROTECTION ACTS
### (By Plaintiff on Behalf of the Multi-State Consumer Protection Class )

84.     Plaintiff incorporates paragraphs 1-56 as if fully set forth herein.

85.     Plaintiff brings this cause of action on behalf of himself and the Multi-State Consumer Protection Class.

86.     Plaintiff and Multi-State Consumer Protection Class members have been injured as a result of P&G's violations of the state consumer protection statutes listed above in paragraph 47 and footnote 1, which also provide a basis for redress to Plaintiff and Multi-State Consumer Class Members based on P&G's fraudulent, deceptive, unfair and unconscionable acts, practices and conduct.

87.     P&G's conduct as alleged herein violates the consumer protection, unfair trade practices, and deceptive acts laws of each of the jurisdictions encompassing the Multi-State Consumer Class.

88.     P&G violated the Multi-State Consumer Class states' consumer protection, unfair

trade practices, and deceptive acts laws through its misleading and deceptive advertising that represented that the Vicks PE products were "MAX STRENGTH." J&J chose to package and market the Products in this way to impact consumer choices and gain market dominance, as it knew or should have known that all consumers who purchased the products would be impacted by its omissions and would reasonably believe P&G's false and misleading "MAX STRENGTH" representations and omissions.

89.     P&G's misrepresentations were material to Plaintiff and Multi-State Consumer Class members' decision to purchase the Products or pay a premium for the Products.

90.     P&G made its untrue and/or misleading statements and representations willfully, wantonly, and with reckless disregard for the truth.

91.     As a result of P&G's violations of the aforementioned states' unfair and deceptive practices laws, Plaintiff and Multi-State Consumer Class members paid a premium for the Products.

92.     As a result of P&G's violations, P&G has been unjustly enriched.

93.     Pursuant to the alleged consumer protection, unfair trade practices, and deceptive acts laws, Plaintiff and Multi-State Consumer Class members are entitled to recover compensatory damages, restitution, punitive, and special damages, including but not limited to statutory or treble damages, reasonable attorneys' fees and costs, and other injunctive or declaratory relief as deemed appropriate or permitted pursuant to the relevant law.

**COUNT IV**
**UNJUST ENRICHMENT**
**(By Plaintiff, on Behalf of the Nationwide Class, or in the Alternative, the Illinois Subclass)**

94.     Plaintiff realleges paragraphs 1-56 above as if fully set forth herein.

95.     Plaintiff brings this cause of action on behalf of himself, the Nationwide Class, and/or the Illinois Subclass against P&G. It is alleged in the alternative to the extent there is no

adequate remedy at law.

96.     Plaintiff and the putative Class members conferred a benefit on P&G when they purchased the Vicks PE Products. By its wrongful acts and omissions described herein, including selling the Vicks PE Products containing the "MAX STRENGTH" representations, which did not conform to the promises or affirmations of fact made on the label, P&G was unjustly enriched at the expense of Plaintiff and the putative class members.

97.     Plaintiff's detriment and P&G's enrichment were related to and flowed from the wrongful conduct challenged in this Complaint.

98.     P&G has profited from its unlawful, unfair, misleading, and deceptive practices at the expense of Plaintiff and the putative class members under circumstances in which it would be unjust for P&G to be permitted to retain the benefit. It would be inequitable for P&G to retain the profits, benefits, and other compensation obtained from their wrongful conduct as described herein in connection with selling the Vicks PE Products.

99.     P&G has been unjustly enriched in retaining the revenues derived from class members' purchases of the Vicks PE Products, which retention of such revenues under these circumstances is unjust and inequitable because P&G marketed, advertised, distributed, and sold the Vicks PE Products, and P&G misrepresented the nature of the products, misrepresented their benefits and attributes, and knowingly marketed and promoted the Vicks PE Products with "MAX STRENGTH" representations, which caused injuries to Plaintiff and the Classes because they would not have purchased the Vicks PE Products based on the same representations if the true facts concerning the Vicks PE Products had been known.

100.    Plaintiff and the putative class members have been damaged as a direct and proximate result of P&G's unjust enrichment because they would not have purchased the Vicks

PE Products on the same terms or for the same price had they known the true nature of the Vicks PE Products and the misstatements regarding the strength of the Vicks PE Products' active ingredients.

101.     P&G either knew or should have known that payments rendered by Plaintiff and the putative class members were given and received with the expectation that the "MAX STRENGTH" representations made by P&G in advertising, on P&G's website, and on the Vicks PE Products' labels and packaging were true. It is inequitable for P&G to retain the benefit of payments under these circumstances because the "MAX STRENGTH" representations are not true.

102.     Plaintiff and the putative class members are entitled to recover from P&G all amounts wrongfully collected and improperly retained by P&G.

103.     As a direct result of P&G's wrongful conduct and unjust enrichment, Plaintiff and the putative class members are entitled to restitution of, disgorgement of, and/or imposition of a constructive trust upon all profits, benefits, and other compensation obtained by P&G for its inequitable and unlawful conduct.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, individually and on behalf of all others similarly situated members of the Classes, prays for relief and judgment, including entry of an order:

A.     Declaring that this action is properly maintained as a class action, certifying the proposed Classes, appointing as Class Representative and appointing Plaintiff's counsel as Class Counsel;

B.     Directing that P&G bear the costs of any notice sent to the Classes;

C.     Declaring that P&G must disgorge, for the benefit of the Classes, all or

part of the ill-gotten profits they received from the sale of the Vicks PE Products, or order P&G to make full restitution to Plaintiff and the members of the Classes;

D.      Awarding restitution and other appropriate equitable relief;

E.      Granting an injunction against P&G to enjoin it from conducting its business through the unlawful, unfair, and fraudulent acts or practices set forth herein;

F.      Granting an Order requiring P&G to fully and appropriately recall the Products and/or to remove the claims on its website and elsewhere, including "MAX STRENGTH" representations regarding the Vicks PE Products;

G.      Ordering a jury trial and damages according to proof;

H.      Awarding Plaintiff and members of the Classes compensatory and punitive damages, or statutory damages, as provided by the applicable state consumer protection statutes invoked above;

I.      Enjoining P&G from continuing to engage in the unlawful and unfair business acts and practices as alleged herein;

J.      Awarding attorneys' fees and litigation costs to Plaintiff and members of the Class(es);

K.      Awarding civil penalties, prejudgment interest, and punitive damages as permitted by law; and

L.      Ordering such other and further relief as the Court deems just and proper.

## **JURY DEMAND**

Plaintiff demands a trial by jury of all claims in this Complaint so triable.

Dated: September 18, 2023    Respectfully submitted,


By: */s/ Gary Klinger*

Gary M. Klinger
**MILBERG COLEMAN BRYSON PHILLIPS GROSSMAN, PLLC**
227 W. Monroe Street, Suite 2100
Chicago, IL 60606
Telephone: (866) 252-0878
Email: gklinger@milberg.com

Nick Suciu III
**MILBERG COLEMAN BRYSON PHILLIPS GROSSMAN, PLLC**
6905 Telegraph Rd., Suite 115
Bloomfield Hills, MI 48301
Telephone: (313) 303-3472
Email: nsuciu@milberg.com

Jeff Ostrow
Jonathan M. Streisfeld
Kristen Lake Cardoso
Daniel Tropin*
**KOPELOWITZ OSTROW P.A.**
One West Las Olas Blvd., Suite 500
Fort Lauderdale, Florida 33301
Telephone: (954) 525-4100
Email: ostrow@kolawyers.com
          streisfeld@kolawyers.com
          cardoso@kolawyers.com
          tropin@kolawyers.com

Melissa S. Weiner
Ryan J. Gott
**PEARSON WARSHAW, LLP**
328 Barry Avenue South, Suite 200
Wayzata, Minnesota 55391
Telephone: (612) 389-0600
Email: mweiner@pwfirm.com
          rgott@pwfirm.com

27

Erin Ruben
**MILBERG COLEMAN BRYSON**
**PHILLIPS GROSSMAN PLLC**
900 W. Morgan Street
Raleigh, NC 27603
Telephone: (919) 600-5000
Email: eruben@milberg.com

J. Hunter Bryson
**MILBERG COLEMAN BRYSON**
**PHILLIPS GROSSMAN, PLLC**
405 E 50th Street
New York, NY 10022
Telephone: (630) 796-0903
Email: hbryson@milberg.com

Karl Amelchenko*
**MILBERG COLEMAN BRYSON**
**PHILLIPS GROSSMAN, PLLC**
900 W. Morgan Street
Raleigh, NC 27603
Telephone: (919) 600-5000
Email: kamelchenko@milberg.com

Jimmy Mintz*
**MILBERG COLEMAN BRYSON**
**PHILLIPS GROSSMAN, PLLC**
201 Sevilla Ave., 2nd Floor
Coral Gables, FL 33134
Telephone: (786) 876-8200
Email: jmintz@milberg.com

*Attorneys for Plaintiff*

*\*Applications for admission forthcoming*

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| MOHAMAD TLAIB, on behalf of himself and all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>PROCTER & GAMBLE COMPANY,<br><br>Defendant. | **AMENDED CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED**<br><br>Case No.: 23-CV-13840 |

Plaintiff, Mohamad Tlaib, on behalf of himself and all others similarly situated, brings this class action against Defendant, Procter & Gamble Company ("P&G"), and allege on personal knowledge, investigation of counsel, and on information and belief as follows:

## GENERAL ALLEGATIONS

1.      P&G offers a variety of over-the-counter drugs, including oral nasal decongestants, competing in a billion-dollar industry. Such products include the over-the-counter oral nasal decongestants and pain relievers/fever reducers under the brand name Vicks ("Products").

2.      All of the Products are oral phenylephrine hydrochloride ("PE") nasal decongestant syrups, pills, or powders, some contain acetaminophen as another active ingredient, and all the Products are marketed as "MAX STRENGTH" ("Maximum Strength Representation").

3.      When consumers purchase decongestants and pain relief/fever reducer pills, the strength of the ingredients is an important purchasing consideration, especially for consumers seeking a maximum strength product.

4.      P&G takes advantage of this consumer preference for strong relief by prominently representing the alleged strength of the Products in the one place every consumer looks when

1

purchasing a product—the front packaging.

5.      On each product package for the Products, P&G uniformly touts in capitalized, font set against a contrasting color background on the front of the package the Products provide maximum strength relief.

6.      The Products that contain PE and/or acetaminophen include: DayQuil MAX STRENGTH Severe Cold & Flu; NyQuil MAX STRENGTH Severe Cold & Flu, DayQuil/NyQuil DayQuil/NyQuil MAX STRENGTH Hot Remedy Cold & Flu Relief Hot Drink Powder Medicine; DayQuil MAX STRENGTH VapoCool Severe Cold & Flu + Congestion; NyQuil MAX STRENGTH VapoCool Severe Cold & Flu + Congestion; and DayQuil Ultra Concentrated MAX STRENGTH Cold and Flu Relief.[1] They are marketed as maximum strength relief for Headache, Fever, Sore Throat, Minor Aches & Pains, Nasal Congestion, and Sinus Pressure.

---

[1] Based upon reasonable investigation, Plaintiff has identified certain Products that contain PE, and at times, acetaminophen, and are also labeled as "MAX STRENGTH." The complete list of Products is in the exclusive control of P&G and will be the subject of discovery. Products include all substantially similar Vicks products, manufactured, marketed, and sold during the relevant class periods, that contained PE and acetaminophen were labeled as "MAX STRENGTH" or another synonymous Maximum Strength Representation, including "MAXIMUM STRENGTH."





3











## Drug Facts

| Active ingredients (in each 30 mL) | Purpose |
| --- | --- |
| Acetaminophen 650 mg | Pain reliever/fever reducer |
| Dextromethorphan HBr 20 mg | Cough suppressant |
| Guaifenesin 400 mg | Expectorant |
| Phenylephrine HCl 10 mg | Nasal decongestant |

### Uses
- temporarily relieves common cold/flu symptoms:
  - nasal congestion • sinus congestion & pressure
  - cough due to minor throat & bronchial irritation
  - minor aches & pains • headache • fever • sore throat
  - reduces swelling of nasal passages
  - temporarily restores freer breathing through the nose
  - promotes nasal and/or sinus drainage
- helps loosen phlegm (mucus) and thin bronchial secretions to rid the bronchial passageways of bothersome mucus and make coughs more productive

### Warnings
**Liver warning:** This product contains acetaminophen. Severe liver damage may occur if you take
- more than 4 doses in 24 hrs, which is the maximum daily amount for this product
- taken with other drugs containing acetaminophen
- 3 or more alcoholic drinks every day while using this product

**Allergy Alert:** Acetaminophen may cause severe skin reactions. Symptoms may include:
- skin reddening • blisters • rash
If a skin reaction occurs, stop use and seek medical help right away.
**Sore throat warning:** If sore throat is severe, persists for more than 2 days, is accompanied or followed by fever, headache, rash, nausea, or vomiting, consult a doctor promptly.

**Do not use**
- with any other drug containing acetaminophen (prescription or nonprescription). If you are not sure whether a drug contains acetaminophen, ask a doctor or pharmacist.
- if you are now taking a prescription monoamine oxidase inhibitor (MAOI) (certain drugs for depression, psychiatric or emotional conditions, or Parkinson's disease), or for 2 weeks after stopping the MAOI drug. If you do not know if your prescription drug contains an MAOI, ask a doctor or pharmacist before taking this product.
- a sodium-restricted diet

**Ask a doctor or pharmacist before use if you are taking** the blood thinning drug warfarin.
**When using this product, do not use more than directed.**
**Stop use and ask a doctor if**
- you get nervous, dizzy or sleepless

**Ask a doctor before use if you have**
- liver disease • heart disease
- high blood pressure • thyroid disease
- diabetes
- trouble urinating due to enlarged prostate gland
- cough that occurs with too much phlegm (mucus)
- persistent or chronic cough such as occurs with smoking, asthma, chronic bronchitis, or emphysema
- pain, nasal congestion, or cough gets worse or lasts more than 7 days
- fever gets worse or lasts more than 3 days
- redness or swelling is present
- new symptoms occur
- cough comes back or occurs with rash or headache that lasts. These could be signs of a serious condition.

**If pregnant or breast-feeding,** ask a health professional before use. **Keep out of reach of children.** In case of overdose, get medical help or contact a Poison Control Center right away. Quick medical attention is critical for adults as well as for children even if you do not notice any signs or symptoms.

### Directions
- take only as directed
- only use the dose cup provided
- do not exceed 4 doses per 24 hrs

| | |
| --- | --- |
| adults & children 12 yrs & over | 30 mL every 4 hrs |
| children 4 to under 12 yrs | ask a doctor |
| children under 4 yrs | do not use |

### Other information
- each 30 mL contains: sodium 81 mg
- store at no greater than 25°C and do not refrigerate

**Inactive ingredients** alcohol, citric acid, D&C Yellow No. 10, FD&C Blue No. 1, flavor, glycerin, propylene glycol, purified water, saccharin sodium, sodium benzoate, sodium chloride, sodium citrate, sorbitol, sucralose



**Drug Facts**

| Active ingredients (in each 30 mL) | Purpose |
|---|---|
| Acetaminophen 650 mg | Pain reliever/fever reducer |
| Dextromethorphan HBr 20 mg | Cough suppressant |
| Doxylamine succinate 12.5 mg | Antihistamine |
| Phenylephrine HCl 10 mg | Nasal decongestant |

**Uses** temporarily relieves common cold/flu symptoms:
- nasal congestion
- sinus congestion & pressure
- cough due to minor throat & bronchial irritation
- cough to help you sleep
- minor aches & pains
- headache
- fever
- sore throat
- runny nose & sneezing
- reduces swelling of nasal passages
- temporarily restores freer breathing through the nose
- promotes nasal and/or sinus drainage

**Warnings**
**Liver warning:** This product contains acetaminophen. Severe liver damage may occur if you take
- more than 4 doses in 24 hours, which is the maximum daily amount for this product
- with other drugs containing acetaminophen
- 3 or more alcoholic drinks every day while using this product

**Allergy Alert:** Acetaminophen may cause severe skin reactions. Symptoms may include:
- skin reddening
- blisters
- rash

If a skin reaction occurs, stop use and seek medical help right away.

**Sore throat warning:** If sore throat is severe, persists for more than 2 days, is accompanied or followed by fever, headache, rash, nausea, or vomiting, consult a doctor promptly.

**Do not use**
- with any other drug containing acetaminophen (prescription or nonprescription). If you are not sure whether a drug contains acetaminophen, ask a doctor or pharmacist.
- if you are now taking a prescription monoamine oxidase inhibitor (MAOI) (certain drugs for depression, psychiatric or emotional conditions, or Parkinson's disease), or for 2 weeks after stopping the MAOI drug. If you do not know if your prescription drug contains an MAOI, ask a doctor or pharmacist before taking this product.

**Ask a doctor before use if you have**
- liver disease
- heart disease
- high blood pressure
- thyroid disease
- diabetes
- glaucoma
- cough that occurs with too much phlegm (mucus)
- a breathing problem or chronic cough that lasts or as occurs with smoking, asthma, chronic bronchitis, or emphysema
- trouble urinating due to enlarged prostate gland
- a sodium-restricted diet

**Ask a doctor or pharmacist before use if you are**
- taking sedatives or tranquilizers
- taking the blood thinning drug warfarin

**When using this product**
- do not use more than directed

**Drug Facts** (continued)

- excitability may occur, especially in children
- marked drowsiness may occur
- avoid alcoholic drinks
- be careful when driving a motor vehicle or operating machinery
- alcohol, sedatives, and tranquilizers may increase drowsiness

**Stop use and ask a doctor if**
- you get nervous, dizzy or sleepless
- pain, nasal congestion, or cough gets worse or lasts more than 7 days
- fever gets worse or lasts more than 3 days
- redness or swelling is present
- new symptoms occur
- cough comes back or occurs with rash or headache that lasts.

These could be signs of a serious condition.

**If pregnant or breast-feeding,** ask a health professional before use. **Keep out of reach of children.** In case of overdose, get medical help or contact a Poison Control Center right away. Quick medical attention is critical for adults as well as for children even if you do not notice any signs or symptoms.

**Directions**
- take only as directed
- only use the dose cup provided
- do not exceed 4 doses per 24 hrs

| | |
|---|---|
| adults & children 12 yrs over | 30 mL every 4 hrs |
| children 4 to under 12 yrs | ask a doctor |
| children under 4 yrs | do not use |

**Other information**
- each 30 mL contains: sodium 81 mg
- store at no greater than 25°C and do not refrigerate

**Inactive ingredients** alcohol, citric acid, D&C Yellow No. 10, FD&C Blue No. 1, flavor, glycerin, propylene glycol, purified water, saccharin sodium, sodium benzoate, sodium chloride, sodium citrate, sorbitol, sucralose

7





7.     Reasonable consumers understand the Maximum Strength Representations to mean that the Products are the strongest over-the-counter nasal decongestant and pain reliever/fever reducers.

8.     Therefore, P&G's labeling of the Products with a Maximum Strength Representation misleads reasonable consumers.

9.     P&G knew the active nasal decongestant ingredient, PE, was not as strong as other over-the-counter oral nasal decongestants available to consumers and, therefore, not suitable for a maximum strength representation. Additionally, the Products do not even contain the maximum dosage of acetaminophen and are thus not deserving of the "MAX STRENGTH" label and representation.

10.     Thus, this maximum strength packaging is misleading because nasal decongestants that are actually stronger—without the maximum strength claim—are available over the counter. For example, both oxymetazoline and pseudoephedrine are available over the counter.

11.     Further, P&G knew higher doses of acetaminophen exist on the market. The Court need look no further than the common manufacturing and marketing of acetaminophen products as "Regular Strength" for 325 mg and "Extra Strength" for 500 mg capsules, tablets, and gelcaps, taken, as with the Products, in dosages of two each. For liquid Products at issue, the dosage is 650 mg.

12.     Despite this knowledge, P&G chose to mislead consumers through its labeling of the Products, with and without acetaminophen, as "MAX STRENGTH" decongestants and/or pain relievers/fever reducers. However, none of the Products are maximum strength. Consumers, including Plaintiff, lack the scientific knowledge necessary to determine whether the Products are maximum strength decongestants and pain relievers/fever reducers, or to ascertain the true quality

9

or strength of these Products. For that reason, reasonable consumers must and do rely on manufacturers, like P&G, to be honest and transparent and to properly disclose on the packaging all material information regarding the Products and strength.

13. Rather than being honest and transparent, P&G makes the Maximum Strength Representation in a knowingly false, misleading, and deceptive manner.

14. For all the reasons set forth herein, including, but not limited to, P&G's misrepresentations and omissions regarding its maximum strength claims, Plaintiff seeks relief in this action individually, and as a class action on behalf of similarly situated purchasers of P&G's Products, for: (1) violation of State consumer protection laws; (2) unjust enrichment, and (3) breach of express and implied warranties.

## **THE PARTIES**

15. Plaintiff is a citizen of Illinois, residing in the Village of Orland Hills, within Cook County. He purchased Nyquil MAX STRENGTH Severe Cold and Flu within the applicable statute of limitations period, most recently in November 2022 at a Walgreens near his home in Orland Hills, Illinois.

16. P&G is a corporation with its principal place of business in Ohio.

## **JURISDICTION AND VENUE**

16. This Court has personal jurisdiction over P&G in this matter. The acts and omissions giving rise to this action occurred in the state of Illinois. P&G has been afforded due process because it has, at all times relevant to this matter, individually or through its agents, subsidiaries, officers and/or representatives, operated, conducted, engaged in and carried on a business venture in this state and/or maintained an office or agency in this state, and/or marketed, advertised, distributed and/or sold the Products in this state, committed a statutory violation within

this state related to the allegations made herein, and caused injuries to Plaintiff and the putative class members, which arose out of the acts and omissions that occurred in the state of Illinois, during the relevant time period, at which time P&G was engaged in business activities in the state of Illinois.

17.     This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C.§ 1332 of the Class Action Fairness Act of 2005 because: (i) there are 100 or more putative class members, (ii) the aggregate amount in controversy exceeds $5,000,000, exclusive of interest and costs, and (iii) there is minimal diversity because at least one Plaintiff and P&G are citizens of different states.

18.     Pursuant to 28 U.S.C. § 1391(a), venue is proper because a substantial part of the events giving rise to the claims asserted occurred in this District. Venue is also proper pursuant to 28 U.S.C. § 1391(c) because P&G conducts substantial business in this District, has sufficient minimum contacts with this District, and otherwise purposely avails itself of the markets in this District, through the promotion, sale, and marketing of the Products in this District. Furthermore, Plaintiff resides in this District.

## <u>FACTS COMMON TO ALL CLASS MEMBERS</u>

20.     P&G is one of the largest drug manufacturing companies in the world. As such, P&G sells several over-the-counter drugs, including the "Robitussin," "Theraflu," and "Contac" branded lines of products.

21.     PE is the oral active ingredient in the Products for nasal decongestion. Acetaminophen is the active ingredient in the Products that are the subject of this action as a pain reliever/fever reducer. When included, both form the basis for P&G's Maximum Strength Representation on the Products' packaging, and overall advertising and marketing campaign.

22.     At all relevant times, P&G has marketed the Products in a consistent and uniform manner nationwide.

23.     As alleged above, the Robitussin Products represent that they are "MAX STRENGTH," which representations prominently appear on the front label of the Robitussin Products in capitalized, white font set against a red background that contrasts with the background of the packaging. This instantly catches the eye of all reasonable consumers, including Plaintiff and class members.

24.     A reasonable consumer would understand that "MAX STRENGTH" means the Products contained the strongest nasal decongestant available on the over-the-counter market, as well as the strongest dose of acetaminophen for pain relief/fever reducer, where applicable.

25.     All reasonable consumers, including Plaintiff, read and relied on P&G's "MAX STRENGTH" representations when purchasing the Products. Indeed, when purchasing pharmaceuticals, especially those promising to be maximum strength, consumers look for a product with the strongest active ingredients available and are willing to pay a premium for them.

26.     P&G's Maximum Strength Representation was material to Plaintiff' and class members' decision to purchase the Products. Had consumers, such as Plaintiff, known the Products were not "MAX STRENGTH," because stronger over-the-counter alternatives existed, they would not have purchased the Products or would have paid less.

27.     P&G's marketing efforts are made in order to—and do in fact—induce consumers to purchase the Products at a premium because consumers believe they are getting maximum strength decongestants. This deceives reasonable consumers into believing PE nasal decongestants are maximum strength when they are not.

28.     P&G, however, has at all relevant times been well aware that its Products are not

maximum strength nasal decongestants, as other, stronger nasal decongestants are available with stronger active ingredients, such as pseudoephedrine, over the counter.

29. Reliable scientific studies undermine PE's effectiveness when compared to other nasal decongestants, thus rendering its Maximum Strength Representation false and misleading in the face of such evidence, and no reasonable consumer would deem the Products maximum strength.

30. Regardless of a handful of clinical studies addressing PE's efficacy, PE's effectiveness has been questioned when compared to other over-the-counter nasal decongestants.

31. "Intervention studies can be placed on a continuum, with a progression from efficacy trials to effectiveness trials. Efficacy can be defined as the performance of an intervention under ideal and controlled circumstances, whereas effectiveness refers to its performance under 'real world' conditions."[2]

32. Further, comparative studies in drugs are designed to improve the health care decisions by providing evidence regarding effectiveness, benefits, and harms of different treatments.[3]

33. In 2006, the authors of a research comparative letter to the editor of a scientific journal found pseudoephedrine superior to PE in reducing nasal congestion, attributing the ineffectiveness to poor bioavailability of PE.[4]

34. Also, in 2009, a comparison effectiveness study was done on PE and

---

[2] *See* https://www.ncbi.nlm.nih.gov/pmc/articles/PMC3912314/. Last visited December 19, 2023.
[3] *See* https://tracs.unc.edu/index.php/services/comparative-effectiveness-research/what-is-cer#:~:text=Comparative%20effectiveness%20research%20is%20designed,harms%20of%20different%20treatment%20options. Last visited December 19, 2023.
[4] *See* https://www.jacionline.org/action/showPdf?pii=S0091-6749%2806%2900633-6. Last visited December 19, 2023.

pseudoephedrine. The authors found that pseudoephedrine was far more effective on the measures of nasal congestion than PE.[5]

35.    Further, the Maximum Strength Representation on the Products' labels is misleading for yet another reason. The only active ingredient for pain relief/fever reducer is 325 mg of acetaminophen, which is the equivalent of a "Regular Strength" acetaminophen tablet. Thus, the strength of the acetaminophen dosage is far below anything that can be considered "MAX STRENGTH," or as acetaminophen is commonly marketed as "Extra Strength."

36.    P&G intended for Plaintiff and class members to be deceived or misled by its misrepresentations and omissions. Indeed, label space is limited, so manufacturers only place the most pertinent information on the front label. P&G specifically labeled and marketed the Products as Maximum Strength when other oral nasal decongestants and pain relievers/fever reducers were not marketed in a similar fashion.

37.    P&G's deceptive and misleading practices proximately caused harm to Plaintiff and the Classes.

38.    Plaintiff and class members would not have purchased the Products, or would have paid less for them, had they known the truth about the mislabeled and falsely advertised products. Indeed, other, stronger nasal decongestants and higher acetaminophen doses are available.

**PLAINTIFF'S FACTUAL ALLEGATIONS**

39.    Plaintiff relied on the "MAX STRENGTH" label in deciding to purchase what they believed to be the strongest nasal decongestant over the counter. Had Plaintiff known that PE, the only active oral nasal decongestant ingredient in the Products, is not the maximum strength nasal decongestant available over the counter, they would not have purchased it or would have paid less.

---

[5] *See* https://pubmed.ncbi.nlm.nih.gov/19230461/. Last visited December 19, 2023.

Further, had they known the acetaminophen in the Products was not the maximum dosage available, they would not have purchased it or would have paid less.

40.     Plaintiff resides in Village of Orland Hills, Illinois and is a citizen of Illinois. Throughout the relevant period, Plaintiff purchased certain of the Products at issue in this lawsuit and was exposed to, and reasonably relied upon, P&G's Maximum Strength Representations. For example, Plaintiff purchased NyQuil MAX STRENGTH Severe Cold and Flu as recently as November of 2022 from Walgreens located at 8400 171st St, Tinley Park, Illinois 60487. At the time of purchase, Plaintiff reviewed the Product packaging, including the front-label "MAX STRENGTH" representation, and reasonably believed from these representations that the Products were maximum strength. Those terms meant to Plaintiff that no stronger alternative over-the-counter nasal decongestant and pain reliever/fever reducer existed. In reasonable reliance on these representations, Plaintiff paid a premium cost for the Products, which were worth less than represented because the statements were not true and were highly misleading. The "MAX STRENGTH" representation on the Products' packaging was part of the basis of the bargain in that Plaintiff attributed value to those representations and Plaintiff would not have purchased the Products, or would not have purchased them on the same terms, if he knew the Maximum Strength Representations were untrue and/or misleading. Plaintiff paid a price premium for empty promises that P&G did not keep. Had Plaintiff been aware that the Maximum Strength Representations made on the Products was untrue, he would have paid less for the Products, or would not have purchased them at all.

### FED. R. CIV. P. 9(B) ALLEGATIONS

41.     P&G made material misrepresentations and/or omissions of fact in its labeling and marketing of the Products by representing that they are "MAX STRENGTH" decongestant and

pain relief/fever reducer products.

42. P&G's alleged conduct was and continues to be fraudulent because it has the effect of deceiving consumers into believing the Products are maximum strength oral nasal decongestant products. P&G omitted from Plaintiff and class members that the Products are not maximum strength oral nasal decongestant products because other stronger over-the-counter nasal decongestant products exist. P&G knew or should have known this information is material to all reasonable consumers and impacts consumers' purchasing decisions. Yet, P&G has and continues to represent the Products are maximum strength oral nasal decongestant products when they are not and has omitted from the Products' packaging the fact that there are other over-the-counter products that are stronger decongestants. P&G has likewise continued to label the Products as maximum strength with respect to pain relief/fever reducer, even though their acetaminophen content is only regular strength.

43. P&G made material misrepresentations and/or omissions detailed herein, including that the Products are maximum strength oral nasal decongestant and pain reliever/fever reducer, continuously throughout the applicable class period(s).

44. P&G's material misrepresentations and omissions, that the Products are maximum strength oral nasal decongestant and pain reliever/fever reducer products, were located on the front label of the Products in capitalized, bold lettering that contrasts with the background of the packaging, which instantly catches the eye of all reasonable consumers, including Plaintiff and class members, at the point of sale in every transaction. The Products are sold in brick-and-mortar stores and online stores in Illinois and nationwide.

45. P&G made written misrepresentations of fact on the front label of the Products that they were "MAX STRENGTH" even though other stronger nasal decongestant and body pain

reliever/fever reducer products are available. As such, P&G's Maximum Strength Representations are false and misleading. Moreover, P&G omitted from the Products' labeling the fact that there are stronger over-the-counter nasal decongestants and pain relievers/fever reducers available. And as alleged in detail throughout this Complaint, Plaintiff and class members read and relied on P&G's Maximum Strength Representations and omissions before purchasing the Products.

46.     P&G misrepresented its Products as being maximum strength nasal decongestant and pain reliever/fever reducer and omitted from the Products' labeling the fact that there are other, over-the-counter products available that are stronger decongestants and pain relievers/fever reducers, for the express purpose of inducing Plaintiff and class members to purchase the inferior PE and acetaminophen products at a price premium. As such, P&G profited by selling the misrepresented products to at least thousands of consumers throughout the nation.

## CLASS ACTION ALLEGATIONS

47.     Plaintiff brings this action on behalf of himself and the following "Classes" pursuant to Federal Rule of Civil Procedure 23(a), (b)(2) and/or (b)(3). Specifically, the Classes are defined as:

> **Nationwide Class**: All persons in the United States who purchased one or more of the Products in the United States for personal use and not for resale during the applicable statute of limitations period, until the date notice is disseminated.
>
> **Illinois Subclass**: All persons in the State of Illinois who purchased one or more of the Products in the State of Illinois for personal use and not for resale during the applicable statute of limitations period, until the date notice is disseminated.
>
> **Multi-State Consumer Protection Class:** All persons who purchased in the State of Illinois or any state with similar laws[6] one or more of the Products, within the

---

[6] While discovery may alter the following, Plaintiff asserts that the other states with similar consumer fraud laws under the facts of this case include, but are not limited to: California (Cal. Bus. & Prof. Code § 17200, *et seq.*); Florida (Fla. Stat. §§ 501.201, *et seq.*); Illinois (815 ICLS §§ 505/1, *et seq.*); Massachusetts (Mass. Gen. Laws Ch. 93A, *et seq.*); Michigan (Mich. Comp. Laws §§ 445.901, *et seq.*); Minnesota (Minn. Stat. §§ 325F.67, *et seq.*); New Jersey (N.J. Stat. §§ 56:8-

applicable statute of limitations, until the date notice is disseminated.

48.     Excluded from the Classes are (a) any person who purchased the Products for resale and not for personal or household use, (b) any person who signed a release of P&G in exchange for consideration, (c) any officers, directors or employees, or immediate family members of the officers, directors or employees, of P&G or any entity in which a P&G has a controlling interest, (d) any legal counsel or employee of legal counsel for P&G, and (e) the presiding Judge in this lawsuit, as well as the Judge's staff and their immediate family members.

49.     Plaintiff reserves the right to amend the definition of the Classes if discovery or further investigation reveals that the Classes should be expanded or otherwise modified.

50.     **Numerosity – Federal Rule of Civil Procedure 23(a)(1).** Class members are so numerous and geographically dispersed that joinder of all class members is impracticable. While the exact number of class members remains unknown at this time, upon information and belief, there are thousands, if not hundreds of thousands or millions, of putative class members.

51.     **Predominance of Common Questions of Law and Fact – Federal Rule of Civil Procedure 23(a)(2) and 23(b)(3).** Common questions of law and fact exist as to all class members and predominate over any questions affecting only individual class members. These common legal and factual questions include, but are limited to, the following:

a.   Whether P&G made the "MAX STRENGTH" representations;

b.   Whether P&G promoted the Products with false and misleading statements of fact and material omissions;

c.   Whether P&G's "MAX STRENGTH" representations are deceptive, unfair, or

---

1, *et seq*.); New York (N.Y. Gen. Bus. Law §§ 349, *et seq*.); Washington (Wash. Rev. Code §§ 19.86.010, *et seq*.); *See Mullins v. Direct Digital, LLC*, No. 13-cv-1829, 2014 WL 5461903 (N.D. Ill. Sept. 30, 2014), *aff'd*, 795 F.3d 654 (7th Cir. 2015).

misleading to the reasonable consumer;

d.   Whether P&G's actions and/or omissions violate applicable laws;

e.   Whether Plaintiff and putative members of the Classes have suffered loss of monies or
     property or other value as a result of P&G's acts, omissions, or misrepresentations of
     material facts;

f.   Whether P&G was unjustly enriched at the expense of Plaintiff and members of the
     putative Classes in connection with the Products;

g.   Whether P&G breached warranties owed to Plaintiff and members of the putative
     Classes;

h.   Whether Plaintiff and members of the putative Classes are entitled to monetary
     damages and, if so, the nature of such relief; and

i.   Whether Plaintiff and members of the putative Classes are entitled to equitable,
     declaratory, or injunctive relief and, if so, the nature of such relief.

52.   **Typicality – Federal Rule of Civil Procedure 23(a)(3).** Plaintiff's claims are
typical of those of the absent class members in that Plaintiff and the class members each purchased
and used the Products and each sustained damages arising from P&G's wrongful conduct, as
alleged more fully herein. Plaintiff shares the aforementioned facts and legal claims or questions
with putative members of the Classes, and Plaintiff and all members of the putative Classes have
been similarly affected by P&G's common course of conduct alleged herein. Plaintiff and all
members of the putative Classes sustained monetary and economic injuries including, but not
limited to, ascertainable loss arising out of P&G's false and deceptive "MAX STRENGTH"
representations about the Products, as alleged herein.

53.   **Adequacy – Federal Rule of Civil Procedure 23(a)(4).** Plaintiff will fairly and

adequately represent and protect the interests of the members of the putative Classes. Plaintiff has retained counsel with substantial experience in handling complex class action litigation, including complex questions that arise in this type of consumer protection litigation. Further, Plaintiff and his counsel are committed to the vigorous prosecution of this action. Plaintiff does not have any conflicts of interest or interests adverse to those of putative Classes.

54. **Declaratory and Injunctive Relief – Federal Rule of Civil Procedure 23(b)(2).** P&G has acted or refused to act on grounds generally applicable to Plaintiff and all members of the Classes, thereby making appropriate final injunctive relief and declaratory relief, as described below, with respect to the members of the Classes as a whole.

55. **Superiority – Federal Rule of Civil Procedure 23(b)(3).** A class action is superior to any other available methods for the fair and efficient adjudication of the present controversy for at least the following reasons:

a. The damages suffered by each individual member of the putative Classes do not justify the burden and expense of individual prosecution of the complex and extensive litigation necessitated by P&G's conduct;

b. Even if individual members of the Classes had the resources to pursue individual litigation, it would be unduly burdensome to the courts in which the individual litigation would proceed;

c. The claims presented in this case predominate over any questions of law or fact affecting individual members of the Classes;

d. Individual joinder of all members of the Classes is impracticable;

e. Absent a class, Plaintiff and members of the putative Classes will continue to suffer harm as a result of P&G's unlawful conduct; and

f.  This action presents no difficulty that would impede its management by the Court as a

class action, which is the best available means by which Plaintiff and members of the

putative Classes can seek redress for the harm caused by P&G.

**CLAIMS FOR RELIEF**

**COUNT I**
**VIOLATION OF ILLINOIS CONSUMER FRAUD**
**AND DECEPTIVE BUSINESS PRACTICES ACT**
**(By Plaintiff on Behalf of the Illinois Subclass)**

56.  Plaintiff realleges paragraphs 1-55 above as if fully set forth herein.

57.  Plaintiff brings this claim on behalf of himself and the Illinois Subclass.

58.  The Illinois Consumer Fraud and Deceptive Business Practices Act (the "ICFA"),

815 ILCS 505/1, *et seq.*, prohibits "unfair methods of competition and unfair or deceptive acts or

practices, including but not limited to the use or employment of any deception, fraud, false

pretense, false promise, misrepresentation or the concealment, suppression or omission of any

material fact, with intent that others rely upon the concealment, suppression or omission of such

material fact or the use or employment of any practice described in Section 2 of the 'Uniform

Deceptive Trade Practices Act' . . . ."

59.  Plaintiff and the Illinois Subclass members were injured by P&G's deceptive

misrepresentations, concealments and omissions and these misrepresentations, concealments and

omissions were material and deceived Plaintiff and the Illinois Subclass. Because Plaintiff and

the Illinois Subclass members relied on P&G's misrepresentations, concealments and omissions

when purchasing the Products, they were injured at the time of purchase.

60.  P&G does business in Illinois, sells and distributes the Products in Illinois, and

engaged in deceptive acts and practices in connection with the sale of the Products in Illinois and

elsewhere in the United States.

61.     The Products purchased by Plaintiff and the Illinois Subclass members were "consumer items" as that term is defined under the ICFA.

62.     P&G engaged in unfair and deceptive acts in violation of 815 Ill. Comp. Stat. 505/2 when it misrepresented and deceptively concealed, suppressed and/or omitted the material information known to P&G as set forth above concerning its Products, which has caused damage and injury to Plaintiff and the Illinois Subclass members. Plaintiff and the Illinois Subclass members were injured by P&G's unfair and deceptive acts at the time of purchasing the Products.

63.     P&G's marking of the Products violates this prohibition by deceiving consumers into believing each of the Products is a "MAX STRENGTH" decongestant or pain reliever/fever reducer.

64.     P&G engaged in fraudulent and/or deceptive conduct, which creates a likelihood of confusion or of misunderstanding in violation of the Act.

65.     P&G engaged in misleading and deceptive advertising that represented that the Products were maximum strength. P&G chose to package and market the products in this way to impact consumer choices and gain market dominance, as it knew or should have known that all consumers who purchased the products would be impacted by its omissions and would reasonably believe P&G's false and misleading Maximum Strength Representations and omissions.

66.     P&G's deceptive acts occurred in a course of conduct involving trade and commerce in Illinois and throughout the United States.

67.     P&G intended Plaintiff and the Illinois Subclass members to rely on its deceptive acts when purchasing the Products.

68.     P&G's deceptive acts proximately caused actual injury and damage to Plaintiff and the Illinois Subclass members at the time of purchase.

69.     Plaintiff and the Illinois Subclass members would not have purchased, or would have paid less for, the Products but for P&G's material misrepresentations as described in this Complaint.

**COUNT VI**
**VIOLATION OF ILLINOIS UNIFORM DECEPTIVE TRADE PRACTICES ACT**
**(By Plaintiff on Behalf of the Illinois Subclass)**

70.     Plaintiff realleges paragraphs 1-55 above as if fully set forth herein.

71.     Plaintiff brings this claim on behalf of himself and the Illinois Subclass.

72.     The Illinois Deceptive Trade Practices Act ("UDTPA"), 815 ILCS 510/2, *et seq.*, prohibits "[u]nfair methods of competition and unfair or deceptive acts or practices, including but not limited to the use or employment of any deception, fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of any material fact, with intent that others rely upon the concealment, suppression or omission of such material fact."

73.     815 ILCS 510/2 provides in pertinent part that a "person engages in a deceptive trade practice when, in the course of his or her business, vocation, or occupation," the person does any of the following: "(5) represents that goods or services have . . . uses, benefits or quantities that they do not have . . .; (7) represents that goods or services are of a particular standard, quality, or grade or that goods are a particular style or model, if they are of another; . . . [or] (12) engages in any other conduct which similarly creates a likelihood of confusion or misunderstanding."

74.     P&G's marking of the Products violates this prohibition by deceiving consumers into believing each of the Products is a "MAX STRENGTH" decongestant or pain reliever/fever reducer.

75.     P&G engaged in fraudulent and/or deceptive conduct, which creates a likelihood of confusion or of misunderstanding in violation of the Act.

23

76. P&G engaged in misleading and deceptive advertising that represented that the Products were maximum strength. P&G chose to package and market the Products in this way to impact consumer choices and gain market dominance, as it knew or should have known that all consumers who purchased the Products would be impacted by its omissions and would reasonably believe P&G's false and misleading Maximum Strength Representations and omissions.

77. P&G intended that Plaintiff and each of the other Illinois Subclass members would reasonably rely upon the material omissions concerning the true nature of the Products.

78. P&G's concealment, omissions, and other deceptive conduct were likely to deceive and cause misunderstanding and/or in fact caused Plaintiff and each of the other Illinois Subclass members to be deceived about the true nature of the Products.

79. P&G's deceptive acts occurred in a course of conduct involving trade and commerce in Illinois and throughout the United States.

80. P&G's deceptive acts proximately caused actual injury and damage to Plaintiff and the Illinois Subclass Members at the time of purchase.

81. Plaintiff and the Illinois Subclass Members would not have purchased, or would have paid less for, the Products but for P&G's material misrepresentations as described in this Complaint.

82. P&G intended Plaintiff and the Illinois Subclass members to rely on its deceptive acts when purchasing the Products.

## COUNT III
### VIOLATION OF STATE CONSUMER PROTECTION STATUTES
**(By Plaintiff on Behalf of the Multi-State Consumer Protection Class)**

83. Plaintiff realleges paragraphs 1-55 as if fully set forth herein.

84. Plaintiff brings this cause of action on behalf of himself and the Multi-State

Consumer Protection Class.

85.     Plaintiff and Multi-State Consumer Protection Class members have been injured as a result of P&G's violations of the state consumer protection statutes listed above in paragraph 47 and footnote 6, which also provide a basis for redress to Plaintiff and Multi-State Consumer Class Members based on P&G's fraudulent, deceptive, unfair and unconscionable acts, practices and conduct.

86.     P&G's conduct as alleged herein violates the consumer protection, unfair trade practices, and deceptive acts laws of each of the jurisdictions encompassing the Multi-State Consumer Class.

87.     P&G violated the Multi-State Consumer Class states' consumer protection, unfair trade practices, and deceptive acts laws through its misleading and deceptive advertising that represented the Products were "MAX STRENGTH." P&G chose to package and market the Products in this way to impact consumer choices and gain market dominance, as it knew or should have known that all consumers who purchased the Products would be impacted by its omissions and would reasonably believe P&G's false and misleading Maximum Strength Representations and omissions.

88.     P&G's misrepresentations were material to Plaintiff and Multi-State Consumer Class members' decision to purchase the Products or pay a premium for the Products.

89.     P&G made its untrue and/or misleading statements and representations willfully, wantonly, and with reckless disregard for the truth.

90.     As a result of P&G's violations of the aforementioned states' unfair and deceptive practices laws, Plaintiff and Multi-State Consumer Class members paid a premium for the Products.

91.     As a result of P&G's violations, P&G has been unjustly enriched.

92.     Pursuant to the alleged consumer protection, unfair trade practices, and deceptive acts laws, Plaintiff and Multi-State Consumer Class members are entitled to recover compensatory damages, restitution, punitive and special damages, including but not limited to statutory or treble damages, reasonable attorneys' fees, and costs, and other injunctive or declaratory relief as deemed appropriate or permitted pursuant to the relevant law.

**COUNT IV**
**UNJUST ENRICHMENT**
**(By Plaintiff, In the Alternative, and on Behalf of the Nationwide and/or Illinois Subclass)**

93.     Plaintiff realleges paragraphs 1-55 above as if fully set forth herein.

94.     Plaintiff brings this cause of action on behalf of himself, the Nationwide Class, and/or the Illinois Subclass. It is alleged it the alternative to the extent there is no adequate remedy at law.

95.     Plaintiff and the putative class members conferred a benefit on P&G when they purchased the Products. By its wrongful acts and omissions described herein, including selling the Products containing the "MAX STRENGTH" representations, which did not conform to the promises or affirmations of fact made on the label, P&G was unjustly enriched at the expense of Plaintiff and the putative class members.

96.     Plaintiff's and the putative class members' detriment and P&G's enrichment were related to and flowed from the wrongful conduct challenged in this Complaint.

97.     P&G has profited from its unlawful, unfair, misleading, and deceptive practices at the expense of Plaintiff and the putative class members under circumstances in which it would be unjust for P&G to be permitted to retain the benefit. It would be inequitable for P&G to retain the profits, benefits, and other compensation obtained from their wrongful conduct as described herein in connection with selling the Products.

26

98.     P&G has been unjustly enriched in retaining the revenues derived from class members' purchases of the Products, which retention of such revenues under these circumstances is unjust and inequitable because P&G marketed, advertised, distributed, and sold the Products, and P&G misrepresented the nature of the products, misrepresented their benefits and attributes, and knowingly marketed and promoted the Products with Maximum Strength Representations, which caused injuries to Plaintiff and the Classes because they would not have purchased the Products based on the same representations if the true facts concerning the Products had been known.

99.     Plaintiff and the putative class members have been damaged as a direct and proximate result of P&G's unjust enrichment because they would not have purchased the Products on the same terms or for the same price had they known the true nature of the Products and the misstatements regarding the strength of the Products' active ingredients.

100.     P&G either knew or should have known that payments rendered by Plaintiff and the class members were given and received with the expectation that the Maximum Strength Representations made by P&G in advertising and on the Products' labels and packaging were true. It is inequitable for P&G to retain the benefit of payments under these circumstances because the Maximum Strength Representations are not true.

101.     Plaintiff and the putative class members are entitled to recover from P&G all amounts wrongfully collected and improperly retained by P&G.

102.     As a direct result of P&G's wrongful conduct and unjust enrichment, Plaintiff and the putative class members are entitled to restitution of, disgorgement of, and/or imposition of a constructive trust upon all profits, benefits, and other compensation obtained by P&G for their inequitable and unlawful conduct.

## COUNT V
## Breach of Express Warranty
## (By Plaintiff, In the Alternative, and on Behalf of the Nationwide and/or Illinois Subclass)

103.     Plaintiff realleges paragraphs 1-55 above as if fully set forth herein.

104.     Plaintiff and class members purchased the Products through P&G's authorized retailers.

105.     Plaintiff and class members formed a contract with P&G at the time Plaintiff and class members purchased the Product.

106.     The terms of the contract include the promises and affirmations of fact made by P&G on the Product packaging and through marketing and advertising, as described above.

107.     This labeling, marketing, and advertising constitute express warranties and became part of the basis of the bargain and are part of the standardized contract between Plaintiff and class members.

108.     P&G made the representations described herein to induce Plaintiff and class members to purchase the Products, and Plaintiff and class members relied on the representations in purchasing the Products.

109.     All conditions precedent to P&G's liability under the above-referenced contract have been performed by Plaintiff and the other class members.

110.     P&G thereby breached the following state warranty laws:

    a.     Code of Ala. § 7-2-313;

    b.     Alaska Stat. § 45.02.313;

    c.     A.R.S. § 47-2313;

    d.     A.C.A. § 4-2-313;

    e.     Cal. Comm. Code § 2313;

    f.     Colo. Rev. Stat. § 4-2-313;

28

g.  Conn. Gen. Stat. § 42a-2-313;

h.  6 Del. C. § 2-313;

i.  D.C. Code § 28:2-313;

j.  Fla. Stat. § 672.313;

k.  O.C.G.A. § 11-2-313;

l.  H.R.S. § 490:2-313;

m.  Idaho Code § 28-2-313;

n.  810 I.L.C.S. 5/2-313;

o.  Ind. Code § 26-1-2-313;

p.  Iowa Code § 554.2313;

q.  K.S.A. § 84-2-313;

r.  K.R.S. § 355.2-313;

s.  11 M.R.S. § 2-313;

t.  Md. Commercial Law Code Ann. § 2-313;

u.  106 Mass. Gen. Laws Ann. § 2-313;

v.  M.C.L.S. § 440.2313;

w.  Minn. Stat. § 336.2-313;

x.  Miss. Code Ann. § 75-2-313;

y.  R.S. Mo. § 400.2-313;

z.  Mont. Code Anno. § 30-2-313;

aa.  Neb. Rev. Stat. § 2-313;

bb.  Nev. Rev. Stat. Ann. § 104.2313;

cc.  R.S.A. 382-A:2-313;

dd.      N.J. Stat. Ann. § 12A:2-313;

ee.      N.M. Stat. Ann. § 55-2-313;

ff.      N.Y. U.C.C. Law § 2-313;

gg.      N.C. Gen. Stat. § 25-2-313;

hh.      N.D. Cent. Code § 41-02-30;

ii.      II. O.R.C. Ann. § 1302.26;

jj.      12A Okl. St. § 2-313;

kk.      Or. Rev. Stat. § 72-3130;

ll.      13 Pa. Rev. Stat. § 72-3130;

mm.      R.I. Gen. Laws § 6A-2-313;

nn.      S.C. Code Ann. § 36-2-313;

oo.      S.D. Codified Laws, § 57A-2-313;

pp.      Tenn. Code Ann. § 47-2-313;

qq.      Tex. Bus. & Com. Code § 2.313;

rr.      Utah Code Ann. § 70A-2-313;

ss.      9A V.S.A. § 2-313;

tt.      Va. Code Ann. § 59.1-504.2;

uu.      Wash. Rev. Code Ann. § 6A.2-313;

vv.      W. Va. Code § 46-2-313;

ww.      Wis. Stat. § 402.313; and

xx.      Wyo. Stat. § 34.1-2-313.

111.      In connection with its sale of the Products, P&G, as the designer, manufacturer, marketer, distributor or seller, expressly warranted that the Products were maximum strength

through its use of the Maximum Strength Representations described herein.

112.     The express warranties covering the Products were a material part of the bargain between P&G and consumers. At the time it made these express warranties, P&G knew reasonable consumers were purchasing the Products because they believed they were maximum strength oral nasal decongestant products and pain reliever/fever reducers, as they were labeled and marketed.

113.     Each of the Products have an identical or substantially identical product representation(s) as they each contain the term "MAX STRENGTH" in their product name. Furthermore, the Products are marketed and advertised in an identical or substantially identical way.

114.     P&G breached its express warranties by selling the Products that were, in actuality, not maximum strength oral nasal decongestant products and pain relievers/fever reducers. P&G breached the warranty because it sold the Products which it labeled and marketed using the Maximum Strength Representations despite the fact that stronger over-the-counter alternatives existed, which was known to P&G and unknown to consumers at the time of sale.

115.     P&G further breached its express written warranties to Plaintiff and class members in that the Products are incapable of fulfilling their promise to function as maximum strength oral nasal decongestant products and pain relievers/fever reducers at the time they leave the manufacturing plant and on the first day of purchase, and by failing to disclose and actively concealing the true benefits of the Products from consumers.

116.     The Products that Plaintiff and class members purchased are not maximum strength oral nasal decongestant products and pain reliever/fever reducers, and thus Plaintiffs and class members suffered the loss of the product, loss of use of the product, and loss of the

benefit of their bargain. P&G's warranty expressly applies to the original purchaser, creating privity between P&G on the one hand, and Plaintiff and class members on the other.

117.     Likewise, it was reasonably foreseeable that Plaintiff and Class Member would be the intended beneficiaries of the Products, creating privity or an exception to any privity requirement. Plaintiff and each of the class members are the intended beneficiaries of P&G's warranties and its sale through retailers. The retailers were not intended to be the ultimate consumers of the Products and have no rights under the warranty agreements provided by P&G. P&G's warranties were designed for and intended to benefit the consumer only and Plaintiff and class members were the intended beneficiaries of the Products.

118.     P&G has been provided sufficient notice of its breaches of the express warranties associated with the Products in a letter dated November 27, 2023.

119.     As a direct and proximate result of P&G's breach of its express warranties, Plaintiff and Class Members suffered, and continue to suffer, financial damage and injury, and are entitled to all damages, in addition to costs, interest and fees, including attorneys' fees, as allowed by law.

## COUNT VI
## Breach of Implied Warranty
## (By Plaintiff, In the Alternative, and on Behalf of the Nationwide and/or Illinois Subclass)

120.     Plaintiff realleges paragraphs 1-55 above as if fully set forth herein.

121.     P&G is a merchant and was at all relevant times involved in the manufacturing, distributing, warranting, and/or selling of the Products.

122.     The Products are goods within the relevant laws and P&G knew or had reason to know of the specific use for which the Products, as goods, were purchased.

123.     The implied warranty of merchantability included with the sale of each Product

means that P&G warranted that the Products would be fit for the ordinary purposes for which the Products were used and sold, and were not otherwise injurious to consumers, that the Products would pass without objection in the trade, be of fair and average quality, and conform to the promises and affirmations of fact made by P&G. This implied warranty of merchantability is part of the basis for the benefit of the bargain between P&G, and Plaintiff, and class members.

124.     Defendant breached the implied warranty of merchantability because the Products are not fit for their ordinary purpose as a maximum strength nasal decongestant and pain reliever/fever reducer. As further alleged herein, stronger over-the-counter alternatives existed, and therefore, there is a breach of the implied warranty of merchantability.

125.     P&G's warranty expressly applies to the original purchaser and any succeeding owner of the Products, creating privity between P&G on the one hand, and Plaintiff and class members on the other.

126.     Nonetheless, privity is not required because Plaintiff and class members are the intended beneficiaries of P&G's warranties and its sale through retailers. P&G's retailers were not intended to be the ultimate consumers of the Products and have no rights under the warranty agreements. P&G's warranties were designed for and intended to benefit the consumer only and Plaintiff and class members were their intended beneficiaries.

127.     Likewise, it was reasonably foreseeable that Plaintiff and class members would be the intended beneficiaries of the Products and warranties.

128.     P&G impliedly warranted that the Products were of merchantable quality and fit for such use. These implied warranties included, among other things: (i) a warranty that the Products manufactured, supplied, distributed, and/or sold by P&G were maximum strength nasal

decongestants and pain relievers/fever reducers; and (ii) a warranty that the Products would be fit for their intended use while they were being used by consumers.

129.     Contrary to the applicable implied warranties, the Products, at the time of sale and thereafter, were not fit for their ordinary and intended purpose of providing Plaintiff and class members with maximum strength nasal decongestants and pain reliever/fever reducers, as other, stronger alternatives are available with stronger active ingredients, such as pseudoephedrine and with higher acetaminophen dosages.

130.     P&G breached the implied warranties because the Products were sold with the inability to provide Plaintiff and class members with a maximum strength nasal decongestant and pain reliever/fever reducers, which substantially reduced and/or prevented the Products from functioning as maximum strength product.

131.     As a direct and proximate result of the foregoing, Plaintiff and class members suffered, and continue to suffer, financial damage and injury, and are entitled to all damages, in addition to costs, interest and fees, including attorneys' fees, as allowed by law.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, individually and on behalf of all others similarly situated members of the Classes, prays for relief and judgment, including entry of an order:

A.     Declaring that this action is properly maintained as a class action, certifying the proposed Classes, appointing as Class Representative and appointing Plaintiff's counsel as Class Counsel;

B.     Directing that P&G bear the costs of any notice sent to the Classes;

C.     Declaring that P&G must disgorge, for the benefit of the Classes, all or part of the ill-gotten profits they received from the sale of the Products, or order P&G to

make full restitution to Plaintiff and the members of the Classes;

      D.      Awarding restitution and other appropriate equitable relief;

      E.      Granting an injunction against P&G to enjoin it from conducting its business through the unlawful, unfair, and fraudulent acts or practices set forth herein;

      F.      Granting an Order requiring P&G to fully and appropriately recall the Products and/or to remove the claims on its website and elsewhere, including "MAX STRENGTH" representations regarding the Products;

      G.      Ordering a jury trial and damages according to proof;

      H.      Awarding Plaintiff and members of the Classes compensatory and punitive damages, or statutory damages, as provided by the applicable state consumer protection statutes invoked above;

      I.      Enjoining P&G from continuing to engage in the unlawful and unfair business acts and practices as alleged herein;

      J.      Awarding attorneys' fees and litigation costs to Plaintiff and members of the Class(es);

      K.      Awarding civil penalties, prejudgment interest, and punitive damages as permitted by law; and

      L.      Ordering such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury of all claims in this Complaint so triable.

Dated: January 5, 2024        Respectfully submitted,

By: */s/ Nick Suciu III*

Nick Suciu III
**MILBERG COLEMAN BRYSON
PHILLIPS GROSSMAN, PLLC**
6905 Telegraph Rd., Suite 115
Bloomfield Hills, MI 48301
Telephone: (313) 303-3472
Email: nsuciu@milberg.com

Gary M. Klinger
**MILBERG COLEMAN BRYSON PHILLIPS
GROSSMAN, PLLC**
227 W. Monroe Street, Suite 2100
Chicago, IL 60606
Telephone: (866) 252-0878
Email: gklinger@milberg.com

Jeff Ostrow
Jonathan M. Streisfeld
Kristen Lake Cardoso
**KOPELOWITZ OSTROW P.A.**
One West Las Olas Blvd., Suite 500
Fort Lauderdale, Florida 33301
Telephone: (954) 525-4100
Email:  ostrow@kolawyers.com
      streisfeld@kolawyers.com
      cardoso@kolawyers.com

Melissa S. Weiner
Ryan J. Gott
**PEARSON WARSHAW, LLP**
328 Barry Avenue South, Suite 200
Wayzata, Minnesota 55391
Telephone: (612) 389-0600
Email: mweiner@pwfirm.com
     rgott@pwfirm.com

Erin Ruben
**MILBERG COLEMAN BRYSON
PHILLIPS GROSSMAN PLLC**
900 W. Morgan Street
Raleigh, NC 27603
Telephone: (919) 600-5000
Email: eruben@milberg.com

36

J. Hunter Bryson
**MILBERG COLEMAN BRYSON**
**PHILLIPS GROSSMAN, PLLC**
405 E 50th Street
New York, NY 10022
Telephone: (630) 796-0903
Email: hbryson@milberg.com

*Attorneys for Plaintiff*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on January 5, 2024 the foregoing document was filed via the Court's ECF system, which will cause a true and correct copy of the same to be served electronically on all ECF-registered counsel of record.

*/s/ Nick Suciu III*
Nick Suciu III

McSHAIN

# United States District Court
## Northern District of Illinois - CM/ECF NextGen 1.7.1.1 (Chicago)
## CIVIL DOCKET FOR CASE #: 1:23-cv-13840

Tlaib v. Procter & Gamble Company
Assigned to: Honorable Franklin U. Valderrama
Demand: $5,000,000
Cause: 28:1332 Diversity-Account Receivable

Date Filed: 09/18/2023
Jury Demand: Both
Nature of Suit: 370 Other Fraud
Jurisdiction: Diversity

**Plaintiff**

**Mohamad Tlaib**
represented by

**Erin J. Ruben**
Milberg Coleman Bryson Phillips Grossman
Pllc
900 W. Morgan Street
Raleigh, NC 27603
(919) 600-5000
Fax: Not a member
Email: eruben@milberg.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**John Hunter Bryson**
Milberg Coleman Bryson Phillips
Grossman, Pllc
900 W. Morgan Street
Raleigh, NC 27603
(919) 600-5000
Fax: Not a member
Email: hbryson@milberg.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Jonathan Marc Streisfeld**
Kopelowitz Ostrow P.A.
One West Las Olas Boulevard
Suite 500
Fort Lauderdale, FL 33301
(954) 525-4100
Fax: Not a member
Email: streisfeld@kolawyers.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Kristen Lake Cardoso**
Kopelowitz Ostrow Ferguson Weiselberg
Gilbert
1 W Las Olas Blvd
Suite 500
Fort Lauderdale, IL 33301
(954) 525-4100

Fax: Not a member
Email: cardoso@kolawyers.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Nick Suciu , III**
Milberg Coleman Bryson Phillips
Grossman, PLLC
6905 Telegraph Rd., Suite 115
Bloomfield Hills, MI 483021
313 303-3472
Fax: Pro Hac Vice
Email: nsuciu@milberg.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Russell Busch**
Milberg Coleman Bryson Phillips Grossman
Pllc
800 S. Gay Street, Suite 1100
Knoxville, TN 37929
(630) 796-0903
Fax: Not a member
Email: rbusch@milberg.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Jeffrey M. Ostrow**
Kopelowitz Ostrow P.A.
Florida
One West Las Olas Blvd.
Suite 500
Fort Lauderdale, FL 33301
954-525-4100
Fax: 954-525-4300
Email: ostrow@kolawyers.com
*ATTORNEY TO BE NOTICED*

**Melissa Susan Weiner**
Pearson Warshaw, LLP
328 Barry Avenue S.
Suite 200
Wayzata, MN 55391
612-389-0600
Fax: 612-389-0610
Email: mweiner@pwfirm.com
*ATTORNEY TO BE NOTICED*

**Ryan Thomas Gott**
Pearson Warshaw, Llp
328 Barry Ave. South
Suite 200
Wayzata, MN 55391
(612) 389-0600

Fax: Not a member
Email: rgott@pwfirm.com
*ATTORNEY TO BE NOTICED*

**Gary M. Klinger**
Milberg Coleman Bryson Phillips Grossman
PLLC
227 W. Monroe Street
Suite 2100
Chicago, IL 60606
866-252-0878
Fax: Active
Email: gklinger@milberg.com
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Procter & Gamble Company**                represented by **Andrew James Soukup**
Covington & Burling LLP
One CityCenter
850 Tenth Street NW
Washington, DC 20001
202-662-5066
Fax: 202-778-5066
Email: asoukup@cov.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Alyssa Marie Gregory**
Locke Lord LLP
111 S. Wacker Dr.
Chicago, IL 60606
(312) 443-0355
Fax: Not a member
Email: alyssa.gregory@lockelord.com
*ATTORNEY TO BE NOTICED*

**Phillip Russell Perdew**
Locke Lord LLP
111 South Wacker Drive
Chicago, IL 60606
(312) 443-1712
Fax: Active
Email: rperdew@lockelord.com
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 09/18/2023 | 1 | COMPLAINT filed by Mohamad Tlaib; Jury Demand. Filing fee $ 402, receipt number AILNDC-21100126.(Klinger, Gary) (Entered: 09/18/2023) |
| 09/18/2023 | 2 | CIVIL Cover Sheet (Klinger, Gary) (Entered: 09/18/2023) |

| 09/18/2023 | 3 | ATTORNEY Appearance for Plaintiff Mohamad Tlaib by Nick Suciu, III (Suciu, Nick) (Entered: 09/18/2023) |
|---|---|---|
| 09/18/2023 | 4 | ATTORNEY Appearance for Plaintiff Mohamad Tlaib by John Hunter Bryson (Bryson, John) (Entered: 09/18/2023) |
| 09/18/2023 | 5 | ATTORNEY Appearance for Plaintiff Mohamad Tlaib by Erin J. Ruben (Ruben, Erin) (Entered: 09/18/2023) |
| 09/20/2023 | 6 | ATTORNEY Appearance for Plaintiff Mohamad Tlaib by Melissa Susan Weiner (Weiner, Melissa) (Entered: 09/20/2023) |
| 09/20/2023 | 7 | ATTORNEY Appearance for Plaintiff Mohamad Tlaib by Ryan Thomas Gott (Gott, Ryan) (Entered: 09/20/2023) |
| 09/20/2023 | | CASE ASSIGNED to the Honorable Franklin U. Valderrama. Designated as Magistrate Judge the Honorable Heather K. McShain. Case assignment: Random assignment. (jcm) (Entered: 09/20/2023) |
| 09/20/2023 | | CLERK'S NOTICE: Pursuant to Local Rule 73.1(b), a United States Magistrate Judge of this court is available to conduct all proceedings in this civil action. If all parties consent to have the currently assigned United States Magistrate Judge conduct all proceedings in this case, including trial, the entry of final judgment, and all post-trial proceedings, all parties must sign their names on the attached Consent To form. This consent form is eligible for filing only if executed by all parties. The parties can also express their consent to jurisdiction by a magistrate judge in any joint filing, including the Joint Initial Status Report or proposed Case Management Order. (jcm) (Entered: 09/20/2023) |
| 09/20/2023 | 8 | MINUTE entry before the Honorable Franklin U. Valderrama: On or before 12/04/2023 the parties shall file a joint initial status report. A template for the Joint Initial Status Report, setting forth the information required, may be found at http://www.ilnd.uscourts.gov/Judges.aspx by clicking on Judge Valderrama's name and then again on the link entitled 'Joint Initial Status Report. Plaintiff must serve this Minute Entry on all other parties. If the defendant(s) has not been served with process by that date, plaintiff's counsel is instructed to file an individual status report indicating the status of service of process by the same deadline. The parties are further ordered to review all of Judge Valderrama's standing orders and the information available on his webpage. Any nongovernmental corporate party that qualifies under the Rules is reminded of the requirement to file a disclosure statement under Federal Rule of Civil Procedure 7.1/N.D. Ill. Local Rule 3.2. Emailed notice (axc). (Entered: 09/20/2023) |
| 09/21/2023 | | SUMMONS Issued as to Defendant Procter & Gamble Company (mek,) (Entered: 09/21/2023) |
| 10/05/2023 | 9 | SUMMONS Returned Executed by Mohamad Tlaib as to Procter & Gamble Company on 9/22/2023, answer due 10/13/2023. (Klinger, Gary) (Entered: 10/05/2023) |
| 10/10/2023 | 10 | ATTORNEY Appearance for Defendant Procter & Gamble Company by Phillip Russell Perdew (Perdew, Phillip) (Entered: 10/10/2023) |
| 10/10/2023 | 11 | ATTORNEY Appearance for Defendant Procter & Gamble Company by Alyssa Marie Gregory (Gregory, Alyssa) (Entered: 10/10/2023) |
| 10/10/2023 | 12 | MOTION by Defendant Procter & Gamble Company to stay *all Proceedings Pending JPML Determination (Joint Motion)*<br><br>(Perdew, Phillip) (Entered: 10/10/2023) |

| 10/11/2023 | 13 | ATTORNEY Appearance for Plaintiff Mohamad Tlaib by Jeffrey M. Ostrow (Ostrow, Jeffrey) (Entered: 10/11/2023) |
|---|---|---|
| 10/11/2023 | 14 | ATTORNEY Appearance for Plaintiff Mohamad Tlaib by Kristen Lake Cardoso (Cardoso, Kristen) (Entered: 10/11/2023) |
| 10/11/2023 | 15 | ATTORNEY Appearance for Plaintiff Mohamad Tlaib by Jonathan Marc Streisfeld (Streisfeld, Jonathan) (Entered: 10/11/2023) |
| 10/12/2023 | 16 | MINUTE entry before the Honorable Franklin U. Valderrama: For the reasons stated in the motion, the Court grants the parties' joint motion to stay all proceedings pending JPML determination in In re: Oral Phenylephrine Marketing and Sales Practices Litigation, MDL No. 3089 12 . All deadlines, including Defendant's obligation to respond to the Complaint and the joint initial status report deadline 8 are hereby vacated. If the JPML does not transfer this action to an MDL, the Parties shall file a status report within 14 days of the JPML's ruling requesting a deadline be set for Defendant's initial response to the Complaint and deadlines for any other matters consistent with this Court rules. Enter order. Emailed notice (axc). (Entered: 10/12/2023) |
| 10/12/2023 | 17 | ORDER GRANTING JOINT MOTION TO STAYALL PROCEEDINGS PENDING JPML DETERMINATION: Signed by the Honorable Franklin U. Valderrama on 10/12/2023. Emailed notice (axc). (Entered: 10/12/2023) |
| 12/19/2023 | 18 | ATTORNEY Appearance for Defendant Procter & Gamble Company by Andrew James Soukup (Soukup, Andrew) (Entered: 12/19/2023) |
| 12/20/2023 | 19 | STATUS Report *Joint Status Report Following JPML Determination* by Mohamad Tlaib (Streisfeld, Jonathan) (Entered: 12/20/2023) |
| 12/22/2023 | 20 | MINUTE entry before the Honorable Franklin U. Valderrama: The Court has reviewed the parties' joint status report 19 , which informs the Court that the JPML declined to include this action in an MDL proceeding. Accordingly, the Court adopts the following schedule proposed by the parties: (1) Plaintiff shall file an Amended Class Action Complaint by January 5, 2024; (2) Defendant shall respond to the Amended Class Action Complaint on or before February 4, 2024. If Defendant files a motion pursuant to Rule 12, Plaintiff shall either file a response to that motion or seek leave to file a Second Amended Class Action Complaint on or before March 5, 2024. Should Plaintiff respond to the motion, Defendant shall file a reply in support of the motion on or before March 26, 2024; and (3) The Parties shall file their Joint Initial Status Report no later than March 12, 2024. Emailed notice (axc). (Entered: 12/22/2023) |
| 12/28/2023 | 21 | ANNUAL REMINDER: Pursuant to Local Rule 3.2 (Notification of Affiliates), any nongovernmental party, other than an individual or sole proprietorship, must file a statement identifying all its affiliates known to the party after diligent review or, if the party has identified no affiliates, then a statement reflecting that fact must be filed. An affiliate is defined as follows: any entity or individual owning, directly or indirectly (through ownership of one or more other entities), 5% or more of a party. The statement is to be electronically filed as a PDF in conjunction with entering the affiliates in CM/ECF as prompted. As a reminder to counsel, parties must supplement their statements of affiliates within thirty (30) days of any change in the information previously reported. This minute order is being issued to all counsel of record to remind counsel of their obligation to provide updated information as to additional affiliates if such updating is necessary. If counsel has any questions regarding this process, this LINK will provide additional information. Signed by the Executive Committee on 12/28/2023: Mailed notice. (tg, ) (Entered: 12/28/2023) |

| 01/02/2024 | 22 | NOTIFICATION of Affiliates pursuant to Local Rule 3.2 by Procter & Gamble Company (Perdew, Phillip) (Entered: 01/02/2024) |
| 01/05/2024 | 23 | AMENDED complaint by Mohamad Tlaib against Procter & Gamble Company (Suciu, Nick) (Entered: 01/05/2024) |
| 01/09/2024 | 24 | ATTORNEY Appearance for Plaintiff Mohamad Tlaib by Russell Busch (Busch, Russell) (Entered: 01/09/2024) |

# Complaint, Amended Complaint, and Docket Sheet for *Tuominen v. Johnson & Johnson Consumer, Inc.*

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| TINA TUOMINEN, on behalf of herself and all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>JOHNSON & JOHNSON CONSUMER, INC..<br><br>Defendant. | Civil Action No. _____<br><br>**CLASS ACTION COMPLAINT AND COMPLAINT FOR DAMAGES**<br><br>**Jury Trial Demanded** |

Plaintiff, Tina Tuominen, on behalf of herself and all others similarly situated, brings this class action against Defendant, Johnson & Jonhson Consumer, Inc. ("Defendant" or "J&J"), and alleges on personal knowledge, investigation of her counsel, and on information and belief as follows:

## <u>GENERAL ALLEGATIONS</u>

1.      J&J offers a variety of non-prescription drugs, including oral nasal decongestants, competing in a billion-dollar industry.  Two such products are the over-the-counter oral nasal decongestants "Sudafed PE: Sinus Pressure + Pain" and "Sudafed PE: Sinus Congestion" products (collectively, "Sudafed PE" or "Products").  While J&J has a number of other Sudafed branded products, the Products are the only phenylephrine hydrochloride nasal decongestants marketed as "Maximum Strength" relief for "Sinus Pressure" and "Sinus Congestion."

2.      Sudafed PE's "effective" ingredient is phenylephrine hydrochloride, which the weight of the reliable scientific evidence, as recently unanimously confirmed by a Food and Drug

1

Administration ("FDA") committee, has determined to be no more effective as a nasal decongestant than a placebo.

3.      When consumers purchase decongestants, the strength and effectiveness of the ingredient is a material purchasing consideration, especially for consumers seeking a "maximum strength" product.

4.      J&J takes advantage of this consumer preference for strong relief by prominently representing the alleged strength of Sudafed PE in the one place every consumer looks when purchasing a product—the packaging. On each Sudafed PE product package, J&J touts in all-cap, red font on the front of the package that it is a decongestant providing "Maximum Strength" relief for "Sinus Pressure" and "Sinus Congestion."  For example, the Sudafed PE: Sinus Congestion product has the following label:



The Sudafed PE: Sinus Pressure + Pain product has similar label, with similar claims, and also falsely touts "Maximum Strength" as to its second active ingredient, acetaminophen, as a pain reliever and fever reducer:

2



5. The brand name "Sudafed" gained prominence as a decongestant through—as the name suggests—its use of pseudoephedrine. Sudafed PE borrows from this brand reputation, but provides an ineffective, inferior active oral nasal decongestant ingredient in place of the original one. By using the "Sudafed" label and portraying the product as a "Maximum Strength" decongestant, J&J misleads consumers into believing Sudafed PE's ingredients are suited to providing the strongest decongestant relief available on the market, or at least offered under the Sudafed brand name.

6. Despite marketing Sudafed PE as "Maximum Strength," J&J knew the active nasal decongestant ingredient in Sudafed PE, phenylephrine hydrochloride, was not as effective as a decongestant. Indeed, studies have shown phenylephrine hydrochloride is no more effective than a placebo. Additionally, the Sudafed PE: Sinus Pressure + Pain product does not even contain the maximum dosages of phenylephrine hydrochloride available or acetaminophen deserving of the "Maximum Strength" label and representation.

3

7.      Thus, this "Maximum Strength" packaging is misleading because nasal decongestants that are actually effective—without the "Maximum Strength" claim—are available, both on the market and under the Sudafed brand name, and higher strength phenylephrine hydrochloride products exists. For example, both oxymetazoline and pseudoephedrine are both available without a prescription, and the former may be purchased over the counter.

8.      Further, J&J well knew that higher doses of Tylenol, its brand name for acetaminophen, exist on the market. The Court need look no further than its long-established manufacturing and marketing of Tylenol as "Regular Strength" for 325 mg capsules and "Extra Strength" for 500 mg capsules.

9.      Despite this knowledge, J&J chose to mislead consumers through its promotion of the Sudafed PE products, with and without acetaminophen, as a "Maximum Strength" decongestant, pain reliever, and/or fever reducer.

10.     Consumers, including Plaintiff, lack the scientific knowledge necessary to determine whether Sudafed PE is a "Maximum Strength" decongestant, pain reliever, and/or fever reducer, or to ascertain the true quality or strength of this product. For that reason, reasonable consumers must and do rely on manufacturers, including J&J, to be honest and transparent and to properly disclose on the packaging all material information regarding the products and the strength of the dosage.

11.     Rather than being honest and transparent, J&J makes this "Maximum Strength" representation in a knowingly false and deceptive manner.

12.     For all the reasons set forth herein, including but not limited to J&J's misrepresentations and omissions regarding its "Maximum Strength" claims, Plaintiff seeks relief in this action individually, and as a class action on behalf of similarly situated purchasers of J&J's

4

Sudafed PE products, for: (1) violation of state consumer protection laws; (2) warranty law; and (3) unjust enrichment.

## THE PARTIES

13.     Plaintiff is a citizen of Illinois, residing in Kane County. She purchased Sudafed PE Sinus Congestion within the applicable statute of limitations period, most recently on or about November 2022.

14.     J&J is a New Jersey corporation with its principal place of business in Skillman, New Jersey.

## JURISDICTION AND VENUE

15.     This Court has personal jurisdiction over J&J in this matter. The acts and omissions giving rise to this action occurred in the state of Illinois. J&J has been afforded due process because it has, at all times relevant to this matter, individually or through its agents, subsidiaries, officers and/or representatives, operated, conducted, engaged in and carried on a business venture in this state and/or maintained an office or agency in this state, and/or marketed, advertised, distributed and/or sold Sudafed PE products in this state, committed a statutory violation within this state related to the allegations made herein, and caused injuries to Plaintiff and putative Class Members, which arose out of the acts and omissions that occurred in the state of Illinois, during the relevant time period, at which time J&J was engaged in business activities in the state of Illinois.

16.     This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C.§ 1332 of the Class Action Fairness Act of 2005 because: (i) there are 100 or more putative Class Members, (ii) the aggregate amount in controversy exceeds $5,000,000, exclusive of interest and costs, and (iii) there is minimal diversity because at least one Plaintiff and J&J are citizens of different states.

5

17.     Pursuant to 28 U.S.C. § 1391(a), venue is proper because a substantial part of the events giving rise to the claims asserted occurred in this District. Venue is also proper pursuant to 28 U.S.C. § 1391(c) because J&J conducts substantial business in this District, has sufficient minimum contacts with this District, and otherwise purposely avails itself of the markets in this District, through the promotion, sale, and marketing of the Sudafed PE products in this District. Furthermore, Plaintiff resides in this District.

## FACTS COMMON TO ALL CLASS MEMBERS

18.     J&J is one of the largest multinational pharmaceutical and medical technologies companies in the world.  As such, J&J markets several OTC drugs, including the Sudafed branded line of products.

19.     Phenylephrine hydrochloride is the active ingredient in J&J's Sudafed PE products for nasal decongestion. Acetaminophen is the active ingredient in one of the Products that is the subject of this action as a pain reliever and fever reducer. When included, both form the basis for J&J's "Maximum Strength" misrepresentations on the Sudafed PE products' packaging, and overall advertising and marketing campaign.

20.     At all relevant times, J&J has marketed its Products in a consistent and uniform manner nationwide.

21.     As alleged above, the Sudafed PE products represent that they are "MAXIMUM STRENGTH" relief for "Sinus Pressure" and "Sinus Congestion," and sometime as a "Pain Reliever/Fever Reducer," representations which predominately appear on the front label of the Products in all-cap bold, red lettering that contrasts with the background of the packaging. This instantly catches the eye of all reasonable consumers, including Plaintiff and Class Members.

6

22.     A reasonable consumer would understand that "MAXIMUM STRENGTH" relief for "Sinus Pressure" and "Sinus Congestion" means the Sudafed PE products contained the best and highest dose of nasal decongestant.  Similarly, that reasonable consumer would understand "MAXIMUM STRENGTH" for "Pain Reliever/Fever Reducer" to mean the product contained the best and highest dose of pain reliever and fever reducer. Indeed, J&J confirms on its website what reasonable consumers would expect—the promise that the Sudafed PE Products contain the "*Maximum strength* sinus decongestant for fast, yet powerful relief from sinus pressure & nasal congestion. Each caplet contains phenylephrine HCl decongestant for effective, non-drowsy symptom relief." *See* https://www.sudafed.com/products/sudafed-pe-sinus-congestion# (emphasis added). J&J confirms on its website that Sudafed PE Sinus Pressure + Pain as a "Non-drowsy decongestant provides powerful relief of sinus congestion and pressure with pain, plus headaches. Each *maximum strength tablet* contains acetaminophen for pain relief and phenylephrine HCI." *See* https://www.sudafed.com/products/sudafed-pe-sinus-pressure-pain (emphasis added).

23.     All reasonable consumers, including Plaintiff, read and relied on J&J's "Maximum Strength" representations when purchasing the Products.  Indeed, when purchasing pharmaceuticals, consumers often look for a product with the highest dosage and most effective active ingredients possible and are hence willing to pay a premium with such representations.

24.     J&J's "Maximum Strength" representation was material to Plaintiff and Class Members' decision to purchase Sudafed PE.  Had consumers, such as Plaintiff, known the Products were not "Maximum Strength" relief for "Sinus Pressure" and "Sinus Congestion," they would not have purchased them.  Indeed, the only reason consumers purchase pharmaceuticals is for their advertised therapeutic effect. They want relief from their cold symptoms, and in this case the

Plaintiff and the class members purchased "Maximum Strength" based on J&J's false representations and omissions.

25.     J&J's marketing efforts are made in order to—and do in fact—induce consumers to purchase the products at a premium because consumers believe they are getting "Maximum Strength" decongestants. This deceives consumers because they are not informed that phenylephrine hydrochloride nasal decongestants are inferior to other, available decongestants.

26.     J&J, however, has at all relevant times been well aware that its Sudafed PE products are not "Maximum Strength" nasal decongestants and that other decongestants that are not promised to be "Maximum Strength" with superior effectiveness are available.

27.     Starting in December 2007, the FDA convened a Nonprescription Drugs Advisory Committee ("NDAC") meeting, to address questions about phenylephrine's purported effectiveness.  On September 11 and 12, 2023, an advisory panel of the FDA met again to present its findings on scientific literature presented as to the effectiveness of phenylephrine hydrochloride (referred to by the FDA as "PE") as an oral nasal decongestant. The panel found: "[W]e have now come to the initial conclusion that orally administered PE is not effective as a nasal decongestant at the monographed dosage (10 mg of PE hydrochloride every 4 hours) as well as at doses up to 40 mg (dosed every 4 hours)."

28.     In 2015, in a well-publicized fashion, further independent research was submitted to the FDA requesting the PE be reclassified as not effective as a nasal decongestant.

29.     As a leading manufacturer of phenylephrine hydrochloride oral nasal decongestants, J&J knew or should have known of the same scientific literature reviewed by the FDA.  Nonetheless, it represents that the Sudafed PE products are Maximum Strength.  This is particularly misleading because J&J offers other Sudafed-branded nasal decongestants, which

contain effective active ingredients, such as pseudoephedrine, which are not marketed as ""Maximum Strength" relief for "Sinus Pressure" and "Sinus Congestion."  Accordingly, consumers are induced into purchasing the Sudafed PE products, based on the "Maximum Strength" representation, when comparing it to other Sudafed-branded and competing nasal decongestants.

30.    However, the Sudafed PE: Sinus Pressure + Pain product's "Maximum Strength" relief for "Sinus Pressure + Congestion" representation is misleading for another reason.  As the back label of the Sudafed PE: Sinus Pressure + Pain product discloses, the only active ingredient for "Nasal decongestant" is 5 mg of "Phenylephrine HCL" per dose, which is half the dosage prescribed in the FDA monograph covering oral nasal decongestants:



31.    This is misleading because Defendant's other phenylephrine-based Sudafed products contain 10 mg of phenylephrine hydrochloride.  For example, the Sudafed PE: Sinus Congestion offers 10 mg of phenylephrine per dose.  Accordingly, the Sudafed PE: Sinus Pressure

9

+ Pain does not even contain the maximum dosage of phenylephrine allowable by FDA. Thus, the "Maximum Strength" claim is literally false based on FDA's allowable limits.

32.     Nonetheless, because the Sudafed PE products contain phenylephrine as the only active oral nasal decongestant ingredient, they are not "Maximum Strength" relief for "Sinus Pressure" and "Sinus Congestion." Phenylephrine is not the "Maximum Strength" nasal decongestant available on the market. Even Defendant offers other Sudafed-branded decongestant with higher strength and more effective active decongestant ingredients.

33.     Further, the Sudafed PE: Sinus Pressure + Pain product's "Maximum Strength" relief for "Sinus Pressure + Congestion" representation is misleading for yet another reason, because the only active ingredient for "Pain Reliever/Fever Reducer" is 325 mg of acetaminophen, which is the equivalent of a "Regular Strength" Tylenol tablet. Thus, the strength of the acetaminophen is far below anything can be considered "Maximum Strength," or as J&J calls it "Extra Strength."

34.     J&J intended for Plaintiff and Class Members to be deceived or mislead by its misrepresentations and omissions. Indeed, label space is limited, so manufacturers only place the most pertinent information on the front label. J&J specifically labeled and marketed the Sudafed PE products as "Maximum Strength" relief for "Sinus Pressure" and "Sinus Congestion," and sometimes "Pain Reliever/Fever Reducer" when other Sudafed-branded oral nasal decongestants were not marketed in a similar fashion.

35.     J&J's deceptive and misleading practices proximately caused harm to Plaintiff and the Classes.

36.     Plaintiff and Class Members would not have purchased the Sudafed PE products or would have paid less for them, had they known the truth about the mislabeled and falsely

advertised products. Indeed, other nasal decongestants, with more effective ingredients and dosages, are available on the market for less.

**PLAINTIFF'S FACTUAL ALLEGATIONS**

37.     Plaintiff relied on the Sudafed PE "Maximum Strength" label in deciding to purchase what she believed to be an effective nasal decongestant. Had Plaintiff known that phenylephrine, the only active oral nasal decongestant ingredient in Sudafed PE, is not the "Maximum Strength" nasal decongestant available on the market, she would not have purchased it.

38.     Plaintiff resides in Batavia, Illinois and is a citizen of Illinois. Throughout the relevant period, Plaintiff purchased the Products at issue in this lawsuit and was exposed to and reasonably relied upon J&J's "Maximum Strength" representations. Specifically, Plaintiff purchased Sudafed PE: Sinus Congestion from a local Walmart located at 801 N Randall Rd, Batavia, IL 60510 within the last three months. Upon purchase, Plaintiff reviewed the Product packaging, including the front-label representations, and reasonably believed from these representations that the Products were "Maximum Strength". In reasonable reliance on these representations, Plaintiff paid an increased cost for the Product, which were worth less than represented because the statements were not true and were highly misleading. The Maximum Strength representation on the Product packaging, was part of the basis of the bargain in that Plaintiff attributed value to those representations and Plaintiff would not have purchased the Products, or would not have purchased them on the same terms, if she knew the Maximum Strength representation was untrue and/or misleading. Plaintiff paid a price premium for empty promises that J&J did not keep. Had Plaintiff been aware that the Maximum Strength representation made

11

by J&J on the Products was untrue, she would have paid less for the Products, or would not have purchased them at all.

## FED. R. CIV. P. 9(B) ALLEGATIONS

39.     J&J made material misrepresentations and/or omissions of fact in its labeling and marketing of the Sudafed PE products by representing that they are "Maximum Strength" decongestant and pain reliever/fever reducer products.

40.     J&J's alleged conduct was and continues to be fraudulent because it has the effect of deceiving consumers into believing that the Sudafed PE products are "Maximum Strength" oral nasal decongestant products. J&J omitted from Plaintiff and Class Members that the Sudafed PE products are not "Maximum Strength" oral nasal decongestant products because other decongestant products exist in the market that are much more effective as decongestants. J&J knew or should have known this information is material to all reasonable consumers and impacts consumers' purchasing decisions. Yet, J&J has and continues to represent that the Sudafed FE products are "Maximum Strength" oral nasal decongestant products when they are not, and has omitted from the products' labeling the fact that there are other prescription products available in the market that are superior decongestants. All of that is also true as to its representation that Sudafed PE: Sinus Pressure + Pain is a "Maximum Strength" pain reliever/fever reducer, even though its acetaminophen content is only regular strength.

41.     J&J made material misrepresentations and/or omissions detailed herein, including that the Sudafed PE products are "Maximum Strength" oral nasal decongestant and pain reliever/fever reducer products, continuously throughout the applicable class period(s).

42.     J&J's material misrepresentations and omissions, that the Sudafed PE products are "Maximum Strength" oral nasal decongestant and pain reliever/fever reducer products, were

located on the front label of the Sudafed PE products in all-cap, bold red lettering that contrasts with the background of the packaging, which instantly catches the eye of all reasonable consumers, including Plaintiff and Class Members, at the point of sale in every transaction. The Sudafed PE products are sold in J&J's brick and mortar stores and online stores in Illinois and nationwide.

43.     J&J made written misrepresentations of fact on the front label of the Sudafed PE products, that the products were "Maximum Strength" oral nasal decongestant products, even though other stronger decongestant products are available in the market. As such, J&J's "Maximum Strength" representations are false and misleading. Moreover, J&J omitted from the Sudafed PE products' labeling the fact that there are other prescription products available in the market that are more effective decongestants and pain relievers/fever reducers. And as alleged in detail throughout this Complaint, Plaintiff read and relied on J&J's "Maximum Strength" representations and omissions before purchasing the products.

44.     J&J misrepresented its Sudafed PE products as being "Maximum Strength" decongestant products and omitted from the products' labeling the fact that there are other, non-prescription products available in the market that are effective decongestants, for the express purpose of inducing Plaintiff and Class Members to purchase the inferior phenylephrine hydrochloride products at a price premium. As such, J&J profited by selling the misrepresented products to at least thousands of consumers throughout the nation.

## CLASS ACTION ALLEGATIONS

45.     Plaintiff brings this action on behalf of herself and the following "Classes" pursuant to Federal Rule of Civil Procedure 23(a), (b)(2) and/or (b)(3). Specifically, the Classes are defined as:

**Nationwide Class**: All persons in the United States who purchased the Products in the United States for personal use and not for resale during the applicable statute of limitations period.

**Multi-State Consumer Protection Class:** All persons who purchased in the State of Illinois or any state with similar laws[1] any of the Products, within the applicable statute of limitations, until the date notice is disseminated.

**Illinois Subclass**: All persons in the State of Illinois who purchased the Products in the State of Illinois for personal use and not for resale during the applicable statute of limitations period.

46. Excluded from the Classes are (a) any person who purchased the Sudafed PE products for resale and not for personal or household use, (b) any person who signed a release of any J&J in exchange for consideration, (c) any officers, directors or employees, or immediate family members of the officers, directors or employees, of any J&J or any entity in which a J&J has a controlling interest, (d) any legal counsel or employee of legal counsel for J&J, and (e) the presiding Judge in this lawsuit, as well as the Judge's staff and their immediate family members.

47. Plaintiff reserves the right to amend the definition of the Classes if discovery or further investigation reveals that the Classes should be expanded or otherwise modified.

48. **Numerosity – Federal Rule of Civil Procedure 23(a)(1).** Class Members are so numerous and geographically dispersed that joinder of all Class Members is impracticable. While

---

[1] While discovery may alter the following, Plaintiff asserts that the other states with similar consumer fraud laws under the facts of this case include, but are not limited to: California (Cal. Bus. & Prof. Code § 17200, *et seq*.); Florida (Fla. Stat. §§ 501.201, *et seq*.); Illinois (815 ICLS §§ 505/1, *et seq*.); Massachusetts (Mass. Gen. Laws Ch. 93A, *et seq*.); Michigan (Mich. Comp. Laws §§ 445.901, *et seq*.); Minnesota (Minn. Stat. §§ 325F.67, *et seq*.); New Jersey (N.J. Stat. §§ 56:8-1, *et seq*.); New York (N.Y. Gen. Bus. Law §§ 349, *et seq*.); Washington (Wash. Rev. Code §§ 19.86.010, *et seq*.); *See Mullins v. Direct Digital, LLC*, No. 13-cv-1829, 2014 WL 5461903 (N.D. Ill. Sept. 30, 2014), *aff'd*, 795 F.3d 654 (7th Cir. 2015).

14

the exact number of Class Members remains unknown at this time, upon information and belief, there are thousands, if not hundreds of thousands, of putative Class Members.

49.     **Predominance of Common Questions of Law and Fact – Federal Rule of Civil Procedure 23(a)(2) and 23(b)(3).** Common questions of law and fact exist as to all Class Members and predominate over any questions affecting only individual Class Members. These common legal and factual questions include, but are limited to, the following:

a.  Whether J&J made the "MAXIMUM STRENGTH" representations;

b.  Whether J&J promoted the Sudafed PE products with false and misleading statements of fact and material omissions;

c.  Whether J&J's "MAXIMUM STRENGTH" representations are deceptive, unfair, or misleading to the reasonable consumer;

d.  Whether J&J's actions and/or omissions violate applicable laws;

e.  Whether J&J's conduct is a breach of warranty;

f.  Whether Plaintiff and putative members of the Classes have suffered a loss of monies or property or other value as a result of J&J's acts, omissions, or misrepresentations of material facts;

g.  Whether J&J's was unjustly enriched at the expense of Plaintiff and members of the putative Classes in connection with the Sudafed PE products;

h.  Whether Plaintiff and members of the putative Classes are entitled to monetary damages or statutory damages and, if so, the nature of such relief; and

i.  Whether Plaintiff and members of the putative Classes are entitled to equitable, declaratory, or injunctive relief and, if so, the nature of such relief.

50.     **Typicality – Federal Rule of Civil Procedure 23(a)(3).** Plaintiff's claims are typical of those of the absent Class Members in that Plaintiff and the Class Members each purchased and used the Sudafed PE products and each sustained damages arising from J&J's wrongful conduct, as alleged more fully herein. Plaintiff shares the aforementioned facts and legal claims or questions with putative members of the Classes, and Plaintiff and all members of the putative Classes have been similarly affected by J&J's common course of conduct alleged herein. Plaintiff and all members of the putative Classes sustained monetary and economic injuries including, but not limited to, ascertainable loss arising out of J&J's false and deceptive "Maximum Strength" representations about the Sudafed PE products, as alleged herein.

51.     **Adequacy – Federal Rule of Civil Procedure 23(a)(4).** Plaintiff will fairly and adequately represent and protect the interests of the members of the putative Classes. Plaintiff has retained counsel with substantial experience in handling complex class action litigation, including complex questions that arise in this type of consumer protection litigation. Further, Plaintiff and their counsel are committed to the vigorous prosecution of this action. Plaintiff does not have any conflicts of interest or interests adverse to those of putative Classes.

52.     **Insufficiency of Separate Actions – Federal Rule of Civil Procedure 23(b)(1).** Absent a class action, Plaintiff and members of the Classes will continue to suffer the harm described herein, for which they would have no remedy. Even if separate actions could be brought by individual consumers, the resulting multiplicity of lawsuits would cause undue burden and expense for both the Court and the litigants, as well as create a risk of inconsistent rulings and adjudications that might be dispositive of the interests of similarly situated consumers, substantially impeding their ability to protect their interests, while establishing incompatible

standards of conduct for J&J. Accordingly, the proposed Classes satisfy the requirements of Fed. R. Civ. P. 23(b)(1).

53.     **Declaratory and Injunctive Relief – Federal Rule of Civil Procedure  23(b)(2).** J&J has acted or refused to act on grounds generally applicable to Plaintiff and all members of the Classes, thereby making appropriate final injunctive relief and declaratory relief, as described below, with respect to the members of the Classes as a whole. In particular, J&J has marketed, advertised, distributed and sold the Sudafed PE products containing the products' "MAXIMUM STRENGTH" representations, which are false and misleading, and continues to do so.

54.     **Superiority – Federal Rule of Civil Procedure 23(b)(3).** A class action is superior to any other available methods for the fair and efficient adjudication of the present controversy for at least the following reasons:

a.   The damages suffered by each individual member of the putative Classes do not justify the burden and expense of individual prosecution of the complex and extensive litigation necessitated by J&J's conduct;

b.   Even if individual members of the Classes had the resources to pursue individual litigation, it would be unduly burdensome to the courts in which the individual litigation would proceed;

c.   The claims presented in this case predominate over any questions of law or fact affecting individual members of the Classes;

d.   Individual joinder of all members of the Classes is impracticable;

e.   Absent a class, Plaintiff and members of the putative Classes will continue to suffer harm as a result of J&J's unlawful conduct; and

f.   This action presents no difficulty that would impede its management by the Court as a

class action, which is the best available means by which Plaintiff and members of the putative Classes can seek redress for the harm caused by J&J.

g.  In the alternative, the Classes may be certified for the following reasons:

   (1) The prosecution of separate actions by individual members of the Classes would create a risk of inconsistent or varying adjudication with respect to individual members of the Classes, which would establish incompatible standards of conduct for J&J;

   (2) Adjudications of claims of the individual members of the Classes against J&J would, as a practical matter, be dispositive of the interests of other members of the putative Classes who are not parties to the adjudication and may substantially impair or impede the ability of other putative Class Members to protect their interests; and

   (3) J&J has acted or refused to act on grounds generally applicable to the members of the putative Classes, thereby making appropriate final and injunctive relief with respect to the putative Classes as a whole.

## CLAIMS FOR RELIEF

### COUNT ONE
**Breach of Express Warranty**
**(By Plaintiff on Behalf of the Nationwide Class**
**or, in the Alternative, the Illinois Subclass)**

55.    Plaintiff incorporates paragraphs 1-56 as if fully set forth herein.

56.    Plaintiff brings this cause of action on behalf of herself, the Nationwide Class, and/or the Illinois Subclass against J&J.

57.    Plaintiff and Class Members formed a contract with Defendant at the time Plaintiff and class members purchased the Sudafed PE products.

18

58.     The terms of the contract include the promises and affirmations of fact made by Defendant on the Sudafed PE packaging and through marketing and advertising, as described above.

59.     This labeling, marketing, and advertising constitute express warranties and became part of the basis of the bargain and are part of the standardized contract with Plaintiff and class members.

60.     As set forth above, Defendant purports, through its advertising, labeling, marketing, and packaging, to create an express warranty that the Sudafed PE products are "Maximum Strength" relief for "Sinus Pressure" and "Sinus Congestion," and "Pain Reliever/Fever Reducer."

61.     The above affirmations of fact were not couched as "belief" or "opinion," and were not "generalized statements of quality not capable of proof or disproof."

62.     These affirmations of fact became part of the basis for the bargain and were material to Plaintiff's and Class Members' decision to purchase the Sudafed PE.

63.     Plaintiff and Class Members reasonably relied upon Defendant's affirmations of fact and justifiably acted in ignorance of the material facts omitted or concealed when they decided to buy Sudafed PE.

64.     Plaintiff and Class Members performed all conditions precedent to Defendant's liability under this contract when they purchased the Sudafed PE.

65.     Defendant thereby breached the following state warranty laws:

- Code of Ala. § 7-2-313;

- Alaska Stat. § 45.02.313;

- A.R.S. § 47-2313;

- A.C.A. § 4-2-313;

- Cal. Comm. Code § 2313;

- Colo. Rev. Stat. § 4-2-313;

- Conn. Gen. Stat. § 42a-2-313;

- 6 Del. C. § 2-313;

- D.C. Code § 28:2-313;

- Fla. Stat. § 672.313;

- O.C.G.A. § 11-2-313;

- H.R.S. § 490:2-313;

- Idaho Code § 28-2-313;

- 810 I.L.C.S. 5/2-313;

- Ind. Code § 26-1-2-313;

- Iowa Code § 554.2313;

- K.S.A. § 84-2-313;

- K.R.S. § 355.2-313;

- 11 M.R.S. § 2-313;

- Md. Commercial Law Code Ann. § 2-313;

- 106 Mass. Gen. Laws Ann. § 2-313;

- M.C.L.S. § 440.2313;

- Minn. Stat. § 336.2-313;

- Miss. Code Ann. § 75-2-313;

- R.S. Mo. § 400.2-313;

- Mont. Code Anno. § 30-2-313;

20

- Neb. Rev. Stat. § 2-313;

- Nev. Rev. Stat. Ann. § 104.2313;

- R.S.A. 382-A:2-313;

- N.J. Stat. Ann. § 12A:2-313;

- N.M. Stat. Ann. § 55-2-313;

- N.Y. U.C.C. Law § 2-313;

- N.C. Gen. Stat. § 25-2-313;

- N.D. Cent. Code § 41-02-30;

- II. O.R.C. Ann. § 1302.26;

- 12A Okl. St. § 2-313;

- Or. Rev. Stat. § 72-3130;

- 13 Pa. Rev. Stat. § 72-3130;

- R.I. Gen. Laws § 6A-2-313;

- S.C. Code Ann. § 36-2-313;

- S.D. Codified Laws, § 57A-2-313;

- Tenn. Code Ann. § 47-2-313;

- Tex. Bus. & Com. Code § 2.313;

- Utah Code Ann. § 70A-2-313;

- 9A V.S.A. § 2-313;

- Va. Code Ann. § 59.1-504.2;

- Wash. Rev. Code Ann. § 6A.2-313;

- W. Va. Code § 46-2-313;

21

- Wis. Stat. § 402.313; and

- Wyo. Stat. § 34.1-2-313.

## COUNT TWO
### Breach of Implied Warranty
### (By Plaintiff on Behalf of the Nationwide Class, or in the alternative, the Illinois Subclass)

66.     Plaintiff incorporates paragraphs 1-56 as if fully set forth herein.

67.     Plaintiff brings this cause of action on behalf of herself, the Nationwide Class, and/or the Illinois Subclass against J&J.

68.     Defendant was in the business of selling over-the-counter drugs at all times relevant hereto.

69.     Plaintiff and Class Members formed a contract with Defendant at the time Plaintiff and Class Members purchased Sudafed PE.   Implied in that contract was a warranty of merchantability.

70.     The implied warranty of merchantability means and includes that the goods will comply with each of the following requirements: (1) they would pass without objection in the trade under the contract description; (2) they are fit for the ordinary purposes for which such goods are used; (3) they are adequately contained, packaged, and labeled; and (4) they conform to the promises or affirmations of fact made on the container or label.

71.     Here, the Sudafed PE products were labeled as "Maximum Strength" relief for "Sinus Pressure" and "Sinus Congestion," and for "Pain Reliever/Fever Reducer" but did not conform to the promises or affirmations of fact made on the container or label.

72.     Defendant thereby breached the following state warranty laws:

- Code of Ala. § 7-2-314;

- Alaska Stat. § 45.02.313;

- A.R.S. § 47-2314;

- A.C.A. § 4-2-314;

- Cal. Comm. Code § 2314;

- Colo. Rev. Stat. § 4-2-314;

- Conn. Gen. Stat. § 42a-2-314;

- 6 Del. C. § 2-314;

- D.C. Code § 28:2-314;

- Fla. Stat. § 672.314;

- O.C.G.A. § 11-2-314;

- H.R.S. § 490:2-314;

- Idaho Code § 28-2-314;

- 810 I.L.C.S. 5/2-314;

- Ind. Code § 26-1-2-314;

- Iowa Code § 554.2314;

- K.S.A. § 84-2-314;

- K.R.S. § 355.2-314;

- 11 M.R.S. § 2-314;

- Md. Commercial Law Code Ann. § 2-314;

- 106 Mass. Gen. Laws Ann. § 2-314;

- M.C.L.S. § 440.2314;

- Minn. Stat. § 336.2-314;

- Miss. Code Ann. § 75-2-314;

- R.S. Mo. § 400.2-313;

- Mont. Code Anno. § 30-2-313;

- Neb. Rev. Stat. § 2-314;

- Nev. Rev. Stat. Ann. § 104.2314;

- R.S.A. 382-A:2-314;

- N.J. Stat. Ann. § 12A:2-314;

- N.M. Stat. Ann. § 55-2-314;

- N.Y. U.C.C. Law § 2-314;

- N.C. Gen. Stat. § 25-2-314;

- N.D. Cent. Code § 41-02-31;

- II. O.R.C. Ann. § 1302.27;

- 12A Okl. St. § 2-314;

- Or. Rev. Stat. § 72-3140;

- 13 Pa. Rev. Stat. § 72-314;

- R.I. Gen. Laws § 6A-2-314;

- S.C. Code Ann. § 36-2-314;

- S.D. Codified Laws, § 57A-2-314;

- Tenn. Code Ann. § 47-2-314;

- Tex. Bus. & Com. Code § 2.314;

- Utah Code Ann. § 70A-2-314;

- 9A V.S.A. § 2-314;

- Va. Code Ann. § 59.1-504.3;

- Wash. Rev. Code Ann. § 6A.2-314;

- W. Va. Code § 46-2-314;

- Wis. Stat. § 402.314; and

- Wyo. Stat. § 34.1-2-314.

### COUNT THREE
**Unjust Enrichment**
**(By Plaintiff on Behalf of the Nationwide Class, or in the**
**Alternative, the Illinois Subclass)**

73. Plaintiff incorporates paragraphs 1-56 as if fully set forth herein.

74. Plaintiff brings this cause of action in the alternative on behalf of herself, the Nationwide Class and/or the Illinois Subclass against J&J. It is alleged in the alternative to the extent there is no adequate remedy at law.

75. Plaintiff and putative class members conferred a benefit on J&J when they purchased Sudafed PE. By its wrongful acts and omissions described herein, including selling Sudafed PE containing the "MAXIMUM STRENGTH" representations, which did not conform to the promises or affirmations of fact made on the label, J&J was unjustly enriched at the expense of Plaintiff and putative Class Members.

76. Plaintiff's detriment and J&J's enrichment were related to and flowed from the wrongful conduct challenged in this Complaint.

77. J&J has profited from its unlawful, unfair, misleading, and deceptive practices at the expense of Plaintiff and putative Class Members under circumstances in which it would be unjust for J&J to be permitted to retain the benefit. It would be inequitable for J&J to retain the profits, benefits, and other compensation obtained from their wrongful conduct as described herein in connection with selling Sudafed PE.

25

78. J&J has been unjustly enriched in retaining the revenues derived from Class Members' purchases of Sudafed PE, which retention of such revenues under these circumstances is unjust and inequitable because J&J marketed, advertised, distributed, and sold the products, and J&J misrepresented the nature of the products, misrepresented their benefits and attributes, and knowingly marketed and promoted the products with "MAXIMUM STRENGTH" representations, which caused injuries to Plaintiff and the class members because they would not have purchased the products based on the same representations if the true facts concerning the Sudafed PE products had been known.

79. Plaintiff and putative class members have been damaged as a direct and proximate result of J&J's unjust enrichment because they would not have purchased the Sudafed PE products on the same terms or for the same price had they known the true nature of the Sudafed PE products and the misstatements regarding the strength of the Sudafed PE products' active ingredient.

80. J&J either knew or should have known that payments rendered by Plaintiff and putative class members were given and received with the expectation that the "MAXIMUM STRENGTH" representations made by J&J in advertising, on J&J's websites, and on the Sudafed PE labels and packaging were true. It is inequitable for J&J to retain the benefit of payments under these circumstances because the "MAXIMUM STRENGTH" representations are not true.

81. Plaintiff and putative Class Members are entitled to recover from J&J all amounts wrongfully collected and improperly retained by J&J.

82. As a direct result of J&J's wrongful conduct and unjust enrichment, Plaintiff and putative Class Members are entitled to restitution of, disgorgement of, and/or imposition of a constructive trust upon all profits, benefits, and other compensation obtained by J&J for their inequitable and unlawful conduct.

## COUNT FOUR
### VIOLATION OF STATE CONSUMER PROTECTION STATUTES
### (By Plaintiff on Behalf of the Multi-State Consumer Protection Class)

83.     Plaintiff incorporates paragraphs 1-56 as if fully set forth herein.

84.     Plaintiff brings this cause of action on behalf of herself and the Multi-State
Consumer Protection Class.

85.     Plaintiff and Multi-State Consumer Protection Class members have been injured as
a result of J&J's violations of the state consumer protection statutes listed above in paragraph 47
and footnote 1, which also provide a basis for redress to Plaintiff and Multi-State Consumer Class
Members based on J&J's fraudulent, deceptive, unfair and unconscionable acts, practices and
conduct.

86.     J&J's conduct as alleged herein violates the consumer protection, unfair trade
practices, and deceptive acts laws of each of the jurisdictions encompassing the Multi-State
Consumer Class.

87.     J&J violated the Multi-State Consumer Class states' consumer protection, unfair
trade practices, and deceptive acts laws through its misleading and deceptive advertising that
represented that the Sudafed PE products were MAXIMUM STRENGTH." J&J chose to package
and market the products in this way to impact consumer choices and gain market dominance, as it
knew or should have known that all consumers who purchased the products would be impacted by
its omissions and would reasonably believe J&J's false and misleading "MAXIMUM
STRENGTH" representations and omissions.

88.     J&J's misrepresentations were material to Plaintiff and Multi-State Consumer
Class members' decision to purchase the Products or pay a premium for the Products.

89.     J&J made its untrue and/or misleading statements and representations willfully, wantonly, and with reckless disregard for the truth.

90.     As a result of J&J's violations of the aforementioned states' unfair and deceptive practices laws, Plaintiff and Multi-State Consumer Class members paid a premium for the Products.

91.     As a result of J&J's violations, J&J has been unjustly enriched.

92.     Pursuant to the alleged  consumer protection, unfair trade practices, and deceptive acts laws, Plaintiff and Multi-State Consumer Class members are entitled to recover compensatory damages, restitution, punitive and special damages including but not limited to statutory or treble damages, reasonable attorneys' fees and costs, and other injunctive or declaratory relief as deemed appropriate or permitted pursuant to the relevant law.

## COUNT FIVE
### VIOLATION OF THE ILLINOIS
### CONSUMER FRAUD AND DECEPTIVE TRADE PRACTICES ACT
#### (By Plaintiff on Behalf of the Illinois Subclass)

93.     Plaintiff incorporates paragraphs 1-56 as if fully set forth herein.

94.     Plaintiff brings this action on behalf of herself  and the Illinois Subclass.

95.     In Illinois, the "Consumer Fraud and Deceptive Business Practices Act" 815 Ill. Comp. Stat. 505/1, *et seq*., prohibits "unfair methods of competition and unfair or deceptive acts or practices, including but not limited to the use or employment of any deception, fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of any material fact, with intent that others rely upon the concealment, suppression or omission of such material fact or the use or employment of any practice described in Section 2 of the 'Uniform Deceptive Trade Practices Act' . . . ."

28

96.     Plaintiff and the Illinois Subclass members were injured by J&J's deceptive misrepresentations, concealments and omissions and these misrepresentations, concealments and omissions were material and deceived Plaintiff and the Illinois Subclass. Because Plaintiff and the Illinois Subclass members relied on J&J's misrepresentations, concealments and omissions when purchasing the Products, they were injured at the time of purchase.

97.     J&J does business in Illinois, sells and distributes the Products in Illinois, and engaged in deceptive acts and practices in connection with the sale of the Products in Illinois and elsewhere in the United States.

98.     The Products purchased by Plaintiff and the Illinois Subclass members were "consumer items" as that term is defined under the Illinois Consumer Fraud Act.

99.     J&J engaged in unfair and deceptive acts in violation of 815 Ill. Comp. Stat. 505/2 when it misrepresented and deceptively concealed, suppressed and/or omitted the material information known to J&J as set forth above concerning its Products, which has caused damage and injury to Plaintiff and the Illinois Subclass Members. Plaintiff and the Illinois Subclass members were injured by J&J's unfair and deceptive acts at the time of purchasing the Products.

100.    J&J's marking of Sudafed PE products violates this prohibition by deceiving consumers into believing Sudafed PE is a "MAXIMUM STRENGTH" decongestant or pain reliever/fever reducer.

101.    J&J engaged in fraudulent and/or deceptive conduct, which creates a likelihood of confusion or of misunderstanding in violation of this Section.

102.    J&J engaged in misleading and deceptive advertising that represented that the Sudafed PE products were MAXIMUM STRENGTH." J&J chose to package and market the products in this way to impact consumer choices and gain market dominance, as it knew or should

29

have known that all consumers who purchased the products would be impacted by its omissions and would reasonably believe J&J's false and misleading "MAXIMUM STRENGTH" representations and omissions.

103.    J&J's deceptive acts occurred in a course of conduct involving trade and commerce in Illinois and throughout the United States.

104.    J&J intended Plaintiff and the Illinois Subclass members to rely on its deceptive acts when purchasing the Products.

105.    J&J's deceptive acts proximately caused actual injury and damage to Plaintiff and the Illinois Subclass members at the time of purchase.

106.    Plaintiff and the Illinois Subclass members would not have purchased, or would have paid less for, the Products but for J&J's material misrepresentations as described in this Complaint.

**COUNT SIX**
**VIOLATION OF THE ILLINOIS**
**UNIFORM DECEPTIVE TRADE PRACTICES ACT**
**(By Plaintiff on Behalf of the Illinois Subclass)**

107.    Plaintiff incorporates paragraphs 1-56 as if fully set forth herein.

108.    Plaintiff brings this action on behalf of herself and the Illinois Subclass.

109.    The Illinois Deceptive Trade Practices Act ("UDTPA"), 815 Ill. Comp. Stat. 510/2, *et seq.*, prohibits "[u]nfair methods of competition and unfair or deceptive acts or practices, including but not limited to the use or employment of any deception, fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of any material fact, with intent that others rely upon the concealment, suppression or omission of such material fact."

110.    815 ILCS 510/2 provides in pertinent part that a "person engages in a deceptive trade practice when, in the course of his or her business, vocation, or occupation," the person does

any of the following: "(5) represents that goods or services have . . . uses, benefits or quantities that they do not have . . .; (7) represents that goods or services are of a particular standard, quality, or grade or that goods are a particular style or model, if they are of another; . . . [or] (12) engages in any other conduct which similarly creates a likelihood of confusion or misunderstanding."

111.    J&J's marking of Sudafed PE products violates this prohibition by deceiving consumers into believing Sudafed PE is a "MAXIMUM STRENGTH" decongestant or pain reliever/fever reducer.

112.    J&J engaged in fraudulent and/or deceptive conduct, which creates a likelihood of confusion or of misunderstanding in violation of this Section.

113.    J&J engaged in misleading and deceptive advertising that represented that the Sudafed PE products were MAXIMUM STRENGTH." J&J chose to package and market the products in this way to impact consumer choices and gain market dominance, as it knew or should have known that all consumers who purchased the products would be impacted by its omissions and would reasonably believe J&J's false and misleading "MAXIMUM STRENGTH" representations and omissions.

114.    J&J intended that Plaintiff and each of the other Illinois Subclass members would reasonably rely upon the material omissions concerning the true nature of the Sudafed PE products.

115.    J&J's concealment, omissions, and other deceptive conduct were likely to deceive and cause misunderstanding and/or in fact caused Plaintiff and each of the other Illinois Subclass members to be deceived about the true nature of the products.

116.    J&J's deceptive acts occurred in a course of conduct involving trade and commerce in Illinois and throughout the United States.

117.    J&J's deceptive acts proximately caused actual injury and damage to Plaintiff and the Illinois Subclass Members at the time of purchase.

118.    Plaintiff and the Illinois Subclass Members would not have purchased, or would have paid less for, the Products but for J&J's material misrepresentations as described in this Complaint.

119.    J&J intended Plaintiff and the Illinois Subclass members to rely on its deceptive acts when purchasing the Products.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, individually and on behalf of all others similarly situated members of the Classes, prays for relief and judgment, including entry of an order:

A.    Declaring that this action is properly maintained as a class action, certifying the proposed Classes, appointing Plaintiff as Class Representative and appointing Plaintiff's counsel as Class Counsel;

B.    Directing that J&J bear the costs of any notice sent to the Class(es);

C.    Declaring that J&J must disgorge, for the benefit of the Class(es), all or part of the ill-gotten profits they received from the sale of the Sudafed PE products, or order J&J to make full restitution to Plaintiff's and the members of the Class(es);

D.    Awarding restitution and other appropriate equitable relief;

E.    Granting an injunction against J&J to enjoin it from conducting its business through the unlawful, unfair, and fraudulent acts or practices set forth herein;

F.    Granting an Order requiring J&J to fully and appropriately recall the products and/or to remove the claims on its website and elsewhere, including "Maximum Strength" representations regarding the Sudafed PE products;

32

G.     Ordering a jury trial and damages according to proof;

H.     Awarding Plaintiff and members of the Class(es) compensatory and punitive damages, or statutory damages, as provided by the applicable state consumer protection statutes invoked above;

I.     Enjoining J&J from continuing to engage in the unlawful and unfair business acts and practices as alleged herein;

J.     Awarding attorneys' fees and litigation costs to Plaintiff and members of the Class(es);

K.     Awarding civil penalties, prejudgment interest, and punitive damages as permitted by law; and

L.     Ordering such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury of all claims in this Complaint so triable.

Dated: September 15, 2023                Respectfully submitted,


                                         By:  */s/ Gary Klinger*

                                         Gary M. Klinger
                                         **MILBERG COLEMAN BRYSON PHILLIPS GROSSMAN, PLLC**
                                         227 W. Monroe Street, Suite 2100
                                         Chicago, IL 60606
                                         Telephone: (866) 252-0878
                                         Email: gklinger@milberg.com

                                         Nick Suciu III
                                         **MILBERG COLEMAN BRYSON PHILLIPS GROSSMAN, PLLC**
                                         6905 Telegraph Rd., Suite 115
                                         Bloomfield Hills, MI 48301
                                         Telephone: (313) 303-3472
                                         Email: nsuciu@milberg.com

33

Jeff Ostrow
Jonathan M. Streisfeld
Kristen Lake Cardoso
**KOPELOWITZ OSTROW P.A.**
One West Las Olas Blvd., Suite 500
Fort Lauderdale, Florida 33301
Telephone: (954) 525-4100
Email:  ostrow@kolawyers.com
          streisfeld@kolawyers.com
          cardoso@kolawyers.com

Melissa S. Weiner
Ryan J. Gott
**PEARSON WARSHAW, LLP**
328 Barry Avenue South, Suite 200
Wayzata, Minnesota 55391
Telephone: (612) 389-0600
Email: mweiner@pwfirm.com
          rgott@pwfirm.com

Erin Ruben
**MILBERG COLEMAN BRYSON**
**PHILLIPS GROSSMAN PLLC**
900 W. Morgan Street
Raleigh, NC 27603
Telephone: (919) 600-5000
Email: eruben@milberg.com

J. Hunter Bryson
**MILBERG COLEMAN BRYSON**
**PHILLIPS GROSSMAN, PLLC**
405 E 50th Street
New York, NY 10022
Telephone: (630) 796-0903
Email: hbryson@milberg.com

*Attorneys for Plaintiff*

34

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS

TINA TUOMINEN, on behalf of herself and
all others similarly situated,

 Plaintiff,

v.

JOHNSON & JOHNSON CONSUMER,
INC.,

 Defendant.

**FIRST AMENDED CLASS ACTION
COMPLAINT**

**JURY TRIAL DEMANDED**

Case No. 1:23-cv-13796-NLM

Plaintiff, Tina Tuominen, on behalf of herself and all others similarly situated, brings this

class action against Defendant Johnson & Johnson Consumer, Inc. ("J&J"), and alleges on

personal knowledge, investigation of counsel, and on information and belief as follows:

## <u>GENERAL ALLEGATIONS</u>

1.    J&J offers a variety of over-the-counter drugs, including oral nasal decongestants,

competing in a billion-dollar industry. Two such products are the over-the-counter oral nasal

decongestants and pain relievers/fever reducers "Sudafed PE: Sinus Pressure + Pain" and "Sudafed

PE: Sinus Congestion" products (collectively, "Sudafed PE" or "Products").

2.    Both of the Products are oral phenylephrine hydrochloride ("PE") nasal

decongestant pills. The Sudafed PE: Sinus Pressure + Pain Product contains acetaminophen as

another active ingredient, and both of the Products are marketed as "MAXIMUM STRENGTH"

("Maximum Strength Representation").

3.    When consumers purchase decongestants and pain relief/fever reducer pills, the

strength of the ingredients is an important purchasing consideration, especially for consumers

seeking a maximum strength product.

    4.    J&J takes advantage of this consumer preference for strong relief by prominently representing the alleged strength of the Products in the one place every consumer looks when purchasing a product—the front packaging.

    5.    On each product package for the Products, J&J uniformly touts in capitalized, red font set against a contrasting color background on the front of the package that the Products provide maximum strength relief.[1]  For example, the Sudafed PE: Sinus Congestion product has the following label:



---

[1] Based upon reasonable investigation, Plaintiff has identified certain Products that contain PE, and at times, acetaminophen, and are also labeled as "MAXIMUM STRENGTH." The complete list of Products is in the exclusive control of J&J and will be the subject of discovery. Products include all substantially similar Sudafed PE products, manufactured, marketed, and sold during the relevant class periods, that contained PE and acetaminophen were labeled as "MAXIMUM STRENGTH" or another synonymous Maximum Strength Representation.

2



The Sudafed PE: Sinus Pressure + Pain product has similar label, with similar claims, and also falsely touts "Maximum Strength" as to its second active ingredient, acetaminophen, as a pain reliever and fever reducer:



3



6.      The Products are marketed as maximum strength relief as nasal decongestants and pain reliever/fever reducer for Sinus Pressure, Sinus Congestion, and Sinus Headache.

7.      Reasonable consumers understand the Maximum Strength Representations to mean that the Products are the strongest over-the-counter nasal decongestant and pain reliever/fever reducers.

8.      Therefore, J&J's labeling of the Products with a Maximum Strength Representation misleads reasonable consumers.

9.      J&J knew the active nasal decongestant ingredient, PE, was not as strong as other over-the-counter oral nasal decongestants available to consumer, and, therefore, not suitable for a maximum strength representation. Additionally, the Products do not even contain the maximum dosage of acetaminophen and are thus not deserving of the "MAXIMUM STRENGTH" label and representation.

10.     Thus, the maximum strength packaging is misleading because nasal decongestants that are actually stronger—without the maximum strength claim—are available over the counter.

4

For example, both oxymetazoline and pseudoephedrine are available over the counter.

11.     Further, J&J knew higher doses of acetaminophen exist on the market.

12.     The Court need look no further than the common manufacturing and marketing of acetaminophen products as "Regular Strength" for 325 mg and "Extra Strength" for 500 mg tablets, taken, as with the Products, in dosages of two each.

13.     Despite this knowledge, J&J chose to mislead consumers through its labeling of the Products, with and without acetaminophen, as "MAXIMUM STRENGTH" decongestants and/or pain relievers/fever reducers. However, none of the Products are maximum strength. Consumers, including Plaintiff, lack the scientific knowledge necessary to determine whether the Products are maximum strength decongestants and pain relievers/fever reducers, or to ascertain the true quality or strength of the Products. For that reason, reasonable consumers must and do rely on manufacturers, like J&J, to be honest and transparent and to properly disclose on the packaging all material information regarding the Products and strength.

14.     Rather than being honest and transparent, J&J makes the Maximum Strength Representation in a knowingly false, misleading, and deceptive manner.

15.     For all the reasons set forth herein, including, but not limited to, J&J's misrepresentations and omissions regarding its maximum strength claims, Plaintiff seeks relief in this action individually, and as a class action on behalf of similarly situated purchasers of J&J's Products, for: (1) violation of State consumer protection laws; (2) unjust enrichment, and (3) breach of express and implied warranties.

### THE PARTIES

16.     Plaintiff is a citizen of Illinois, residing in Kane County. She purchased Sudafed PE Sinus Congestion within the applicable statute of limitations period, most recently on or about

November 2022.

17.     J&J is a New Jersey corporation with principal place of business in Skillman, New Jersey.  J&J markets, advertises, manufactures, sells, and/or distributes the Products.

## JURISDICTION AND VENUE

16.     This Court has personal jurisdiction over J&J in this matter. The acts and omissions giving rise to this action occurred in the state of Illinois. J&J has been afforded due process because it has, at all times relevant to this matter, individually or through its agents, subsidiaries, officers and/or representatives, operated, conducted, engaged in and carried on a business venture in this state and/or maintained an office or agency in this state, and/or marketed, advertised, distributed, sold and/or placed the Products into the stream of commerce directed at this state, committed a statutory violation within this state related to the allegations made herein, and caused injuries to Plaintiff and proposed Class Members, which arose out of the acts and omissions that occurred in the state of Illinois, during the relevant time period, at which time J&J was engaged in business activities in the state of Illinois.

17.     This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C.§ 1332 of the Class Action Fairness Act of 2005 because: (i) there are 100 or more proposed Class Members, (ii) the aggregate amount in controversy exceeds $5,000,000, exclusive of interest and costs, and (iii) there is minimal diversity because at least one Plaintiff and J&J are citizens of different states.

18.     Pursuant to 28 U.S.C. § 1391(a), venue is proper because Plaintiff resides in this District, purchased the Product in this District, a substantial part of the events giving rise to the claims asserted occurred in this District. Venue is also proper pursuant to 28 U.S.C. § 1391(c) because J&J conducts substantial business in this District, has sufficient minimum contacts with

6

this District, and otherwise purposely avails itself of the markets in this District, through the promotion, sale, and marketing of the Products in this District.

## FACTS COMMON TO ALL CLASS MEMBERS

20. J&J is one of the largest drug manufacturing companies in the world. As such, J&J markets several over-the-counter drugs, including the Sudafed branded line of products.

21. PE is the oral active ingredient in the Products for nasal decongestion. Acetaminophen is the active ingredient in Sudafed PE: Sinus Pressure + Pain Product. Both form the basis for J&J's Maximum Strength Representation on the Products' packaging, and overall advertising and marketing campaign.

22. At all relevant times, J&J has marketed the Products in a consistent and uniform manner nationwide.

23. 22. As alleged above, the Products represent that they are "MAXIMUM STRENGTH" relief for "Sinus Pressure" and "Sinus Congestion," and sometime for "Sinus Headache" relieving pain, representations which prominently appear on the front label of the Products in all-cap bold, red lettering that contrasts with the white background of the packaging. This instantly catches the eye of all reasonable consumers, including Plaintiff and Class Members.

24. A reasonable consumer would understand that "MAXIMUM STRENGTH" means the Products contained the strongest nasal decongestant available on the over-the-counter market, as well as the strongest dose of acetaminophen for pain relief/fever reducer, where applicable.

25. A reasonable consumer would understand "MAXIMUM STRENGTH " means the Products contained the strongest nasal decongestant available on the over-the-counter market, as well as the strongest dose of acetaminophen for pain relief/fever reducer, where applicable.

26. All reasonable consumers, including Plaintiff, read and relied on J&J's

7

"MAXIMUM STRENGTH" representations when purchasing the Products. Indeed, when purchasing pharmaceuticals, especially those promising to be maximum strength, consumers look for a product with the strongest active ingredients available and are willing to pay a premium for them.

27.     J&J's Maximum Strength Representation was material to Plaintiff and class members' decision to purchase the Products. Had consumers, such as Plaintiff, known the Products were not "MAXIMUM STRENGTH," because stronger over-the-counter alternatives existed, they would not have purchased the Products or would have paid less.

28.     J&J's marketing efforts are made in order to—and do in fact—induce consumers to purchase the Products at a premium because consumers believe they are getting maximum strength decongestants. This deceives reasonable consumers into believing PE nasal decongestants are maximum strength when they are not.

29.     J&J, however, has at all relevant times been well aware that its Products are not maximum strength nasal decongestants, as other, stronger nasal decongestants are available with stronger active ingredients, such as pseudoephedrine, over the counter.

30.     All reasonable consumers, including Plaintiff, read and relied on J&J's "MAXIMUM STRENGTH" representations when purchasing the Products. Indeed, when purchasing pharmaceuticals, especially those promising to be maximum strength, consumers look for a product with the strongest active ingredients available and are willing to pay a premium for them.

31.     J&J's Maximum Strength Representation was material to Plaintiff and class members' decision to purchase the Products. Had consumers, such as Plaintiff, known the Products were not "MAXIMUM STRENGTH," because stronger over-the-counter alternatives existed, they

8

would not have purchased the Products or would have paid less.

32.     J&J's marketing efforts are made in order to—and do in fact—induce consumers to purchase the Products at a premium because consumers believe they are getting maximum strength decongestants. This deceives reasonable consumers into believing PE nasal decongestants are maximum strength when they are not.

33.     J&J, however, has at all relevant times been well aware that its Products are not maximum strength nasal decongestants, as other, stronger nasal decongestants are available with stronger active ingredients, such as pseudoephedrine, over the counter.

34.     Reliable scientific studies undermine PE's effectiveness when compared to other nasal decongestants, thus rendering its Maximum Strength Representation false and misleading in the face of such evidence, and no reasonable consumer would deem the Products maximum strength.

35.     Regardless of a handful of clinical studies addressing PE's efficacy, PE's effectiveness has been questioned when compared to other over-the-counter nasal decongestants.

36.     "Intervention studies can be placed on a continuum, with a progression from efficacy trials to effectiveness trials. Efficacy can be defined as the performance of an intervention under ideal and controlled circumstances, whereas effectiveness refers to its performance under 'real world' conditions."[2]

37.     Further, comparative studies in drugs are designed to improve the health care decisions by providing evidence regarding effectiveness, benefits, and harms of different

---

[2] *See* https://www.ncbi.nlm.nih.gov/pmc/articles/PMC3912314/. Last visited Jan. 12, 2024.

treatments.[3]

38.     In 2006, the authors of a research comparative letter to the editor of a scientific journal found pseudoephedrine superior to PE in reducing nasal congestion, attributing the ineffectiveness to poor bioavailability of PE.[4]

39.     Also, in 2009, a comparison effectiveness study was done on PE and pseudoephedrine. The authors found that pseudoephedrine was far more effective on the measures of nasal congestion than PE.[5]

40.     As a leading manufacturer of phenylephrine hydrochloride oral nasal decongestants, J&J knew or should have known of this scientific literature. Nonetheless, it represents that the Products are maximum strength.

41.     Nonetheless, because the Sudafed PE products contain phenylephrine as the only active oral nasal decongestant ingredient, they are not maximum strength" relief for "Sinus Pressure" and "Sinus Congestion." Phenylephrine is not the maximum strength nasal decongestant available on the market.

42.     Further, the Maximum Strength Representation on the Products' labels is misleading for yet another reason. The only active ingredient for pain relief/fever reducer is 650 mg of acetaminophen per dose, which is the equivalent of a "Regular Strength" acetaminophen tablet. Thus, the strength of the acetaminophen dosage is far below anything that can be considered "MAXIMUM STRENGTH," or as acetaminophen is commonly marketed as "Extra Strength."

---

[3] *See* https://tracs.unc.edu/index.php/services/comparative-effectiveness-research/what-is-cer#:~:text=Comparative%20effectiveness%20research%20is%20designed,harms%20of%20different%20treatment%20options. Last visited Jan. 12, 2024.

[4] *See* https://www.jacionline.org/action/showPdf?pii=S0091-6749%2806%2900633-6. Last visited Jan. 12, 2024.

[5] *See* https://pubmed.ncbi.nlm.nih.gov/19230461/. Last visited Jan. 12, 2024.

43.     J&J intended for Plaintiff and class members to be deceived or misled by its misrepresentations and omissions. Indeed, label space is limited, so manufacturers only place the most pertinent information on the front label. J&J specifically labeled and marketed the Products as Maximum Strength when other oral nasal decongestants and pain relievers/fever reducers were not marketed in a similar fashion.

44.     J&J's deceptive and misleading practices proximately caused harm to Plaintiff and the Classes.

45.     Plaintiff and class members would not have purchased the Products, or would have paid less for them, had they known the truth about the mislabeled and falsely advertised products. Indeed, other, stronger nasal decongestants and higher acetaminophen doses are available.

## PLAINTIFF'S FACTUAL ALLEGATIONS

46.     Plaintiff relied on the Sudafed PE "MAXIMUM STRENGTH" label in deciding to purchase what she believed to be the strongest available nasal decongestant over the counter. Had Plaintiff known that phenylephrine, the only active oral nasal decongestant ingredient in Sudafed PE, is not the maximum strength nasal decongestant available on the market, she would not have purchased it or would have paid less.

47.     Plaintiff resides in Batavia, Illinois and is a citizen of Illinois. Throughout the relevant period, Plaintiff purchased the Products at issue in this lawsuit and was exposed to and reasonably relied upon J&J's "MAXIMUM STRENGTH" representations. Specifically, Plaintiff purchased Sudafed PE: Sinus Congestion from a local Walmart located at 801 N Randall Rd, Batavia, IL 60510 within the last three months. Upon purchase, Plaintiff reviewed the Product packaging, including the front-label representations, and reasonably believed from these representations that the Products were "MAXIMUM STRENGTH," Those terms meant to Plaintiff

11

that no stronger alternative over-the-counter nasal decongestant and pain reliever/fever reducer existed. In reasonable reliance on these representations, Plaintiff paid a premium cost for the Product, which were worth less than represented because the statements were not true and were highly misleading. The Maximum Strength Representation on the Product packaging, was part of the basis of the bargain in that Plaintiff attributed value to those representations and Plaintiff would not have purchased the Products, or would not have purchased them on the same terms, if she knew the Maximum Strength Representation was untrue and/or misleading. Plaintiff paid a price premium for empty promises that J&J did not keep. Had Plaintiff been aware that the Maximum Strength Representation made by J&J on the Products was untrue, she would have paid less for the Products, or would not have purchased them at all.

## **FED. R. CIV. P. 9(B) ALLEGATIONS**

48.     J&J made material misrepresentations and/or omissions of fact in its labeling and marketing of the Products by representing that they are "MAXIMUM STRENGTH" decongestant and pain relief/fever reducer products.

49.     J&J's alleged conduct was and continues to be fraudulent because it has the effect of deceiving consumers into believing the Products are maximum strength oral nasal decongestant products. J&J omitted from Plaintiff and class members that the Products are not maximum strength oral nasal decongestant products because other stronger over-the-counter nasal decongestant products exist. J&J knew or should have known this information is material to all reasonable consumers and impacts consumers' purchasing decisions. Yet, J&J has and continues to represent the Products are maximum strength oral nasal decongestant products when they are not and has omitted from the Products' packaging the fact that there are other over-the-counter products that are stronger decongestants. J&J has likewise continued to label the Products as

12

maximum strength with respect to pain relief/fever reducer, even though their acetaminophen content is only regular strength.

50.     J&J made material misrepresentations and/or omissions detailed herein, including that the Products are maximum strength oral nasal decongestant and pain reliever/fever reducer, continuously throughout the applicable class period(s).

51.     J&J's material misrepresentations and omissions, that the Products are maximum strength oral nasal decongestant and pain reliever/fever reducer products, were located on the front label of the Products in capitalized, bold lettering that contrasts with the background of the packaging, which instantly catches the eye of all reasonable consumers, including Plaintiff and class members, at the point of sale in every transaction. The Products are sold in brick-and-mortar stores and online stores in Illinois and nationwide.

52.     J&J made written misrepresentations of fact on the front label of the Products that they were "MAXIMUM STRENGTH" even though other stronger nasal decongestant and body pain reliever/fever reducer products are available. As such, J&J's Maximum Strength Representations are false and misleading. Moreover, J&J omitted from the Products' labeling the fact that there are stronger over-the-counter nasal decongestants and pain relievers/fever reducers available. And as alleged in detail throughout this Complaint, Plaintiff and class members read and relied on J&J's Maximum Strength Representations and omissions before purchasing the Products.

53.     J&J misrepresented its Products as being maximum strength nasal decongestant and pain reliever/fever reducer and omitted from the Products' labeling the fact that there are other, over-the-counter products available that are stronger decongestants and pain relievers/fever reducers, for the express purpose of inducing Plaintiff and class members to purchase the inferior

PE and acetaminophen products at a price premium. As such, J&J profited by selling the misrepresented products to at least thousands of consumers throughout the nation.

## **CLASS ACTION ALLEGATIONS**

54.    Plaintiff brings this action on behalf of herself and the following "Classes" pursuant to Federal Rule of Civil Procedure 23(a), (b)(2) and/or (b)(3). Specifically, the Classes are defined as:

> **Nationwide Class**: All persons in the United States who purchased one or more of the Products in the United States for personal use and not for resale during the applicable statute of limitations period, until the date notice is disseminated.

> **Illinois Subclass**: All persons in the State of Illinois who purchased one or more of the Products in the State of Illinois for personal use and not for resale during the applicable statute of limitations period, until the date notice is disseminated.

> **Multi-State Consumer Protection Class:** All persons who purchased in the State of Illinois or any state with similar laws[6] one or more of the Products, within the applicable statute of limitations, until the date notice is disseminated.

55.    Excluded from the Classes are (a) any person who purchased the Products for resale and not for personal or household use, (b) any person who signed a release of J&J in exchange for consideration, (c) any officers, directors or employees, or immediate family members of the officers, directors or employees, of J&J or any entity in which a J&J has a controlling interest, (d) any legal counsel or employee of legal counsel for J&J, and (e) the presiding Judge in this lawsuit, as well as the Judge's staff and their immediate family members.

56.    Plaintiff reserves the right to amend the definition of the Classes if discovery or

---

[6] While discovery may alter the following, Plaintiff asserts that the other states with similar consumer fraud laws under the facts of this case include, but are not limited to: California (Cal. Bus. & Prof. Code § 17200, *et seq*.); Florida (Fla. Stat. §§ 501.201, *et seq*.); Illinois (815 ICLS §§ 505/1, *et seq*.); Massachusetts (Mass. Gen. Laws Ch. 93A, *et seq*.); Michigan (Mich. Comp. Laws §§ 445.901, *et seq*.); Minnesota (Minn. Stat. §§ 325F.67, *et seq*.); New Jersey (N.J. Stat. §§ 56:8-1, *et seq*.); New York (N.Y. Gen. Bus. Law §§ 349, *et seq*.); Washington (Wash. Rev. Code §§ 19.86.010, *et seq*.); *See Mullins v. Direct Digital, LLC*, No. 13-cv-1829, 2014 WL 5461903 (N.D. Ill. Sept. 30, 2014), *aff'd*, 795 F.3d 654 (7th Cir. 2015).

further investigation reveals that the Classes should be expanded or otherwise modified.

57.    **Numerosity – Federal Rule of Civil Procedure 23(a)(1).** Class members are so numerous and geographically dispersed that joinder of all class members is impracticable. While the exact number of class members remains unknown at this time, upon information and belief, there are thousands, if not hundreds of thousands or millions, of putative class members.

58.    **Predominance of Common Questions of Law and Fact – Federal Rule of Civil Procedure 23(a)(2) and 23(b)(3).** Common questions of law and fact exist as to all class members and predominate over any questions affecting only individual class members. These common legal and factual questions include, but are limited to, the following:

a.    Whether J&J made the "MAXIMUM STRENGTH" representations;

b.    Whether J&J promoted the Products with false and misleading statements of fact and material omissions;

c.    Whether J&J's "MAXIMUM STRENGTH " representations are deceptive, unfair, or misleading to the reasonable consumer;

d.    Whether J&J's actions and/or omissions violate applicable laws;

e.    Whether Plaintiff and putative members of the Classes have suffered loss of monies or property or other value as a result of J&J's acts, omissions, or misrepresentations of material facts;

f.    Whether J&J was unjustly enriched at the expense of Plaintiff and members of the putative Classes in connection with the Products;

g.    Whether J&J breached warranties owed to Plaintiff and members of the putative Classes;

h.    Whether Plaintiff and members of the putative Classes are entitled to monetary

15

damages and, if so, the nature of such relief; and

i.  Whether Plaintiff and members of the putative Classes are entitled to equitable, declaratory, or injunctive relief and, if so, the nature of such relief.

59.  **Typicality – Federal Rule of Civil Procedure 23(a)(3).** Plaintiff's claims are typical of those of the absent class members in that Plaintiff and the class members each purchased and used the Products and each sustained damages arising from J&J's wrongful conduct, as alleged more fully herein. Plaintiff shares the aforementioned facts and legal claims or questions with putative members of the Classes, and Plaintiff and all members of the putative Classes have been similarly affected by J&J's common course of conduct alleged herein. Plaintiff and all members of the putative Classes sustained monetary and economic injuries including, but not limited to, ascertainable loss arising out of J&J's false and deceptive "MAXIMUM STRENGTH" representations about the Products, as alleged herein.

60.  **Adequacy – Federal Rule of Civil Procedure 23(a)(4).** Plaintiff will fairly and adequately represent and protect the interests of the members of the putative Classes. Plaintiff has retained counsel with substantial experience in handling complex class action litigation, including complex questions that arise in this type of consumer protection litigation. Further, Plaintiff and her counsel are committed to the vigorous prosecution of this action. Plaintiff does not have any conflicts of interest or interests adverse to those of putative Classes.

61.  **Declaratory and Injunctive Relief – Federal Rule of Civil Procedure 23(b)(2).** J&J has acted or refused to act on grounds generally applicable to Plaintiff and all members of the Classes, thereby making appropriate final injunctive relief and declaratory relief, as described below, with respect to the members of the Classes as a whole.

62.  **Superiority – Federal Rule of Civil Procedure 23(b)(3).** A class action is superior

16

to any other available methods for the fair and efficient adjudication of the present controversy for at least the following reasons:

 a. The damages suffered by each individual member of the putative Classes do not justify the burden and expense of individual prosecution of the complex and extensive litigation necessitated by J&J's conduct;

 b. Even if individual members of the Classes had the resources to pursue individual litigation, it would be unduly burdensome to the courts in which the individual litigation would proceed;

 c. The claims presented in this case predominate over any questions of law or fact affecting individual members of the Classes;

 d. Individual joinder of all members of the Classes is impracticable;

 e. Absent a class, Plaintiff and members of the putative Classes will continue to suffer harm as a result of J&J's unlawful conduct; and

 f. This action presents no difficulty that would impede its management by the Court as a class action, which is the best available means by which Plaintiff and members of the putative Classes can seek redress for the harm caused by J&J.

## CLAIMS FOR RELIEF

### COUNT I
### VIOLATION OF ILLINOIS CONSUMER FRAUD
### AND DECEPTIVE BUSINESS PRACTICES ACT
### (By Plaintiff on Behalf of the Illinois Subclass)

63. Plaintiff repeats and re-alleges the allegations above as if set forth herein.

64. The Illinois Consumer Fraud and Deceptive Business Practices Act (the "ICFA"), 815 ILCS 505/1, *et seq.*, prohibits "unfair methods of competition and unfair or deceptive acts or practices, including but not limited to the use or employment of any deception, fraud, false

17

pretense, false promise, misrepresentation or the concealment, suppression or omission of any material fact, with intent that others rely upon the concealment, suppression or omission of such material fact or the use or employment of any practice described in Section 2 of the 'Uniform Deceptive Trade Practices Act' . . . ."

65.     Plaintiff and the Illinois Subclass members were injured by J&J's deceptive misrepresentations, concealments and omissions and these misrepresentations, concealments and omissions were material and deceived Plaintiff and the Illinois Subclass. Because Plaintiff and the Illinois Subclass members relied on J&J's misrepresentations, concealments and omissions when purchasing the Products, they were injured at the time of purchase.

66.     J&J does business in Illinois, sells and distributes the Products in Illinois, and engaged in deceptive acts and practices in connection with the sale of the Products in Illinois and elsewhere in the United States.

67.     The Products purchased by Plaintiff and the Illinois Subclass members were "consumer items" as that term is defined under the ICFA.

68.     J&J engaged in unfair and deceptive acts in violation of 815 Ill. Comp. Stat. 505/2 when it misrepresented and deceptively concealed, suppressed and/or omitted the material information known to J&J as set forth above concerning its Products, which has caused damage and injury to Plaintiff and the Illinois Subclass members. Plaintiff and the Illinois Subclass members were injured by J&J's unfair and deceptive acts at the time of purchasing the Products.

69.     J&J's marking of the Products violates this prohibition by deceiving consumers into believing each of the Products is a "MAXIMUM STRENGTH" decongestant or pain reliever/fever reducer.

70.     J&J engaged in fraudulent and/or deceptive conduct, which creates a likelihood of

18

confusion or of misunderstanding in violation of the Act.

71.     J&J engaged in misleading and deceptive advertising that represented that the Products were maximum strength. J&J chose to package and market the products in this way to impact consumer choices and gain market dominance, as it knew or should have known that all consumers who purchased the products would be impacted by its omissions and would reasonably believe J&J's false and misleading Maximum Strength Representations and omissions.

72.     J&J's deceptive acts occurred in a course of conduct involving trade and commerce in Illinois and throughout the United States.

73.     J&J intended Plaintiff and the Illinois Subclass members to rely on its deceptive acts when purchasing the Products.

74.     J&J's deceptive acts proximately caused actual injury and damage to Plaintiff and the Illinois Subclass members at the time of purchase.

75.     Plaintiff and the Illinois Subclass members would not have purchased, or would have paid less for, the Products but for J&J's material misrepresentations as described in this Complaint.

## COUNT II
## VIOLATION OF ILLINOIS UNIFORM DECEPTIVE TRADE PRACTICES ACT
### (By Plaintiff on Behalf of the Illinois Subclass)

76.     Plaintiff repeats and re-alleges the allegations above as if set forth herein.

77.     The Illinois Deceptive Trade Practices Act ("UDTPA"), 815 ILCS 510/2, *et seq.*, prohibits "[u]nfair methods of competition and unfair or deceptive acts or practices, including but not limited to the use or employment of any deception, fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of any material fact, with intent that others rely upon the concealment, suppression or omission of such material fact."

19

78.    815 ILCS 510/2 provides in pertinent part that a "person engages in a deceptive trade practice when, in the course of his or her business, vocation, or occupation," the person does any of the following: "(5) represents that goods or services have . . . uses, benefits or quantities that they do not have . . .; (7) represents that goods or services are of a particular standard, quality, or grade or that goods are a particular style or model, if they are of another; . . . [or] (12) engages in any other conduct which similarly creates a likelihood of confusion or misunderstanding."

79.    J&J's marking of the Products violates this prohibition by deceiving consumers into believing each of the Products is a "MAXIMUM STRENGTH" decongestant or pain reliever/fever reducer.

80.    J&J engaged in fraudulent and/or deceptive conduct, which creates a likelihood of confusion or of misunderstanding in violation of the Act.

81.    J&J engaged in misleading and deceptive advertising that represented that the Products were maximum strength. J&J chose to package and market the Products in this way to impact consumer choices and gain market dominance, as it knew or should have known that all consumers who purchased the Products would be impacted by its omissions and would reasonably believe J&J's false and misleading Maximum Strength Representations and omissions.

82.    J&J intended that Plaintiff and each of the other Illinois Subclass members would reasonably rely upon the material omissions concerning the true nature of the Products.

83.    J&J's concealment, omissions, and other deceptive conduct were likely to deceive and cause misunderstanding and/or in fact caused Plaintiff and each of the other Illinois Subclass members to be deceived about the true nature of the Products.

84.    J&J's deceptive acts occurred in a course of conduct involving trade and commerce in Illinois and throughout the United States.

20

85.     J&J's deceptive acts proximately caused actual injury and damage to Plaintiff and the Illinois Subclass Members at the time of purchase.

86.     Plaintiff and the Illinois Subclass Members would not have purchased, or would have paid less for, the Products but for J&J's material misrepresentations as described in this Complaint.

87.     J&J intended Plaintiff and the Illinois Subclass members to rely on its deceptive acts when purchasing the Products.

### COUNT III
### VIOLATION OF STATE CONSUMER PROTECTION STATUTES
**(By Plaintiff on Behalf of the Multi-State Consumer Protection Class)**

88.     Plaintiff repeats and re-alleges the allegations above as if set forth herein.

89.     Plaintiff and Multi-State Consumer Protection Class members have been injured as a result of J&J's violations of the state consumer protection statutes listed above in paragraph 47 and footnote 6, which also provide a basis for redress to Plaintiff and Multi-State Consumer Class Members based on J&J's fraudulent, deceptive, unfair and unconscionable acts, practices and conduct.

90.     J&J's conduct as alleged herein violates the consumer protection, unfair trade practices, and deceptive acts laws of each of the jurisdictions encompassing the Multi-State Consumer Class.

91.     J&J violated the Multi-State Consumer Class states' consumer protection, unfair trade practices, and deceptive acts laws through its misleading and deceptive advertising that represented the Products were "MAXIMUM STRENGTH." J&J chose to package and market the Products in this way to impact consumer choices and gain market dominance, as it knew or should have known that all consumers who purchased the Products would be impacted by its omissions

and would reasonably believe J&J's false and misleading Maximum Strength Representations and omissions.

92.     J&J's misrepresentations were material to Plaintiff and Multi-State Consumer Class members' decision to purchase the Products or pay a premium for the Products.

93.     J&J made its untrue and/or misleading statements and representations willfully, wantonly, and with reckless disregard for the truth.

94.     As a result of J&J's violations of the aforementioned states' unfair and deceptive practices laws, Plaintiff and Multi-State Consumer Class members paid a premium for the Products.

95.     As a result of J&J's violations, J&J has been unjustly enriched.

96.     Pursuant to the alleged consumer protection, unfair trade practices, and deceptive acts laws, Plaintiff and Multi-State Consumer Class members are entitled to recover compensatory damages, restitution, punitive and special damages, including but not limited to statutory or treble damages, reasonable attorneys' fees, and costs, and other injunctive or declaratory relief as deemed appropriate or permitted pursuant to the relevant law.

## COUNT IV
## UNJUST ENRICHMENT
**(By Plaintiff, In the Alternative, and on Behalf of the Nationwide and/or Illinois Subclass)**

97.     Plaintiff repeats and re-alleges the allegations above as if set forth herein.

98.     Plaintiff and the putative class members conferred a benefit on J&J when they purchased the Products. By its wrongful acts and omissions described herein, including selling the Products containing the "MAXIMUM STRENGTH" representations, which did not conform to the promises or affirmations of fact made on the label, J&J was unjustly enriched at the expense of Plaintiff and the putative class members.

99.     Plaintiff's and the putative class members' detriment and J&J's enrichment were

related to and flowed from the wrongful conduct challenged in this Complaint.

100. J&J has profited from its unlawful, unfair, misleading, and deceptive practices at the expense of Plaintiff and the putative class members under circumstances in which it would be unjust for J&J to be permitted to retain the benefit. It would be inequitable for J&J to retain the profits, benefits, and other compensation obtained from their wrongful conduct as described herein in connection with selling the Products.

101. J&J has been unjustly enriched in retaining the revenues derived from class members' purchases of the Products, which retention of such revenues under these circumstances is unjust and inequitable because J&J marketed, advertised, distributed, and sold the Products, and J&J misrepresented the nature of the products, misrepresented their benefits and attributes, and knowingly marketed and promoted the Products with Maximum Strength Representations, which caused injuries to Plaintiff and the Classes because they would not have purchased the Products based on the same representations if the true facts concerning the Products had been known.

102. Plaintiff and the putative class members have been damaged as a direct and proximate result of J&J's unjust enrichment because they would not have purchased the Products on the same terms or for the same price had they known the true nature of the Products and the misstatements regarding the strength of the Products' active ingredients.

103. J&J either knew or should have known that payments rendered by Plaintiff and the class members were given and received with the expectation that the Maximum Strength Representations made by J&J in advertising and on the Products' labels and packaging were true. It is inequitable for J&J to retain the benefit of payments under these circumstances because the Maximum Strength Representations are not true.

104. Plaintiff and the putative class members are entitled to recover from J&J all

amounts wrongfully collected and improperly retained by J&J.

105.    As a direct result of J&J's wrongful conduct and unjust enrichment, Plaintiff and the putative class members are entitled to restitution of, disgorgement of, and/or imposition of a constructive trust upon all profits, benefits, and other compensation obtained by J&J for their inequitable and unlawful conduct.

**COUNT V**
**Breach of Express Warranty**
**(By Plaintiff, In the Alternative, and on Behalf of the Nationwide and/or Illinois Subclass)**

106.    Plaintiff repeats and re-alleges the allegations above as if set forth herein.

107.    The terms of the contract include the promises and affirmations of fact made by J&J on the Product packaging and through marketing and advertising, as described above.

108.    This labeling, marketing, and advertising constitute express warranties and became part of the basis of the bargain and are part of the standardized contract between Plaintiff and class members.

109.    J&J made the representations described herein to induce Plaintiff and class members to purchase the Products, and Plaintiff and class members relied on the representations in purchasing the Products.

110.    All conditions precedent to J&J's liability under the above-referenced contract have been performed by Plaintiff and the other class members.

111.    J&J thereby breached the following state warranty laws:

a.      Code of Ala. § 7-2-313;

b.      Alaska Stat. § 45.02.313;

c.      A.R.S. § 47-2313;

d.      A.C.A. § 4-2-313;

e.      Cal. Comm. Code § 2313;

24

f.      Colo. Rev. Stat. § 4-2-313;

g.      Conn. Gen. Stat. § 42a-2-313;

h.      6 Del. C. § 2-313;

i.      D.C. Code § 28:2-313;

j.      Fla. Stat. § 672.313;

k.      O.C.G.A. § 11-2-313;

l.      H.R.S. § 490:2-313;

m.      Idaho Code § 28-2-313;

n.      810 I.L.C.S. 5/2-313;

o.      Ind. Code § 26-1-2-313;

p.      Iowa Code § 554.2313;

q.      K.S.A. § 84-2-313;

r.      K.R.S. § 355.2-313;

s.      11 M.R.S. § 2-313;

t.      Md. Commercial Law Code Ann. § 2-313;

u.      106 Mass. Gen. Laws Ann. § 2-313;

v.      M.C.L.S. § 440.2313;

w.      Minn. Stat. § 336.2-313;

x.      Miss. Code Ann. § 75-2-313;

y.      R.S. Mo. § 400.2-313;

z.      Mont. Code Anno. § 30-2-313;

aa.     Neb. Rev. Stat. § 2-313;

bb.     Nev. Rev. Stat. Ann. § 104.2313;

cc.    R.S.A. 382-A:2-313;

dd.    N.J. Stat. Ann. § 12A:2-313;

ee.    N.M. Stat. Ann. § 55-2-313;

ff.    N.Y. U.C.C. Law § 2-313;

gg.    N.C. Gen. Stat. § 25-2-313;

hh.    N.D. Cent. Code § 41-02-30;

ii.    II. O.R.C. Ann. § 1302.26;

jj.    12A Okl. St. § 2-313;

kk.    Or. Rev. Stat. § 72-3130;

ll.    13 Pa. Rev. Stat. § 72-3130;

mm.    R.I. Gen. Laws § 6A-2-313;

nn.    S.C. Code Ann. § 36-2-313;

oo.    S.D. Codified Laws, § 57A-2-313;

pp.    Tenn. Code Ann. § 47-2-313;

qq.    Tex. Bus. & Com. Code § 2.313;

rr.    Utah Code Ann. § 70A-2-313;

ss.    9A V.S.A. § 2-313;

tt.    Va. Code Ann. § 59.1-504.2;

uu.    Wash. Rev. Code Ann. § 6A.2-313;

vv.    W. Va. Code § 46-2-313;

ww.    Wis. Stat. § 402.313; and

xx.    Wyo. Stat. § 34.1-2-313.

112.    In connection with its sale of the Products, J&J, as the designer, manufacturer,

26

marketer, distributor or seller, expressly warranted that the Products were maximum strength through its use of the Maximum Strength Representations described herein.

113. The express warranties covering the Products were a material part of the bargain between J&J and consumers. At the time it made these express warranties, J&J knew reasonable consumers were purchasing the Products because they believed they were maximum strength oral nasal decongestant products and pain reliever/fever reducers, as they were labeled and marketed.

114. Each of the Products have an identical or substantially identical product representation(s) as they each contain the term "MAXIMUM STRENGTH" in their product name. Furthermore, the Products are marketed and advertised in an identical or substantially identical way.

115. J&J breached its express warranties by selling the Products that were, in actuality, not maximum strength oral nasal decongestant products and pain relievers/fever reducers. J&J breached the warranty because it sold the Products which it labeled and marketed using the Maximum Strength Representations despite the fact that stronger over-the-counter alternatives existed, which was known to J&J and unknown to consumers at the time of sale.

116. J&J further breached its express written warranties to Plaintiff and class members in that the Products are incapable of fulfilling their promise to function as maximum strength oral nasal decongestant products and pain relievers/fever reducers at the time they leave the manufacturing plant and on the first day of purchase, and by failing to disclose and actively concealing the true benefits of the Products from consumers.

117. The Products that Plaintiff and class members purchased are not maximum strength oral nasal decongestant products and pain reliever/fever reducers, and thus Plaintiffs

and class members suffered the loss of the product, loss of use of the product, and loss of the

benefit of their bargain. J&J's warranty expressly applies to the original purchaser, creating

privity between J&J on the one hand, and Plaintiff and class members on the other.

118.     Likewise, it was reasonably foreseeable that Plaintiff and Class Member would

be the intended beneficiaries of the Products, creating privity or an exception to any privity

requirement. Plaintiff and each of the class members are the intended beneficiaries of J&J's

warranties and its sale through retailers. The retailers were not intended to be the ultimate

consumers of the Products and have no rights under the warranty agreements provided by J&J.

J&J's warranties were designed for and intended to benefit the consumer only and Plaintiff and

class members were the intended beneficiaries of the Products.

119.     J&J has been provided sufficient notice of its breaches of the express warranties

associated with the Products in a letter dated November 27, 2023.

120.     As a direct and proximate result of J&J's breach of its express warranties, Plaintiff

and Class Members suffered, and continue to suffer, financial damage and injury, and are entitled

to all damages, in addition to costs, interest and fees, including attorneys' fees, as allowed by

law.

## COUNT VI
## Breach of Implied Warranty
### (By Plaintiff, In the Alternative, and on Behalf of the Nationwide and/or Illinois Subclass)

121.     Plaintiff repeats and re-alleges the allegations above as if set forth herein.

122.     The Products are goods within the relevant laws and J&J knew or had reason to

know of the specific use for which the Products, as goods, were purchased.

123.     The implied warranty of merchantability included with the sale of each Product

means that J&J warranted that the Products would be fit for the ordinary purposes for which the

Products were used and sold, and were not otherwise injurious to consumers, that the Products would pass without objection in the trade, be of fair and average quality, and conform to the promises and affirmations of fact made by J&J. This implied warranty of merchantability is part of the basis for the benefit of the bargain between J&J, and Plaintiff, and class members.

124. Defendant breached the implied warranty of merchantability because the Products are not fit for their ordinary purpose as a maximum strength nasal decongestant and pain reliever/fever reducer. As further alleged herein, stronger over-the-counter alternatives existed, and therefore, there is a breach of the implied warranty of merchantability.

125. J&J's warranty expressly applies to the original purchaser and any succeeding owner of the Products, creating privity between J&J on the one hand, and Plaintiff and class members on the other.

126. Nonetheless, privity is not required because Plaintiff and class members are the intended beneficiaries of J&J's warranties and its sale through retailers. J&J's retailers were not intended to be the ultimate consumers of the Products and have no rights under the warranty agreements. J&J's warranties were designed for and intended to benefit the consumer only and Plaintiff and class members were their intended beneficiaries.

127. Likewise, it was reasonably foreseeable that Plaintiff and class members would be the intended beneficiaries of the Products and warranties.

128. J&J impliedly warranted that the Products were of merchantable quality and fit for such use. These implied warranties included, among other things: (i) a warranty that the Products manufactured, supplied, distributed, and/or sold by J&J were maximum strength nasal decongestants and pain relievers/fever reducers; and (ii) a warranty that the Products would be fit for their intended use while they were being used by consumers.

129.     Contrary to the applicable implied warranties, the Products, at the time of sale and thereafter, were not fit for their ordinary and intended purpose of providing Plaintiff and class members with maximum strength nasal decongestants and pain reliever/fever reducers, as other, stronger alternatives are available with stronger active ingredients, such as pseudoephedrine and with higher acetaminophen dosages.

130.     J&J breached the implied warranties because the Products were sold with the inability to provide Plaintiff and class members with a maximum strength nasal decongestant and pain reliever/fever reducers, which substantially reduced and/or prevented the Products from functioning as maximum strength product.

131.     As a direct and proximate result of the foregoing, Plaintiff and class members suffered, and continue to suffer, financial damage and injury, and are entitled to all damages, in addition to costs, interest and fees, including attorneys' fees, as allowed by law.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, individually and on behalf of all others similarly situated members of the Classes, prays for relief and judgment, including entry of an order:

A.     Declaring that this action is properly maintained as a class action, certifying the proposed Classes, appointing as Class Representative and appointing Plaintiff's counsel as Class Counsel;

B.     Directing that J&J bear the costs of any notice sent to the Classes;

C.     Declaring that J&J must disgorge, for the benefit of the Classes, all or part of the ill-gotten profits they received from the sale of the Products, or order J&J to make full restitution to Plaintiff and the members of the Classes;

D.     Awarding restitution and other appropriate equitable relief;

E.  Granting an injunction against J&J to enjoin it from conducting its business through the unlawful, unfair, and fraudulent acts or practices set forth herein;

F.  Granting an Order requiring J&J to fully and appropriately recall the Products and/or to remove the claims on its website and elsewhere, including "MAXIMUM STRENGTH" representations regarding the Products;

G.  Ordering a jury trial and damages according to proof;

H.  Awarding Plaintiff and members of the Classes compensatory and punitive damages, or statutory damages, as provided by the applicable state consumer protection statutes invoked above;

I.  Enjoining J&J from continuing to engage in the unlawful and unfair business acts and practices as alleged herein;

J.  Awarding attorneys' fees and litigation costs to Plaintiff and members of the Class(es);

K.  Awarding civil penalties, prejudgment interest, and punitive damages as permitted by law; and

L.  Ordering such other and further relief as the Court deems just and proper.

## **JURY DEMAND**

Plaintiff demands a trial by jury of all claims in this Complaint so triable.

Dated: January 12, 2024                  Respectfully submitted,

By: */s/ Nick Suciu III*

Nick Suciu III
**MILBERG COLEMAN BRYSON
PHILLIPS GROSSMAN, PLLC**
6905 Telegraph Rd., Suite 115
Bloomfield Hills, MI 48301
Telephone: (313) 303-3472
Email: nsuciu@milberg.com

31

Gary M. Klinger
**MILBERG COLEMAN BRYSON PHILLIPS GROSSMAN, PLLC**
227 W. Monroe Street, Suite 2100
Chicago, IL 60606
Telephone: (866) 252-0878
Email: gklinger@milberg.com

Jeff Ostrow
Jonathan M. Streisfeld
Kristen Lake Cardoso
**KOPELOWITZ OSTROW P.A.**
One West Las Olas Blvd., Suite 500
Fort Lauderdale, Florida 33301
Telephone: (954) 525-4100
Email: ostrow@kolawyers.com
    streisfeld@kolawyers.com
    cardoso@kolawyers.com

Melissa S. Weiner
Ryan J. Gott
**PEARSON WARSHAW, LLP**
328 Barry Avenue South, Suite 200
Wayzata, Minnesota 55391
Telephone: (612) 389-0600
Email: mweiner@pwfirm.com
    rgott@pwfirm.com

Erin Ruben
**MILBERG COLEMAN BRYSON PHILLIPS GROSSMAN PLLC**
900 W. Morgan Street
Raleigh, NC 27603
Telephone: (919) 600-5000
Email: eruben@milberg.com

J. Hunter Bryson
**MILBERG COLEMAN BRYSON PHILLIPS GROSSMAN, PLLC**
405 E 50th Street
New York, NY 10022
Telephone: (630) 796-0903
Email: hbryson@milberg.com

*Attorneys for Plaintiff*

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that on January 12, 2024 the foregoing document was filed via the Court's ECF system, which will cause a true and correct copy of the same to be served electronically on all ECF-registered counsel of record.


        */s/ Nick Suciu III*
        Nick Suciu III

# United States District Court
## Northern District of Illinois - CM/ECF NextGen 1.7.1.1 (Chicago)
## CIVIL DOCKET FOR CASE #: 1:23-cv-13796

Tuominen v. Johnson & Johnson Consumer, Inc.
Assigned to: Honorable Nancy L. Maldonado
Demand: $9,999,000
Cause: 28:1332 Diversity-Account Receivable

Date Filed: 09/15/2023
Jury Demand: Both
Nature of Suit: 370 Other Fraud
Jurisdiction: Diversity

**Plaintiff**

**Tina Tuominen**
*on behalf of herself and all others similarly situated*

represented by **Erin J. Ruben**
Milberg Coleman Bryson Phillips Grossman Pllc
900 W. Morgan Street
Raleigh, NC 27603
(919) 600-5000
Fax: Not a member
Email: eruben@milberg.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Gary M. Klinger**
Milberg Coleman Bryson Phillips Grossman PLLC
227 W. Monroe Street
Suite 2100
Chicago, IL 60606
866-252-0878
Fax: Active
Email: gklinger@milberg.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Jeffrey M. Ostrow**
Kopelowitz Ostrow P.A.
Florida
One West Las Olas Blvd.
Suite 500
Fort Lauderdale, FL 33301
954-525-4100
Fax: 954-525-4300
Email: ostrow@kolawyers.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**John Hunter Bryson**
Milberg Coleman Bryson Phillips Grossman, Pllc
900 W. Morgan Street
Raleigh, NC 27603

(919) 600-5000
Fax: Not a member
Email: hbryson@milberg.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Jonathan Marc Streisfeld**
Kopelowitz Ostrow P.A.
One West Las Olas Boulevard
Suite 500
Fort Lauderdale, FL 33301
(954) 525-4100
Fax: Not a member
Email: streisfeld@kolawyers.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Kristen Lake Cardoso**
Kopelowitz Ostrow Ferguson Weiselberg
Gilbert
1 W Las Olas Blvd
Suite 500
Fort Lauderdale, IL 33301
(954) 525-4100
Fax: Not a member
Email: cardoso@kolawyers.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Nick Suciu , III**
Milberg Coleman Bryson Phillips
Grossman, PLLC
6905 Telegraph Rd., Suite 115
Bloomfield Hills, MI 483021
313 303-3472
Fax: Pro Hac Vice
Email: nsuciu@milberg.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Russell Busch**
Milberg Coleman Bryson Phillips Grossman
Pllc
800 S. Gay Street, Suite 1100
Knoxville, TN 37929
(630) 796-0903
Fax: Not a member
Email: rbusch@milberg.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Melissa Susan Weiner**
Pearson Warshaw, LLP
328 Barry Avenue S.

Suite 200
Wayzata, MN 55391
612-389-0600
Fax: 612-389-0610
Email: mweiner@pwfirm.com
*ATTORNEY TO BE NOTICED*

**Ryan Thomas Gott**
Pearson Warshaw, Llp
328 Barry Ave. South
Suite 200
Wayzata, MN 55391
(612) 389-0600
Fax: Not a member
Email: rgott@pwfirm.com
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

| | | |
|---|---|---|
| **Johnson & Johnson Consumer, Inc.** | represented by | **Bradley Joseph Andreozzi** |

Faegre Drinker Biddle & Reath LLP
191 North Wacker Drive
Suite 3700
Chicago, IL 60606-1698
(312) 569-1173
Fax: Active
Email:
bradley.andreozzi@faegredrinker.com
*ATTORNEY TO BE NOTICED*

**Shannon M. Barrett**
O'Melveny & Myers LLP
1625 I St NW
Washington, DC 20006
(202) 383-5308
Fax: Not a member
Email: sbarrett@omm.com
*ATTORNEY TO BE NOTICED*

**Sophie Honey Gotlieb**
Faegre Drinker Biddle & Reath LLP
320 South Canal Street
Ste 3300
Chicago, IL 60606
312-569-1128
Email: sophie.gotlieb@faegredrinker.com
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 09/15/2023 | 1 | COMPLAINT filed by Tina Tuominen; Jury Demand. Filing fee $ 402, receipt number |

| | | AILNDC-21085911.(Klinger, Gary) (Entered: 09/15/2023) |
|---|---|---|
| 09/15/2023 | 2 | CIVIL Cover Sheet (Klinger, Gary) (Entered: 09/15/2023) |
| 09/15/2023 | 3 | ATTORNEY Appearance for Plaintiff Tina Tuominen by Nick Suciu, III (Suciu, Nick) (Entered: 09/15/2023) |
| 09/15/2023 | 4 | ATTORNEY Appearance for Plaintiff Tina Tuominen by Erin J. Ruben (Ruben, Erin) (Entered: 09/15/2023) |
| 09/15/2023 | 5 | ATTORNEY Appearance for Plaintiff Tina Tuominen by John Hunter Bryson (Bryson, John) (Entered: 09/15/2023) |
| 09/20/2023 | | CASE ASSIGNED to the Honorable Nancy L. Maldonado. Designated as Magistrate Judge the Honorable M. David Weisman. Case assignment: Random assignment. (axk, ) (Entered: 09/20/2023) |
| 09/20/2023 | | CLERK'S NOTICE: Pursuant to Local Rule 73.1(b), a United States Magistrate Judge of this court is available to conduct all proceedings in this civil action. If all parties consent to have the currently assigned United States Magistrate Judge conduct all proceedings in this case, including trial, the entry of final judgment, and all post-trial proceedings, all parties must sign their names on the attached Consent To form. This consent form is eligible for filing only if executed by all parties. The parties can also express their consent to jurisdiction by a magistrate judge in any joint filing, including the Joint Initial Status Report or proposed Case Management Order. (axk, ) (Entered: 09/20/2023) |
| 09/21/2023 | 6 | ATTORNEY Appearance for Plaintiff Tina Tuominen by Melissa Susan Weiner (Weiner, Melissa) (Entered: 09/21/2023) |
| 09/21/2023 | 7 | ATTORNEY Appearance for Plaintiff Tina Tuominen by Ryan Thomas Gott (Gott, Ryan) (Entered: 09/21/2023) |
| 09/21/2023 | 8 | MINUTE entry before the Honorable Nancy L. Maldonado: A Rule 16 initial status hearing is set for 12/19/23 at 10:00 a.m. in person in Courtroom 1925. By 12/12/23 the parties shall file a joint Initial Status Report that complies with the Court's standing order, which can be found on the Court's website. Notices mailed. (psm, ) (Entered: 09/21/2023) |
| 09/21/2023 | | SUMMONS Issued as to Defendant Johnson & Johnson Consumer, Inc. (mek,) (Entered: 09/21/2023) |
| 09/25/2023 | 10 | MOTION to transfer case pursuant to 28 U.S.C., Sec. 1407. (Attachments: # 1 Attachments)(kl, ) (Entered: 10/03/2023) |
| 10/02/2023 | 9 | SUMMONS Returned Executed by Tina Tuominen as to Johnson & Johnson Consumer, Inc. on 9/25/2023, answer due 10/16/2023. (Klinger, Gary) (Entered: 10/02/2023) |
| 10/04/2023 | 11 | MINUTE entry before the Honorable Nancy L. Maldonado:The motion to transfer case 10 is a copy of a motion filed before the Judicial Panel on Multidistrict Litigation. The copy was filed in this Court pursuant to 28 U.S.C. 1407(c)(ii). Because the filing at 10 is not a motion for this Court to rule on but rather serves to give this Court notice of the motion before the Judicial Panel on Multidistrict Litigation, the motion to transfer case 10 is administratively terminated. (ca, ) (Entered: 10/04/2023) |
| 10/12/2023 | 12 | ATTORNEY Appearance for Plaintiff Tina Tuominen by Jeffrey M. Ostrow (Ostrow, Jeffrey) (Entered: 10/12/2023) |
| 10/12/2023 | 13 | ATTORNEY Appearance for Plaintiff Tina Tuominen by Kristen Lake Cardoso (Cardoso, Kristen) (Entered: 10/12/2023) |

| 10/12/2023 | [14](#) | ATTORNEY Appearance for Plaintiff Tina Tuominen by Jonathan Marc Streisfeld (Streisfeld, Jonathan) (Entered: 10/12/2023) |
|---|---|---|
| 10/16/2023 | [15](#) | MOTION by Plaintiff Tina Tuominen to stay *Joint Motion to Stay All Proceedings Pending JPML Determination* <br><br> (Klinger, Gary) (Entered: 10/16/2023) |
| 10/16/2023 | [16](#) | ATTORNEY Appearance for Defendant Johnson & Johnson Consumer, Inc. by Shannon M. Barrett (Barrett, Shannon) (Entered: 10/16/2023) |
| 10/16/2023 | [17](#) | NOTIFICATION of Affiliates pursuant to Local Rule 3.2 by Johnson & Johnson Consumer, Inc. (Barrett, Shannon) (Entered: 10/16/2023) |
| 10/17/2023 | [18](#) | MINUTE entry before the Honorable Nancy L. Maldonado:The joint motion to stay all proceedings pending JPML determination [15](#) is granted for the reasons stated in the motion. The deadlines to respond to the Complaint and to file a joint initial status report by 12/12/23 [8](#) are stayed. The initial status hearing on 12/19/23 [8](#) is stricken. If this case is not transferred to multidistrict litigation, the parties shall file a joint initial status report within 14 days of the ruling by the Judicial Panel on Multidistrict Litigation. (ca, ) (Entered: 10/17/2023) |
| 12/06/2023 | [19](#) | TRANSFER ORDER signed 12/6/23 by Panel on Multidistrict Litigation. (gcy, ) (Entered: 12/06/2023) |
| 12/08/2023 | [20](#) | MINUTE entry before the Honorable Nancy L. Maldonado: This case will not be transferred to multidistrict litigation. See Dkt. [19](#) . The stay on deadlines is lifted, and the following deadlines shall apply: A Rule 16 initial status hearing is set for 1/16/24 at 10:30 a.m. in person in Courtroom 1925. By 1/9/24 the parties shall file a joint Initial Status Report that complies with the Court's standing order, which can be found on the Court's website. Defendant's responsive pleading is due 1/5/24. (ca, ) (Entered: 12/08/2023) |
| 12/18/2023 | [21](#) | ATTORNEY Appearance for Defendant Johnson & Johnson Consumer, Inc. by Bradley Joseph Andreozzi (Andreozzi, Bradley) (Entered: 12/18/2023) |
| 12/18/2023 | [22](#) | ATTORNEY Appearance for Defendant Johnson & Johnson Consumer, Inc. by Sophie Honey Gotlieb (Gotlieb, Sophie) (Entered: 12/18/2023) |
| 12/20/2023 | [23](#) | MOTION by Defendant Johnson & Johnson Consumer, Inc. Joint Motion for Modification of Case Schedule <br><br> (Andreozzi, Bradley) (Entered: 12/20/2023) |
| 12/21/2023 | [24](#) | MINUTE entry before the Honorable Nancy L. Maldonado:The joint motion for modification of case schedule [23](#) is granted in part in light of Plaintiff's intention to amend the complaint. Plaintiff's amended complaint is now due 1/12/24; Defendant to answer or otherwise respond by 2/26/24. The Court strikes the 1/16/24 initial status hearing and the 1/9/24 status report dates. Instead, the initial status hearing is set for 4/9/24 at 10:00 a.m. in person in Courtroom 1925; the joint Initial Status Report is due 4/2/24. (ca, ) (Entered: 12/21/2023) |
| 12/28/2023 | [25](#) | ANNUAL REMINDER: Pursuant to [Local Rule 3.2 (Notification of Affiliates),](#) any nongovernmental party, other than an individual or sole proprietorship, must file a statement identifying all its affiliates known to the party after diligent review or, if the party has identified no affiliates, then a statement reflecting that fact must be filed. An affiliate is defined as follows: any entity or individual owning, directly or indirectly (through ownership of one or more other entities), 5% or more of a party. The statement is to be electronically filed as a PDF in conjunction with entering the affiliates in CM/ECF as |

| | | prompted. As a reminder to counsel, parties must supplement their statements of affiliates within thirty (30) days of any change in the information previously reported. This minute order is being issued to all counsel of record to remind counsel of their obligation to provide updated information as to additional affiliates if such updating is necessary. If counsel has any questions regarding this process, this LINK will provide additional information. Signed by the Executive Committee on 12/28/2023: Mailed notice. (tg, ) (Entered: 12/28/2023) |
|---|---|---|
| 01/09/2024 | 26 | ATTORNEY Appearance for Plaintiff Tina Tuominen by Russell Busch (Busch, Russell) (Entered: 01/09/2024) |
| 01/12/2024 | 27 | AMENDED complaint by Tina Tuominen against Johnson & Johnson Consumer, Inc. (Suciu, Nick) (Entered: 01/12/2024) |

# Complaint, Amended Complaint, and Docket Sheet in *Riccio v. Pfizer*

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| ROSE RICCIO, on behalf of herself and all others similarly situated,<br><br> Plaintiff,<br><br>v.<br><br>PFIZER, INC.,<br><br> Defendant. | **CLASS ACTION COMPLAINT**<br>**JURY TRIAL DEMANDED**<br><br>Case No.: |

Plaintiff, Rose Riccio, on behalf of herself and all others similarly situated, brings this class action against Defendant, Pfizer, Inc. ("Defendant" or "Pfizer"), and alleges on personal knowledge, investigation of counsel, and on information and belief as follows:

## GENERAL ALLEGATIONS

1. Pfizer offers a variety of non-prescription drugs, including oral nasal decongestants, competing in a billion-dollar industry. Such products include the over the counter oral nasal decongestants "Robitussin Adult MAXIMUM STRENGTH– Severe Multi-Symptom Cough Cold + Flu," "Robitussin Adult MAXIMUM STRENGTH– Severe Multi-Symptom Cough Cold + Flu Nighttime," and "Robitussin Adult MAXIMUM STRENGTH– Severe Multi-Symptom Cough Cold + Flue – Day and Night Value Pack" (collectively, "Products" or "Robitussin PE Products"). These Products are phenylephrine hydrochloride ("PE") nasal decongestant syrups marketed as "MAXIMUM STRENGTH" relief for "Nasal Congestion," "Body Aches," and "Fever."

2. The active decongestant ingredient is phenylephrine, which the weight of the reliable scientific evidence, as recently unanimously confirmed by a Food and Drug Administration ("FDA") committee, has determined to be no more effective as a nasal

decongestant than placebo.

3.    When consumers purchase decongestants and pain relief pills, the strength of the ingredients are important purchasing considerations, especially for consumers seeking a "MAXIMUM STRENGTH" product.

4.    Pfizer takes advantage of this consumer preference for strong relief by prominently representing the alleged strength of the Robitussin PE Products in the one place every consumer looks when purchasing a product—the front packaging.

5.    On each product package for the Products, Pfizer uniformly touts in capitalized, white font set against a red background on the front of the package that provides "MAXIMUM STRENGTH" relief and also misleadingly touts "MAXIMUM STRENGTH" as to their other active ingredient, acetaminophen, as a pain reliever::







6.     The Day & Night Cold Relief product also falsely touts it is "MAXIMUM STRENGTH" as to the other active ingredient, acetaminophen, as a body aches/fever reliever.

7.     By portraying the Robitussin PE Products as "MAXIMUM STRENGTH" decongestants and body aches/fever relievers, Pfizer misleads consumers into believing the ingredients are suited to providing the strongest decongestant and body aches/fever relief allowable over the counter.

8.     Despite marketing these Robitussin PE Products as "MAXIMUM STRENGTH," Pfizer knew the active nasal decongestant ingredient, phenylephrine hydrochloride, was not as strong as other decongestants. Indeed, studies have shown that phenylephrine hydrochloride is no

4

more effective than a placebo. Additionally, the Products do not even contain the maximum dosage of acetaminophen. and are thus not deserving of the "MAXIMUM STRENGTH" label and representation.

9.     Thus, this "MAXIMUM STRENGTH" packaging is misleading because nasal decongestants that are actually effective—without the "MAXIMUM STRENGTH" claim—are available. For example, both oxymetazoline and pseudoephedrine are both available without a prescription, and the former may be purchased over the counter.

10.     Further, Pfizer knew that higher doses of acetaminophen exist on the market. The Court need look no further than the manufacturing and marketing of acetaminophen products as "Regular Strength" for 325 mg and "Extra Strength" for 500 mg capsules, tablets, and gelcaps, taken, as with the Robitussin PE Product, in dosages of two each.

11.     Despite this knowledge, Pfizer chose to mislead consumers through its promotion of the Robitussin PE Products, with and without acetaminophen, as "MAXIMUM STRENGTH" decongestants and pain relievers. However, none of the Robitussin PE Products are "MAXIMUM STRENGTH." Consumers, including Plaintiff, lack the scientific knowledge necessary to determine whether the Robitussin PE Products are "MAXIMUM STRENGTH" decongestants and body aches/fever relievers, or to ascertain the true quality or strength of these Products. For that reason, reasonable consumers must and do rely on manufacturers, like Pfizer, to be honest and transparent and to properly disclose on the packaging all material information regarding the Products and strength.

12.     Rather than being honest and transparent, Pfizer makes this "MAXIMUM STRENGTH" representation in a knowingly false, misleading and deceptive manner.

13.     For all the reasons set forth herein, including, but not limited to, Pfizer's

5

misrepresentations and omissions regarding its "MAXIMUM STRENGTH" claims, Plaintiff seeks relief in this action individually, and as a class action on behalf of similarly situated purchasers of Pfizer's Robitussin PE Products, for: (1) violation of State consumer protection laws and (2) unjust enrichment.

## THE PARTIES

14.     Plaintiff is a citizen of Illinois, residing in the Village of Niles, within Cook County. She purchased Robitussin Severe Multi-Symptom Cough, Cold + Flu within the applicable statute of limitations period, most recently in 2023.

15.     Pfizer is a Delaware corporation with its principal place of business in New York. As such, Pfizer is a resident and citizen of New York.

## JURISDICTION AND VENUE

16.      This Court has personal jurisdiction over Pfizer in this matter. The acts and omissions giving rise to this action occurred in the state of Illinois. Pfizer has been afforded due process because it has, at all times relevant to this matter, individually or through its agents, subsidiaries, officers and/or representatives, operated, conducted, engaged in and carried on a business venture in this state and/or maintained an office or agency in this state, and/or marketed, advertised, distributed and/or sold the Products in this state, committed a statutory violation within this state related to the allegations made herein, and caused injuries to Plaintiff and the putative class members, which arose out of the acts and omissions that occurred in the state of Illinois, during the relevant time period, at which time Pfizer was engaged in business activities in the state of Illinois.

17.      This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C.§ 1332 of the Class Action Fairness Act of 2005 because: (i) there are 100 or more putative Class

members, (ii) the aggregate amount in controversy exceeds $5,000,000, exclusive of interest and costs, and (iii) there is minimal diversity because at least one Plaintiff and Pfizer are citizens of different states.

18.    Pursuant to 28 U.S.C. § 1391(a), venue is proper because a substantial part of the events giving rise to the claims asserted occurred in this District. Venue is also proper pursuant to 28 U.S.C. § 1391(c) because Pfizer conducts substantial business in this District, has sufficient minimum contacts with this District, and otherwise purposely avails itself of the markets in this District, through the promotion, sale, and marketing of the Robitussin PE Products in this District. Furthermore, Plaintiff Riccio resides in this District.

## FACTS COMMON TO ALL CLASS MEMBERS

20.    Pfizer is one of the largest drug manufacturing companies in the world. As such, Pfizer sells several OTC drugs, including the "Robitussin" branded line of products.

21.    Phenylephrine hydrochloride is the active ingredient in Pfizer's Robitussin PE Products for nasal decongestion. Acetaminophen is the active ingredient in the Robitussin PE Products that are the subject of this action as a pain reliever. When included, both form the basis for Pfizer's "MAXIMUM STRENGTH" misrepresentations on the Products' packaging, and overall advertising and marketing campaign.

22.    At all relevant times, Pfizer has marketed its Products in a consistent and uniform manner nationwide.

23.    As alleged above, the Robitussin PE Products represent that they are "MAXIMUM STRENGTH" relief for "Nasal Congestion," "Body Aches," and "Fever," which representations prominently appear on the front label of the Products in capitalized, white font set against a red background that contrasts with the background of the packaging. This instantly catches the eye of

7

all reasonable consumers, including Plaintiff and class members.

24.     A reasonable consumer would understand that "MAXIMUM STRENGTH" relief means the Products contained the strongest nasal decongestant available on the over the counter market, as well as the strongest dose of acetaminophen for pain relief.

25.     All reasonable consumers, including Plaintiff, read and relied on Pfizer's "MAXIMUM STRENGTH" representations when purchasing the Products. Indeed, when purchasing pharmaceuticals, especially those promising to be "MAXIMUM STRENGTH," consumers look for a product with the strongest active ingredients possible and are willing to pay a premium for them.

26.     Pfizer's "MAXIMUM STRENGTH" representation was material to Plaintiff's and class members' decision to purchase the Robitussin PE Products. Had consumers, such as Plaintiff, known the Robitussin PE Products were not "MAXIMUM STRENGTH" relief for "Nasal Congestion," "Body Aches," and "Fever," they would not have purchased the Products or would have paid less. Indeed, the only reason consumers purchase pharmaceuticals is for their advertised therapeutic effect. They want relief from their cold symptoms, and in this case, Plaintiff and the Class members purchased "MAXIMUM STRENGTH" based on Pfizer's false representations and omissions.

27.     Pfizer's marketing efforts are made in order to—and do in fact—induce consumers to purchase the Robitussin PE Products at a premium because consumers believe they are getting "MAXIMUM STRENGTH" decongestants. This deceives consumers because they are not informed that phenylephrine hydrochloride nasal decongestants are not "MAXIMUM STRENGTH" as compared to other, available decongestants.

28.     Pfizer, however, has at all relevant times been well aware that its PE Products are

8

not "MAXIMUM STRENGTH" nasal decongestants and that other, stronger decongestants are available.

29.     Starting in December 2007, the FDA convened a Nonprescription Drugs Advisory Committee ("NDAC") meeting, to address questions about phenylephrine's purported effectiveness.  On September 11 and 12, 2023, an advisory panel of the FDA met again to present its findings on scientific literature presented as to the effectiveness of phenylephrine hydrochloride (referred to by the FDA as "PE") as an oral nasal decongestant. The panel found: "[W]e have now come to the initial conclusion that orally administered PE is not effective as a nasal decongestant at the monographed dosage (10 mg of PE hydrochloride every 4 hours) as well as at doses up to 40 mg (dosed every 4 hours)."

30.     In 2015, in a well-publicized fashion, further independent research was submitted to the FDA requesting the PE be reclassified as not effective as a nasal decongestant.

31.     As a leading manufacturer of phenylephrine hydrochloride oral nasal decongestants, Defendant knew, or should have known, of the same scientific literature reviewed by the FDA. Nonetheless, it represents that the Robitussin PE Products are "MAXIMUM STRENGTH." This is particularly misleading because there exist other non-prescription nasal decongestants, which contain effective active ingredients, such as pseudoephedrine. Accordingly, consumers are induced into purchasing the Robitussin PE Products, based on the "MAXIMUM STRENGTH" representation, when comparing it to competing nasal decongestants.

32.     Nonetheless, because the Robitussin PE Products contain phenylephrine as the only active oral nasal decongestant ingredient, for that reason alone they are not "MAXIMUM STRENGTH" relief for "Nasal Congestion." Phenylephrine is not the "MAXIMUM STRENGTH" nasal decongestant available over the counter. Even Defendant offers other

9

Robitussin-branded decongestant with higher strength active decongestant ingredients.

33.     Further, the "MAXIMUM STRENGTH" representation in the Robitussin PE Products is misleading for yet another reason. The only active ingredient for "Body Aches/Fever" is 325 mg of acetaminophen, which is the equivalent of a "Regular Strength" acetaminophen tablet. Thus, the strength of the acetaminophen dosage is far below anything that can be considered "MAXIMUM STRENGTH," or as it is acetaminophen is commonly marketed as "Extra Strength."

34.     Pfizer intended for Plaintiff and Class members to be deceived or misled by its misrepresentations and omissions. Indeed, label space is limited, so manufacturers only place the most pertinent information on the front label. Defendant specifically labeled and marketed the Robitussin PE Products as "MAXIMUM STRENGTH" relief for "Nasal Congestion" "Body Aches," and "Fever," when other oral nasal decongestants were not marketed in a similar fashion.

35.     Pfizer's deceptive and misleading practices proximately caused harm to Plaintiff and the Classes.

36.     Plaintiff and Class Members would not have purchased the Robitussin PE Products, or would have paid less for them, had they known the truth about the mislabeled and falsely advertised products. Indeed, other, stronger nasal decongestants and higher acetaminophen doses are available.

## PLAINTIFF'S FACTUAL ALLEGATIONS

37.     Plaintiff relied on the "MAXIMUM STRENGTH" label in deciding to purchase what she believed to be the strongest nasal decongestant. Had Plaintiff known that phenylephrine, the only active oral nasal decongestant ingredient in Robitussin PE Products, is not the "MAXIMUM STRENGTH" nasal decongestant allowable over the counter, she would not have purchased it. Further, had she known the acetaminophen in the Robitussin PE Product was not the

maximum dosage available, she would not have purchased it.

38.     Plaintiff resides in Village of Niles, Illinois and is a citizen of Illinois. Throughout the relevant period, Plaintiff purchased the Products at issue in this lawsuit and was exposed to, and reasonably relied upon, Pfizer's "MAXIMUM STRENGTH" representations. Specifically, Plaintiff purchased Pfizer Robitussin Severe Multi-Symptom Cough, Cold + Flu from a local Walgreens and Jewel Osco located near her home in within Village of Niles, Illinois as recently as three months ago. At the time of purchase, Plaintiff reviewed the Product packaging, including the front-label representations, and reasonably believed from these representations that the Products were "MAXIMUM STRENGTH." In reasonable reliance on these representations, Plaintiff paid an increased cost for the Products, which were worth less than represented because the statements were not true and were highly misleading. The "MAXIMUM STRENGTH" representation on the Products' packaging, was part of the basis of the bargain in that Plaintiff attributed value to those representations and Plaintiff would not have purchased the Products, or would not have purchased them on the same terms, if she knew the "MAXIMUM STRENGTH" representations were untrue and/or misleading. Plaintiff paid a price premium for empty promises that Pfizer did not keep. Had Plaintiff been aware that the "MAXIMUM STRENGTH" representations made by Pfizer on the Products was untrue, she would have paid less for the Products, or would not have purchased them at all.

### FED. R. CIV. P. 9(B) ALLEGATIONS

39.     Pfizer made material misrepresentations and/or omissions of fact in its labeling and marketing of the Robitussin PE Products by representing that they are "MAXIMUM STRENGTH" decongestant and pain relief products.

40.     Pfizer's alleged conduct was and continues to be fraudulent because it has the effect

of deceiving consumers into believing that the Robitussin PE Products are "MAXIMUM STRENGTH" oral nasal decongestant products. Pfizer omitted from Plaintiff and Class members that the Robitussin PE Products are not "MAXIMUM STRENGTH" oral nasal decongestant products because other decongestant products exist in the market that are stronger as decongestants. Pfizer knew or should have known this information is material to all reasonable consumers and impacts consumers' purchasing decisions. Yet, Pfizer has and continues to represent that the Robitussin PE Products are "MAXIMUM STRENGTH" oral nasal decongestant products when they are not, and has omitted from the Robitussin PE Products' packaging the fact that there are other non-prescription products that are stronger decongestants. So too with respect to Pfizer's misrepresentations that Robitussin PE products are "MAXIMUM STRENGTH" with respect to pain relief, even though their acetaminophen content is only regular strength.

41.    Pfizer made material misrepresentations and/or omissions detailed herein, including that the Robitussin PE Products are "MAXIMUM STRENGTH" oral nasal decongestant and pain reliever, continuously throughout the applicable class period(s).

42.    Pfizer's material misrepresentations and omissions, that the Robitussin PE Products are "MAXIMUM STRENGTH" oral nasal decongestant and pain reliever products, were located on the front label of the Robitussin PE Products in capitalized, bold white lettering that contrasts with the red background of the packaging, which instantly catches the eye of all reasonable consumers, including Plaintiff and class members, at the point of sale in every transaction. Robitussin PE Products are sold in brick-and-mortar stores and online stores in Illinois and nationwide.

43.    Pfizer made written misrepresentations of fact on the front label of the Robitussin PE Products, that the Robitussin PE Products were "MAXIMUM STRENGTH" oral nasal

decongestant products and pain relievers, even though other stronger decongestant and body pain reliever products are available over the counter. As such, Pfizer's "MAXIMUM STRENGTH" representations are false and misleading. Moreover, Pfizer omitted from the Robitussin PE Products' labeling the fact that there are other non-prescription products available in the market that are stronger decongestants and pain relievers. And as alleged in detail throughout this Complaint, Plaintiff and class members read and relied on Pfizer's "MAXIMUM STRENGTH" representations and omissions before purchasing the Robitussin PE Products.

44.     Pfizer misrepresented its PE Products as being "MAXIMUM STRENGTH" decongestant and body aches/fever products and omitted from the Robitussin PE Products' labeling the fact that there are other, non-prescription products available in the market that are stronger decongestants and pain relievers, for the express purpose of inducing Plaintiff and Class members to purchase the inferior phenylephrine hydrochloride and acetaminophen products at a price premium. As such, Pfizer profited by selling the misrepresented products to at least thousands of consumers throughout the nation.

## CLASS ACTION ALLEGATIONS

45.     Plaintiff brings this action on behalf of themselves and the following "Classes" pursuant to Federal Rule of Civil Procedure 23(a), (b)(2) and/or (b)(3). Specifically, the Classes are defined as:

> **Nationwide Class**: All persons in the United States who purchased the Robitussin PE Products in the United States for personal use and not for resale during the applicable statute of limitations period.

> **Illinois Subclass**: All persons in the State of Illinois who purchased the Robitussin PE Products in the State of Illinois for personal use and not for resale during the applicable statute of limitations period.

> **Multi-State Consumer Protection Class:** All persons who purchased in the State

13

of Illinois or any state with similar laws[1] any of the Products, within the applicable statute of limitations, until the date notice is disseminated.

46.     Excluded from the Classes are (a) any person who purchased the Robitussin PE Products for resale and not for personal or household use, (b) any person who signed a release of any Pfizer in exchange for consideration, (c) any officers, directors or employees, or immediate family members of the officers, directors or employees, of any Pfizer or any entity in which a Pfizer has a controlling interest, (d) any legal counsel or employee of legal counsel for Pfizer, and (e) the presiding Judge in this lawsuit, as well as the Judge's staff and their immediate family members.

47.     Plaintiff reserves the right to amend the definition of the Classes if discovery or further investigation reveals that the Classes should be expanded or otherwise modified.

48.     **Numerosity – Federal Rule of Civil Procedure 23(a)(1).** Class members are so numerous and geographically dispersed that joinder of all class members is impracticable. While the exact number of class members remains unknown at this time, upon information and belief, there are thousands, if not hundreds of thousands, of putative class members.

49.     **Predominance of Common Questions of Law and Fact – Federal Rule of Civil Procedure 23(a)(2) and 23(b)(3).** Common questions of law and fact exist as to all Class members and predominate over any questions affecting only individual Class members. These common legal and factual questions include, but are limited to, the following:

---

[1] While discovery may alter the following, Plaintiff asserts that the other states with similar consumer fraud laws under the facts of this case include, but are not limited to: California (Cal. Bus. & Prof. Code § 17200*, et seq*.); Florida (Fla. Stat. §§ 501.201, *et seq*.); Illinois (815 ICLS §§ 505/1, *et seq*.); Massachusetts (Mass. Gen. Laws Ch. 93A, *et seq*.); Michigan (Mich. Comp. Laws §§ 445.901, *et seq*.); Minnesota (Minn. Stat. §§ 325F.67, *et seq*.); New Jersey (N.J. Stat. §§ 56:8-1, *et seq*.); New York (N.Y. Gen. Bus. Law §§ 349, *et seq*.); Washington (Wash. Rev. Code §§ 19.86.010, *et seq*.); *See Mullins v. Direct Digital, LLC*, No. 13-cv-1829, 2014 WL 5461903 (N.D. Ill. Sept. 30, 2014), *aff'd*, 795 F.3d 654 (7th Cir. 2015).

a.  Whether Pfizer made the "MAXIMUM STRENGTH" representations;

b.  Whether Pfizer promoted the Robitussin PE Products with false and misleading statements of fact and material omissions;

c.  Whether Pfizer's "MAXIMUM STRENGTH" representations are deceptive, unfair, or misleading to the reasonable consumer;

d.  Whether Pfizer's actions and/or omissions violate applicable laws;

e.  Whether Plaintiff and putative members of the Classes have suffered loss of monies or property or other value as a result of Pfizer's acts, omissions, or misrepresentations of material facts;

f.  Whether Pfizer was unjustly enriched at the expense of Plaintiff and members of the putative Classes in connection with the Robitussin PE Products ;

g.  Whether Plaintiff and members of the putative Classes are entitled to monetary damages and, if so, the nature of such relief; and

h.  Whether Plaintiff and members of the putative Classes are entitled to equitable, declaratory, or injunctive relief and, if so, the nature of such relief.

50.  **Typicality – Federal Rule of Civil Procedure 23(a)(3).** Plaintiff's claims are typical of those of the absent Class members in that Plaintiff and the Class members each purchased and used the Robitussin PE Products and each sustained damages arising from Pfizer's wrongful conduct, as alleged more fully herein. Plaintiff shares the aforementioned facts and legal claims or questions with putative members of the Classes, and Plaintiff and all members of the putative Classes have been similarly affected by Pfizer's common course of conduct alleged herein. Plaintiff and all members of the putative Classes sustained monetary and economic injuries including, but not limited to, ascertainable loss arising out of Pfizer's false and deceptive

15

"MAXIMUM STRENGTH" representations about the Robitussin PE Products, as alleged herein.

51.    **Adequacy – Federal Rule of Civil Procedure 23(a)(4).** Plaintiff will fairly and adequately represent and protect the interests of the members of the putative Classes. Plaintiff has retained counsel with substantial experience in handling complex class action litigation, including complex questions that arise in this type of consumer protection litigation. Further, Plaintiff and her counsel are committed to the vigorous prosecution of this action. Plaintiff does not have any conflicts of interest or interests adverse to those of putative Classes.

52.    **Insufficiency of Separate Actions – Federal Rule of Civil Procedure 23(b)(1).** Absent a class action, Plaintiff and members of the Classes will continue to suffer the harm described herein, for which they would have no remedy. Even if separate actions could be brought by individual consumers, the resulting multiplicity of lawsuits would cause undue burden and expense for both the Court and the litigants, as well as create a risk of inconsistent rulings and adjudications that might be dispositive of the interests of similarly situated consumers, substantially impeding their ability to protect their interests, while establishing incompatible standards of conduct for Pfizer. Accordingly, the proposed Classes satisfy the requirements of Fed. R. Civ. P. 23(b)(1).

53.    **Declaratory and Injunctive Relief – Federal Rule of Civil Procedure 23(b)(2).** Pfizer has acted or refused to act on grounds generally applicable to Plaintiff and all members of the Classes, thereby making appropriate final injunctive relief and declaratory relief, as described below, with respect to the members of the Classes as a whole.

54.    **Superiority – Federal Rule of Civil Procedure 23(b)(3).** A class action is superior to any other available methods for the fair and efficient adjudication of the present controversy for at least the following reasons:

a. The damages suffered by each individual member of the putative Classes do not justify the burden and expense of individual prosecution of the complex and extensive litigation necessitated by Pfizer's conduct;

b. Even if individual members of the Classes had the resources to pursue individual litigation, it would be unduly burdensome to the courts in which the individual litigation would proceed;

c. The claims presented in this case predominate over any questions of law or fact affecting individual members of the Classes;

d. Individual joinder of all members of the Classes is impracticable;

e. Absent a class, Plaintiff and members of the putative Classes will continue to suffer harm as a result of Pfizer's unlawful conduct; and

f. This action presents no difficulty that would impede its management by the Court as a class action, which is the best available means by which Plaintiff and members of the putative Classes can seek redress for the harm caused by Pfizer.

g. In the alternative, the Classes may be certified for the following reasons:

  (1) The prosecution of separate actions by individual members of the Classes would create a risk of inconsistent or varying adjudication with respect to individual members of the Classes, which would establish incompatible standards of conduct for Pfizer;

  (2) Adjudications of claims of the individual members of the Classes against Pfizer would, as a practical matter, be dispositive of the interests of other members of the putative Classes who are not parties to the adjudication and may substantially impair or impede the ability of other putative Class members to protect their

interests; and

(3) Pfizer has acted or refused to act on grounds generally applicable to the members

of the putative Classes, thereby making appropriate final and injunctive relief

with respect to the putative Classes as a whole.

### CLAIMS FOR RELIEF

### COUNT I
### VIOLATION OF ILLINOIS CONSUMER FRAUD
### AND DECEPTIVE BUSINESS PRACTICES ACT
(By Plaintiff on Behalf of the Illinois Subclass)

55.     Plaintiff realleges paragraphs 1-54 above as if fully set forth herein.

56.     Plaintiff brings this claim on behalf of herself and the Illinois Subclass.

57.     The Illinois Consumer Fraud and Deceptive Business Practices Act (the "ICFA"),

815 ILCS 505/1, et seq., prohibits "unfair methods of competition and unfair or deceptive acts or

practices, including but not limited to the use or employment of any deception, fraud, false

pretense, false promise, misrepresentation or the concealment, suppression or omission of any

material fact, with intent that others rely upon the concealment, suppression or omission of such

material fact or the use or employment of any practice described in Section 2 of the 'Uniform

Deceptive Trade Practices Act' . . . .".

58.     Plaintiff and the Illinois Subclass members were injured by Pfizer's deceptive

misrepresentations, concealments and omissions and these misrepresentations, concealments and

omissions were material and deceived Plaintiff and the Illinois Subclass. Because Plaintiff and

the Illinois Subclass members relied on Pfizer's misrepresentations, concealments and omissions

when purchasing the Products, they were injured at the time of purchase.

59.     Pfizer does business in Illinois, sells and distributes the Products in Illinois, and

engaged in deceptive acts and practices in connection with the sale of the Products in Illinois and

18

elsewhere in the United States.

60.     The Products purchased by Plaintiff and the Illinois Subclass members were "consumer items" as that term is defined under the ICFA.

61.     Pfizer engaged in unfair and deceptive acts in violation of 815 Ill. Comp. Stat. 505/2 when it misrepresented and deceptively concealed, suppressed and/or omitted the material information known to Pfizer as set forth above concerning its Products, which has caused damage and injury to Plaintiff and the Illinois Subclass members. Plaintiff and the Illinois Subclass members were injured by Pfizer's unfair and deceptive acts at the time of purchasing the Products.

62.     Pfizer's marking of Robitussin PE Products violates this prohibition by deceiving consumers into believing Robitussin PE is a "MAXIMUM STRENGTH" decongestant or pain reliever/fever reducer.

63.     Pfizer engaged in fraudulent and/or deceptive conduct, which creates a likelihood of confusion or of misunderstanding in violation of the Act.

64.     Pfizer engaged in misleading and deceptive advertising that represented that the Robitussin PE Products were MAXIMUM STRENGTH." Pfizer chose to package and market the products in this way to impact consumer choices and gain market dominance, as it knew or should have known that all consumers who purchased the products would be impacted by its omissions and would reasonably believe Pfizer's false and misleading "MAXIMUM STRENGTH" representations and omissions.

65.     Pfizer's deceptive acts occurred in a course of conduct involving trade and commerce in Illinois and throughout the United States.

66.     Pfizer intended Plaintiff and the Illinois Subclass members to rely on its deceptive acts when purchasing the Products.

19

67.     Pfizer's deceptive acts proximately caused actual injury and damage to Plaintiff and the Illinois Subclass members at the time of purchase.

68.     Plaintiff and the Illinois Subclass members would not have purchased, or would have paid less for, the Products but for Pfizer's material misrepresentations as described in this Complaint.

<u>**COUNT VI**</u>
**VIOLATION OF ILLINOIS UNIFORM DECEPTIVE TRADE PRACTICES ACT**
**(By Plaintiff on Behalf of the Illinois Subclass)**

69.     Plaintiff realleges paragraphs 1-54 above as if fully set forth herein.

70.     Plaintiff brings this claim on behalf of herself and the Illinois Subclass.

71.     The Illinois Deceptive Trade Practices Act ("UDTPA"), 815 Ill. Comp. Stat. 510/2, *et seq*., prohibits "[u]nfair methods of competition and unfair or deceptive acts or practices, including but not limited to the use or employment of any deception, fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of any material fact, with intent that others rely upon the concealment, suppression or omission of such material fact."

72.     815 ILCS 510/2 provides in pertinent part that a "person engages in a deceptive trade practice when, in the course of his or her business, vocation, or occupation," the person does any of the following: "(5) represents that goods or services have . . . uses, benefits or quantities that they do not have . . .; (7) represents that goods or services are of a particular standard, quality, or grade or that goods are a particular style or model, if they are of another; . . . [or] (12) engages in any other conduct which similarly creates a likelihood of confusion or misunderstanding."

73.     Pfizer's marking of Robitussin PE Products violates this prohibition by deceiving consumers into believing Robitussin PE is a "MAXIMUM STRENGTH" decongestant or body aches/fever reliver.

74.     Pfizer engaged in fraudulent and/or deceptive conduct, which creates a likelihood of confusion or of misunderstanding in violation of the Act.

75.     Pfizer engaged in misleading and deceptive advertising that represented that the Robitussin PE Products were MAXIMUM STRENGTH." Pfizer chose to package and market the Products in this way to impact consumer choices and gain market dominance, as it knew or should have known that all consumers who purchased the Products would be impacted by its omissions and would reasonably believe Pfizer's false and misleading "MAXIMUM STRENGTH" representations and omissions.

76.     Pfizer intended that Plaintiff and each of the other Illinois Subclass members would reasonably rely upon the material omissions concerning the true nature of the Robitussin PE Products.

77.     Pfizer's concealment, omissions, and other deceptive conduct were likely to deceive and cause misunderstanding and/or in fact caused Plaintiff and each of the other Illinois Subclass members to be deceived about the true nature of the Products.

78.     Pfizer's deceptive acts occurred in a course of conduct involving trade and commerce in Illinois and throughout the United States.

79.     Pfizer's deceptive acts proximately caused actual injury and damage to Plaintiff and the Illinois Subclass Members at the time of purchase.

80.     Plaintiff and the Illinois Subclass Members would not have purchased, or would have paid less for, the Products but for Pfizer's material misrepresentations as described in this Complaint.

81.     Pfizer intended Plaintiff and the Illinois Subclass members to rely on its deceptive acts when purchasing the Products.

## COUNT III
## VIOLATION OF STATE CONSUMER PROTECTION STATUTES
### (By Plaintiff on Behalf of the Multi-State Consumer Protection Class)

82.     Plaintiff incorporates paragraphs 1-54 as if fully set forth herein.

83.     Plaintiff brings this cause of action on behalf of herself and the Multi-State Consumer Protection Class.

84.     Plaintiff and Multi-State Consumer Protection Class members have been injured as a result of Pfizer's violations of the state consumer protection statutes listed above in paragraph 45 and footnote 1, which also provide a basis for redress to Plaintiff and Multi-State Consumer Class Members based on Defendant's fraudulent, deceptive, unfair and unconscionable acts, practices and conduct.

85.     Pfizer's conduct as alleged herein violates the consumer protection, unfair trade practices, and deceptive acts laws of each of the jurisdictions encompassing the Multi-State Consumer Class.

86.     Pfizer violated the Multi-State Consumer Class states' consumer protection, unfair trade practices, and deceptive acts laws through its misleading and deceptive advertising that represented that the Robitussin PE Products were "MAXIMUM STRENGTH." Pfizer chose to package and market the Products in this way to impact consumer choices and gain market dominance, as it knew or should have known that all consumers who purchased the Products would be impacted by its omissions and would reasonably believe Defendant's false and misleading "MAXIMUM STRENGTH" representations and omissions.

87.     Pfizer's misrepresentations were material to Plaintiff and Multi-State Consumer Class members' decision to purchase the Robitussin PE Products or pay a premium for the Robitussin PE Products.

88.     Pfizer made its untrue and/or misleading statements and representations willfully, wantonly, and with reckless disregard for the truth.

89.     As a result of Pfizer's violations of the aforementioned states' unfair and deceptive practices laws, Plaintiff and Multi-State Consumer Class members paid a premium for the Products.

90.     As a result of Defendant's violations, Pfizer has been unjustly enriched.

91.     Pursuant to the alleged consumer protection, unfair trade practices, and deceptive acts laws, Plaintiff and Multi-State Consumer Class members are entitled to recover compensatory damages, restitution, punitive and special damages, including but not limited to statutory or treble damages, reasonable attorneys' fees, and costs, and other injunctive or declaratory relief as deemed appropriate or permitted pursuant to the relevant law.

**COUNT IV**
**UNJUST ENRICHMENT**
**(By Plaintiff, In the Alternative, and on Behalf of the Nationwide and/or Illinois Subclass)**

92.     Plaintiff realleges paragraphs 1-54 above as if fully set forth herein.

93.     Plaintiff brings this cause of action on behalf of herself, the Nationwide Class, and/or the Illinois Subclass. It is alleged it the alternative to the extent there is no adequate remedy at law.

94.     Plaintiff and the putative class members conferred a benefit on Pfizer when they purchased the Robitussin PE Products. By its wrongful acts and omissions described herein, including selling the Robitussin PE Products containing the "MAXIMUM STRENGTH" representations, which did not conform to the promises or affirmations of fact made on the label, Pfizer was unjustly enriched at the expense of Plaintiff and the putative class members.

95.     Plaintiff's detriment and Pfizer's enrichment were related to and flowed from the wrongful conduct challenged in this Complaint.

23

96.     Pfizer has profited from its unlawful, unfair, misleading, and deceptive practices at the expense of Plaintiff and the putative class members under circumstances in which it would be unjust for Pfizer to be permitted to retain the benefit. It would be inequitable for Pfizer to retain the profits, benefits, and other compensation obtained from their wrongful conduct as described herein in connection with selling the Robitussin PE Products.

97.     Pfizer has been unjustly enriched in retaining the revenues derived from class members' purchases of the Robitussin PE Products, which retention of such revenues under these circumstances is unjust and inequitable because Pfizer marketed, advertised, distributed, and sold the Robitussin PE Products, and Pfizer misrepresented the nature of the products, misrepresented their benefits and attributes, and knowingly marketed and promoted the Robitussin PE Products with "MAXIMUM STRENGTH" representations, which caused injuries to Plaintiff and the Classes because they would not have purchased the Robitussin PE Products based on the same representations if the true facts concerning the Robitussin PE Products had been known.

98.     Plaintiff and the putative class members have been damaged as a direct and proximate result of Pfizer's unjust enrichment because they would not have purchased the Robitussin PE Products on the same terms or for the same price had they known the true nature of the Robitussin PE Products and the misstatements regarding the strength of the Robitussin PE Products' active ingredient.

99.     Pfizer either knew or should have known that payments rendered by Plaintiff and the Class members were given and received with the expectation that the "MAXIMUM STRENGTH" representations made by Pfizer in advertising and on the PE Products' labels and packaging were true. It is inequitable for Pfizer to retain the benefit of payments under these circumstances because the "MAXIMUM STRENGTH" representations are not true.

24

100.     Plaintiff and the putative Class members are entitled to recover from Pfizer all amounts wrongfully collected and improperly retained by Pfizer.

101.     As a direct result of Pfizer's wrongful conduct and unjust enrichment, Plaintiff and the putative Class members are entitled to restitution of, disgorgement of, and/or imposition of a constructive trust upon all profits, benefits, and other compensation obtained by Pfizer for their inequitable and unlawful conduct.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, individually and on behalf of all others similarly situated members of the Classes, prays for relief and judgment, including entry of an order:

A.     Declaring that this action is properly maintained as a class action, certifying the proposed Classes, appointing as Class Representative and appointing Plaintiff's counsel as Class Counsel;

B.     Directing that Pfizer bear the costs of any notice sent to the Classes;

C.     Declaring that Pfizer must disgorge, for the benefit of the Classes, all or part of the ill-gotten profits they received from the sale of the Robitussin PE Products, or order Pfizer to make full restitution to Plaintiff and the members of the Classes;

D.     Awarding restitution and other appropriate equitable relief;

E.     Granting an injunction against Pfizer to enjoin it from conducting its business through the unlawful, unfair, and fraudulent acts or practices set forth herein;

F.     Granting an Order requiring Pfizer to fully and appropriately recall the Products and/or to remove the claims on its website and elsewhere, including "MAXIMUM STRENGTH" representations regarding the Robitussin PE Products;

G.     Ordering a jury trial and damages according to proof;

H.    Awarding Plaintiff and members of the Classes compensatory and punitive damages, or statutory damages, as provided by the applicable state consumer protection statutes invoked above;

I.    Enjoining Pfizer from continuing to engage in the unlawful and unfair business acts and practices as alleged herein;

J.    Awarding attorneys' fees and litigation costs to Plaintiff and members of the Class(es);

K.    Awarding civil penalties, prejudgment interest, and punitive damages as permitted by law; and

L.    Ordering such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury of all claims in this Complaint so triable.

Dated: September 18, 2023          Respectfully submitted,

By: */s/ Gary Klinger*

Gary M. Klinger
**MILBERG COLEMAN BRYSON PHILLIPS GROSSMAN, PLLC**
227 W. Monroe Street, Suite 2100
Chicago, IL 60606
Telephone: (866) 252-0878
Email: gklinger@milberg.com

Nick Suciu III
**MILBERG COLEMAN BRYSON PHILLIPS GROSSMAN, PLLC**
6905 Telegraph Rd., Suite 115
Bloomfield Hills, MI 48301
Telephone: (313) 303-3472
Email: nsuciu@milberg.com

Jeff Ostrow
Jonathan M. Streisfeld
Kristen Lake Cardoso
Daniel Tropin*
**KOPELOWITZ OSTROW P.A.**
One West Las Olas Blvd., Suite 500
Fort Lauderdale, Florida 33301
Telephone: (954) 525-4100
Email: ostrow@kolawyers.com
       streisfeld@kolawyers.com
       cardoso@kolawyers.com

Melissa S. Weiner
Ryan J. Gott
**PEARSON WARSHAW, LLP**
328 Barry Avenue South, Suite 200
Wayzata, Minnesota 55391
Telephone: (612) 389-0600
Email: mweiner@pwfirm.com
       rgott@pwfirm.com

Erin Ruben
**MILBERG COLEMAN BRYSON**
**PHILLIPS GROSSMAN PLLC**
900 W. Morgan Street
Raleigh, NC 27603
Telephone: (919) 600-5000
Email: eruben@milberg.com

J. Hunter Bryson
**MILBERG COLEMAN BRYSON**
**PHILLIPS GROSSMAN, PLLC**
405 E 50th Street
New York, NY 10022
Telephone: (630) 796-0903
Email: hbryson@milberg.com

Karl Amelchenko*
**MILBERG COLEMAN BRYSON**
**PHILLIPS GROSSMAN, PLLC**
900 W. Morgan Street
Raleigh, NC 27603
Telephone: (919) 600-5000
Email: kamelchenko@milberg.com

Jimmy Mintz*
**MILBERG COLEMAN BRYSON**
**PHILLIPS GROSSMAN, PLLC**
201 Sevilla Ave., 2nd Floor
Coral Gables, FL 33134
Telephone: (786) 876-8200
Email: jmintz@milberg.com

*Attorneys for Plaintiff*

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| ROSE RICCIO, PAUL MATEER and WILLIAM MITCHELL, on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>HALEON US HOLDINGS LLC d/b/a HALEON,<br><br>Defendant. | **AMENDED CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED**<br><br>Case No.: 23-CV-13843 |

Plaintiffs, Rose Riccio, Paul Mateer, and William Mitchell on behalf of themselves and all others similarly situated, bring this class action against Defendant, Haleon US Holdings LLC d/b/a Haleon ("Haleon"), and allege on personal knowledge, investigation of counsel, and on information and belief as follows:

## GENERAL ALLEGATIONS

1.      Haleon offers a variety of over-the-counter drugs, including oral nasal decongestants, competing in a billion-dollar industry. Such products include the over-the-counter oral nasal decongestants and pain relievers/fever reducers under the brand names Robitussin, Theraflu, and Contac ("Products"). In the past, each of these brands was manufactured, marketed, and sold by another pharmaceutical manufacturer, but Haleon is the current owner of these brands. Haleon holds all potential liabilities related to the allegations herein, including for the manufacturing, marketing, and sale of the Products prior to the transaction through which Haleon agreed to hold the potential liabilities of the predecessor manufacturers of the Products.

2.      All of the Products are oral phenylephrine hydrochloride ("PE") nasal decongestant syrups or tablets, some contain acetaminophen as another active ingredient, and all the Products are marketed as "MAXIMUM STRENGTH," "MAX," and/or "ExpressMAX" (sometimes collectively referred to as the "Maximum Strength Representation").

3.      When consumers purchase decongestants and pain relief/fever reducer pills, the strength of the ingredients is an important purchasing consideration, especially for consumers seeking a maximum strength product.

4.      Haleon takes advantage of this consumer preference for strong relief by prominently representing the alleged strength of the Products in the one place every consumer looks when purchasing a product—the front packaging.

5.      On each product package for the Products, Haleon uniformly touts in capitalized, font set against a contrasting color background on the front of the package the Products provide maximum strength relief.

6.      The Robitussin products that contain PE and/or acetaminophen include: Adult MAXIMUM STRENGTH – Severe Multi-Symptom Cough Cold + Flu; Adult MAXIMUM STRENGTH – Severe Multi-Symptom Cough Cold + Flu Nighttime; and Adult MAXIMUM STRENGTH – Severe Multi-Symptom Cough Cold + Flue – Day and Night Value Pack (collectively, "Robitussin Products").[1] They are marketed as "MAXIMUM STRENGTH" and "MAX" relief for "Sore Throat," "Nasal Congestion," "Runny Nose," "Body Aches," and "Fever."

---

[1] Based upon reasonable investigation, Plaintiffs have identified certain Robitussin Products that contain PE, and at times, acetaminophen, and are also labeled as "MAXIMUM STRENGTH" and "MAX." The complete list of Robitussin Products is in the exclusive control of Haleon and will be the subject of discovery. Robitussin Products includes all substantially similar Robitussin products, manufactured, marketed, and sold during the relevant class periods, that contained PE and acetaminophen were labeled as "MAXIMUM STRENGTH" and "MAX."

2





3







**Drug Facts**

**Active ingredients (in each 20 ml)**      **Purposes**

Acetaminophen, USP 650 mg .................... Pain reliever/Fever reducer
Dextromethorphan HBr, USP 20 mg ........................ Cough suppressant
Guaifenesin, USP 400 mg ........................................ Expectorant
Phenylephrine HCl, USP 10 mg .......................... Nasal decongestant

**Uses**

- temporarily relieves these symptoms occurring with a cold or flu:
  - cough due to minor throat and bronchial irritation
  - nasal congestion
  - sinus congestion and pressure
  - minor aches and pains
  - sore throat
  - headache
- temporarily reduces fever
- helps loosen phlegm (mucus) and thin bronchial secretions to drain bronchial tubes and make coughs more productive

**Warnings**

**Liver warning:** This product contains acetaminophen. Severe liver damage may occur if you take

- more than 6 doses in any 24-hour period, which is the maximum daily amount
- with other drugs containing acetaminophen
- 3 or more alcoholic drinks every day while using this product

**Allergy alert:** acetaminophen may cause severe skin reactions. Symptoms may include:

- skin reddening
- blisters
- rash

If a skin reaction occurs, stop use and seek medical help right away.

**Sore throat warning:** If sore throat is severe, persists for more than 2 days, is accompanied or followed by fever, headache, rash, nausea, or vomiting, consult a doctor promptly.

**Do not use**

- if you are now taking a prescription monoamine oxidase inhibitor (MAOI) (certain drugs for depression, psychiatric, or emotional conditions, or Parkinson's disease), or for 2 weeks after stopping the MAOI drug. If you do not know if your prescription drug contains an MAOI, ask a doctor or pharmacist before taking this product.
- with any other drug containing acetaminophen (prescription or nonprescription). If you are not sure whether a drug contains acetaminophen ask a doctor or pharmacist

**Ask a doctor before use if you have**

- liver disease
- heart disease
- high blood pressure
- thyroid disease
- diabetes
- trouble urinating due to an enlarged prostate gland
- cough that occurs with too much phlegm (mucus)
- a breathing problem or chronic cough that lasts or as occurs with smoking, asthma, chronic bronchitis, or emphysema

**Ask a doctor or pharmacist before use if you are**

- taking the blood thinning drug warfarin
- taking any other oral nasal decongestant or stimulant
- taking any other pain reliever/fever reducer

**When using this product do not use more than directed**

**Stop use and ask a doctor if**

- you get nervous, dizzy, or sleepless
- pain, cough, or nasal congestion gets worse or lasts more than 7 days
- fever gets worse or lasts more than 3 days
- redness or swelling is present
- new symptoms occur
- cough comes back or occurs with rash or headache that lasts. These could be signs of a serious condition.

**If pregnant or breast-feeding,** ask a health professional before use.
**Keep out of reach of children.** In case of overdose, get medical help or contact a Poison Control Center right away. Prompt medical attention is critical for adults as well as for children, even if you do not notice any signs or symptoms

**Directions**

- do not take more than 6 doses in any 24-hour period
- do not exceed recommended dosage. Taking more than the recommended dose (overdose) may cause serious liver damage.
- measure only with dosing cup provided
- keep dosing cup with product
- ml = milliliter
- this adult product is not intended for use in children under 12 years of age

| age | dose |
|---|---|
| adults and children 12 years and over | 20 ml every 4 hours |
| children under 12 years | do not use |

**Other information**

- each 20 ml contains: sodium 14 mg
- store at 20-25°C (68-77°F)

**Inactive ingredients**

anhydrous citric acid, edetate disodium, FD&C red no. 40, glycerin, menthol, natural and artificial flavors, polyethylene glycol, propyl gallate, propylene glycol, purified water, sodium benzoate, sodium citrate, sorbitol solution, sucralose, triacetin, xanthan gum

**Questions or comments?**

call weekdays from 9 AM to 5 PM EST at **1-800-762-4675**

---

7.      The Theraflu products that contain PE and/or acetaminophen include: ExpressMax

Nighttime Severe Cold & Cough Syrup, ExpressMax Daytime Severe Cold & Cough Syrup, and

ExpressMax Severe Cold & Flu Syrup (collectively, "Theraflu Products").[2] They are marketed as

---

[2] Based upon reasonable investigation, Plaintiffs have identified certain Theraflu Products that contain PE, and at times, acetaminophen, and are also labeled as "ExpressMax." The complete list of Theraflu Products is in the exclusive control of Haleon and will be the subject of discovery. Theraflu Products includes all substantially similar Theraflu products, manufactured, marketed,

"ExpressMax" relief for "Nasal Congestion," "Sore Throat Pain," "Runny Nose," "Headache," "Body Ache," and/or "Fever."





___

and sold during the relevant class periods, that contained PE and acetaminophen were labeled as "ExpressMax" or with another synonymous Maximum Strength Representation.